IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                No. CR 07-706 JB

BILLY GIANGOLA,

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's Amended Motion to Dismiss Indictment Without Prejudice on the Basis that the Current United States Attorney has been Unconstitutionally Appointed, filed January 30, 2008 (Doc. 44)("Motion").  The Court held a hearing on April 25, 2008.  The primary issues are: (i) whether the Court should reach the constitutional issues that Defendant Billy Giangola raises, or dismiss the indictment against Giangola, given that the indictment was secured during the tenure of a prior, executive-appointed United States Attorney and was signed by an Assistant United States Attorney; (ii) whether the judicial appointment of Gregory Fouratt under 28 U.S.C. § 541(d) violates the Appointments Clause of the United States Constitution; (iii) whether the judicial appointment of Mr. Fouratt under 28 U.S.C. § 541(d) violates the separation-of-powers doctrine; and (iv) whether the judicial appointment of Mr. Fouratt under 28 U.S.C. § 541(d) is unconstitutional as applied to this case. Because the indictment is valid, regardless of how the Court decides the constitutional issues, the Court will deny Giangola's request that the Court dismiss the indictment.  Because the Court concludes that it should address Giangola's constitutional arguments, the Court finds that § 541(d)

is not unconstitutional under the specific arguments that Giangola raises, and because the Court finds that Mr. Fouratt's judicial appointment is not unconstitutional, under Giangola's facial or as-applied challenges to 28 U.S.C. § 541(d), pursuant to the Appointments Clause and the separation-of-powers doctrine, the Court will deny Giangola's motion.

## FACTUAL BACKGROUND

Former United States Attorney David C. Iglesias resigned his position effective February 28, 2007.  See United States' Response to Motion to Dismiss Indictment on the Basis that the Current United States Attorney Has Been Unconstitutionally Appointed at 5, filed February 13, 2008 (Doc. 47)("Response").   In the immediate wake of Iglesias' resignation, First Assistant United States Attorney Larry Gomez became Acting United States Attorney under the Vacancies Reform Act, 5 U.S.C. § 3345(a)(1).  See Response at 5.  On September 26, 2007, Acting Attorney General Peter Keisler appointed Mr. Gomez as United States Attorney pursuant to 28 U.S.C. § 546(a).  See Response at 5.

## PROCEDURAL BACKGROUND

Giangola was indicted before Mr. Fouratt was judicially appointed.  See  Indictment, filed April 10, 2007 (Doc. 1)(Court Only)("Indictment"). The indictment was secured under Mr. Gomez' tenure, and an Assistant United States Attorney signed the indictment.   See Indictment at 2. The question is whether Mr. Fouratt should be allowed to participate in the prosecution of  this case given the way that he secured his current position.

### 1.    The Background of Giangola's Case.

As the changes in the United States Attorney's Office have occurred, the Assistant United States Attorneys have continued to carry out their duties, including presenting cases to the grand jury.  On April 10, 2007, during Mr. Gomez' term as United States Attorney, a grand jury returned

the indictment against Giangola.  See Indictment at 1.  An Assistant United States Attorney, whom the Attorney General duly appointed to his position, signed the indictment.  See id. at 2.

### 2.      Mr. Fouratt's Appointment as United States Attorney.

By law, Mr. Gomez' appointment as United States Attorney expired after 120 days.  See 28 U.S.C. § 546(c)(2).  On January 25, 2008, a majority of the Article III judges of the United States District Court for the District of New Mexico, acting sua sponte, exercised the Court's authority under 28 U.S.C. § 546(d) and appointed Mr. Fouratt as the United States Attorney for the District of New Mexico.   See Administrative Order (dated January 25, 2008), available at http://www.nmcourt.fed.us/web/DCDOCS/dcindex.html.   One active judge abstained from the discretionary appointment and one active judge dissented from the Court's exercise of its power to appoint.  See id. at 1.

### 3.      Motion to Dismiss.

On January 30, 2008, Giangola filed a motion to dismiss his indictment without prejudice premised on Mr. Fouratt's appointment.  See Motion 1.  Giangola requests that the Court dismiss the indictment on the basis that a United States Attorney, who has been unconstitutionally appointed, is pursuing the prosecution.  See id.  Giangola argues that the Court's recent appointment of Mr. Fouratt under 28 U.S.C. § 546(d) as the United States Attorney for the District of New Mexico is unconstitutional.  See id.   Specifically, Giangola contends that Mr. Fouratt's appointment offends the Appointments Clause of the Constitution, Art. II, § 2, cl. 2, see Motion at 2-3, and violates the constitutional principle of separation of powers, both facially and as applied, see id. at 4-9.  As part of his motion, however, Giangola does not argue that the return of the indictment was in any way invalid.

Giangola argues that Mr. Fouratt's appointment by the district court violated the separation-

of-powers doctrine.  See Motion at 4-9.  Giangola contends that under, the test that Justice Scalia articulated in Morrison v. Olson, 487 U.S. 654, 697 (1988)(Scalia, J., dissenting), Mr. Fouratt's appointment was unconstitutional.  See Motion at 7.   He argues that Mr. Fouratt is "ultimately accountable to the judiciary, not the president."  Id.

While Giangola acknowledges that Mr. Fouratt is an "inferior" officer under the United States Constitution, id., he nevertheless argues that Mr. Fouratt's appointment violates the Appointments Clause of the United States Constitution, see id. at 8.  Giangola "asserts that the Appointments Clause is violated when a collage of Article III judges appoint the individual who has the responsibility to ensure that the laws of the United States are faithfully executed, yet who will keep his job only if he placates the very same supposedly neutral and detached judicial officers." Id. at 9.  Giangola argues that the district court appointment of Mr. Fouratt is incongruous with the constitutional function of the judiciary.  See Defendant's Reply to the United States' Response to Motion to Dismiss Indictment on the Basis that the Current United States Attorney Has Been Unconstitutionally Appointed at 1-10, filed February 20, 2008 (Doc. 49)("Reply").  Giangola argues that, because Mr. Fouratt has important decisions to make in his case, "including whether to offer a plea or whether to dismiss the case, or whether to seek a superseding indictment," 28 U.S.C. § 546(d) is constitutionally infirm as applied to his case.  Reply at 10.

The United States responded to Giangola's motion on February 13, 2008.  See Response. The United States argues that the appointment of Mr. Fouratt did not violate the Appointments Clause because: (i) United States Attorneys are inferior officers under the Appointments Clause and (ii) the Supreme Court of the United States has already concluded that judicial appointment of prosecutors is not incongruous with judicial functions.  See Response at 7 (citing Morrison v. Olson, 487 U.S. at 676-77).  The United States argues that the United States Court of Appeals for the First

Circuit provided the proper standard for determining whether the appointment of Mr. Fouratt violated separation of powers in United States v. Hilario, 218 F.3d 19, 26 (1st Cir. 2000), cert. denied., 531 U.S. 1014 (2000).  See Response at 12.

Under the inquiry in United States v. Hilario, the court must: (i) ask whether Congress, in vesting the power to appoint interim United States Attorneys in the district court, conferred upon the judges a power that usurped the prerogatives of another branch of government and, thus, effected an unconstitutional accumulation of power within the Judicial Branch;  and (ii) ask whether the exercise of the power to appoint somehow impedes the proper functioning of the Judicial Branch. See United States v. Hilario, 218 F.3d at 27.  The United States contends that 28 U.S.C. § 546(d) only "gives the district court a limited power of appointment, [and] . . . does not grant the district court any authority to supervise or remove an interim United States Attorney."  Response at 13-14. The United States argues that the appointment of Mr. Fouratt does not "impugn the judiciary's institutional integrity."  Response at 15 (internal quotations omitted).

Finally, the  United States contends that Giangola's "as applied" argument fails because Mr. Fouratt is accountable to the Executive Branch, not the district court.  Response at 17-18.  The United States also notes that Giangola does not explain why dismissal of his indictment is a valid remedy for his claimed constitutional injury because he "offers no explanation as to why a validly obtained indictment, filed during the tenure of a duly appointed United States Attorney, should be dismissed if a subsequent United States Attorney is defectively appointed."  Id. at 19.

At the April 25, 2008 hearing, the parties indicated that they wanted the Court to decide this motion on the briefing and did not wish to have a hearing on the motion.  See Transcript of Hearing

(taken April 25, 2008)("Tr.") at 4:15-5:8 (Court, Ortega & Oliveros).[1]

## LAW REGARDING THE POSITION OF THE UNITED STATES ATTORNEY

While a United States Attorney is important in his or her district, importance does not answer the question whether the position is a principal or inferior office. Rather, the Court must look carefully at the details of the statutory framework that governs the appointment, removal, and supervision of United States Attorneys. While there have been recent changes, certain features of the current statutory framework have remained consistent over the last one hundred years.

### 1.    Role and Powers of United States Attorneys.

Title 28, Section 547 of the United States Code enumerates a United States Attorney's responsibility to prosecute criminal cases that the United States brings, to prosecute and defend civil cases in which the United States is a party, and to collect debts owed to the United States that cannot be collected through administrative means. See 28 U.S.C. § 547. United States Attorneys serve as the chief federal law enforcement official within each of the nation's ninety-four judicial districts. See 28 U.S.C. § 541(a) ("The President shall appoint, by and with the advice and consent of the Senate, a United States attorney for each judicial district."); Nadler v. Mann, 951 F.2d 301, 305 (11th Cir. 1992)("A United States Attorney . . . is the chief federal law enforcement official for the judicial district he serves and is responsible for the prosecution of all offenses against the United States within his district.")(citing 28 U.S.C. §§ 541 and 547). The scope and scale of federal-law enforcement expanded dramatically during the twentieth century. See, e.g., Bonner, The Federalization of Crime: Too Much of a Good Thing?, 32 U. Rich. L. Rev. 905, 920-25 (1998). Accordingly, the United States Attorney has the ability to affect the lives of almost every citizen of

---

[1] The Court's citations to the transcript of the hearing refer to the Court Reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

his or her district.

With a few exceptions, the United States Attorneys have been delegated the authority to make the important and sensitive decisions that drive criminal prosecutions.  See 28 U.S.C. § 547(1) (vesting United States Attorneys with authority to "prosecute for all offenses against the United States").  "With law enforcement comes discretion . . . ."  Wiener, Inter-Branch Appointments After the Independent Counsel: Court Appointment of United States Attorneys, 86 Minn. L. Rev. 363, 369 (2001).  Federal prosecutors have broad discretion.  "For example, U.S. Attorneys routinely decide whether to focus limited investigative and prosecutorial resources on petty criminals, white-collar criminals, loan sharks, cyberspace pirates, or violent street gangs."  Id. at 366.  These judgments are informed by the United States Attorney's prosecutorial philosophy, and his or her assessment of the particular problems and vulnerabilities.  See Wiener, supra at 366 n.12 (citing Executive Office for the U.S. Attorneys, U.S. Dep't of Justice, U.S. Attorneys Annual Statistical Report 1 (2000)("Each United States Attorney is responsible for establishing law enforcement priorities within his or her district.")).  See also Executive Office for the U.S. Attorneys, U.S. Dep't of Justice, United States Attorneys Annual Statistical Reports for 2002 through 2006, available at http://www.usdoj.gov/usao/reading_room/ foiamanuals.html.

For most cases, "the prosecutorial discretion of the U.S. Attorney is vast and unchecked by any formal, external constraints or regulatory mechanisms."  Frase, The Decision to File Federal Criminal Charges: A Quantitive Study of Prosecutorial Discretion, 47 U. Chi. L. Rev. 246, 303 (1980).

> U.S. Attorneys exercise the entire range of prosecutorial discretion literally on a daily basis.  For example, on behalf of the United States, U.S. Attorneys routinely decide what crimes grand juries will investigate; what evidence and witnesses will be presented to the grand jury; whether to pursue an investigation, or to close one; what charges will be brought, against whom, and on how many counts; and whether

charges will be dropped or reduced in exchange for a guilty plea and cooperation. Further, through the inevitable rationing of limited resources, U.S. Attorneys set the federal law enforcement agenda for their districts by determining which crimes are worth major investigative resources, which crimes are better left to the state criminal justice systems, when justice will be served by leniency, and what magnitude of fraud deserves to be prosecuted.

Wiener, supra at 382-83. See United States v. Luttrell, 923 F.2d 764 (9th Cir. 1991)(holding that probable cause or reasonable suspicion are not prerequisites for initiating investigations of individuals); Levenson, Working Outside the Rules: The Undefined Responsibilities of Federal Prosecutors, 26 Fordham Urb. L.J. 553, 560 (1999)("The law does not pretend to dictate when a prosecutor may open an investigation."). These discretionary powers led Attorney General, and later Associate Justice, Robert Jackson to conclude that "[t]he prosecutor has more control over life, liberty, and reputation than any other person in America." Attorney General Robert Jackson, The Federal Prosecutor, Address Delivered at the Second Annual Conference of United States Attorneys (April 1, 1940), reprinted in 24 J. Am. Judicature Soc'y 18 (1940).

> One of the greatest difficulties of the position of prosecutor is that he must pick his cases, because no prosecutor can even investigate all of the cases in which he receives complaints. . . . What every prosecutor is practically required to do is to select the cases for prosecution and to select those in which the offense is the most flagrant, the public harm the greatest, and the proof the most certain.

Id. at 18.

## 2.   Statutory History and Background of Appointing United States Attorneys.

The Appointments Clause of the United States Constitution provides:

He shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur; and he shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone,

in the Courts of Law, or in the Heads of Departments.

U.S. Const., art. II, § 2, cl. 3 (emphasis added).  Since 1789, federal law has mandated that the President of the United States, with the advice and consent of the United States Senate, appoints a United States Attorney.  See Parsons v. United States, 167 U.S. 324, 338-39 (1897).  Congress has vested the appointment of a United States Attorney in the President, with the advice and consent of the Senate.  See 28 U.S.C. § 541(a).  Congress has, however, provided by statute for appointment of a United States Attorney by the courts for more than half the life of the republic.  Congress first authorized the judicial appointment of interim United States Attorneys in 1863, vesting the Circuit Justice with power to fill a vacancy "until an appointment shall be made by the President, and the appointment has duly qualified, and no longer."  Act to Give Greater Efficiency to the Judicial System of the United States of March 3, 1863, 12 Stat. 768.  In 1898, Congress transferred this authority to the district courts, because "'the circuit justice is not always to be found in the circuit and time is wasted in ascertaining his whereabouts.'"  United States v. Sotomayor Vazquez, 69 F.Supp.2d 286, 295 (D.P.R. 1999)(quoting  H.R. Rep. No. 1317, 55th Cong., 2d Sess. 1 (1898)).

Since the Civil War, with the exception of a very brief hiatus from 2006 to 2007, Congress has continuously and intentionally vested the federal judiciary with a role in appointment of United States Attorneys.  See USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177, 120 Stat. 192.  For example, in 1985, the Department of Justice requested that Congress authorize the Attorney General to fill vacancies in the Offices of the United States Attorneys, but the statute that Congress adopted the next year permitted the Attorney General to make only a 120-day appointment, while retaining the judiciary's power to make appointments after this 120-day period had expired.  Compare 131 Cong.Rec. S9185-02 (July 9, 1985) with Pub. L. No. 99-646, Sec. 69, 100 Stat. 3592.  Thus, before 2006, Title 28, Section 546 of the United States Code delegated

appointment power to the Attorney General where a federal district's United States Attorney's office remained vacant.

The Attorney General's appointment power was, however, limited in candidacy and scope. An Attorney General could not appoint an individual whom the United States Senate had previously refused pursuant to its advice and consent responsibilities.  See 28 U.S.C. § 546(b).  Furthermore, an Attorney General's appointment lasted only until the President appointed a United States Attorney, but in no case was the Attorney General's appointee permitted to hold office beyond 120 days.  See 28 U.S.C. § 546(c).  If the Attorney General's appointment expired under the 120-day rule, the United States District Court had the power to appoint an interim United States Attorney until an appointment by the President, with presentment to the Senate, could be effected.  See 28 U.S.C. § 546(d).

The only brief break in the judiciary's appointment power since the Civil War came in 2006 with the passage of the USA PATRIOT Improvement and Reauthorization Act of 2005.  See Pub. L. No. 109-177, 120 Stat. 192.  In 2006, Congress struck the 120-day limitation of § 546(c)(2) and struck § 546(d) altogether.  See Pub. L. No. 109-177, 120 Stat. 192. Subsection (d) of § 546 had allowed the United States District Court to appoint an interim United States Attorney upon the expiration of the statutory 120-day period. See 28 U.S.C. § 546(d).

### 3.    The Current Statutory Appointment Process.

In 2007, Congress restored both the 120-day limitation upon the term of the Attorney General's appointee and the judiciary's power to make appointments of United States Attorneys in 28 U.S.C. § 546(d).  See Preserving United States Attorney Independence Act of 2007, Pub. L. 110-34, 121 Stat. 224.  Specifically, Congress amended 28 U.S.C. § 546 to reinstate the statutory language in effect until 2006.  See Preserving United States Attorney Independence Act of 2007,

Pub. L. 110-34, 121 Stat. 224.

Thus, when a United States Attorney's position is vacant, an interim United States Attorney may be appointed.  Congress has divided the responsibility for making interim appointments between the Attorney General and the district courts.  Section 546(d) now provides that district courts may appoint an interim United States Attorney  to serve "until the vacancy is filled."  28 U.S.C. § 546(d).   Section 541(d) still confers, however, the power to appoint United States Attorneys on the President. See 28 U.S.C. § 541(d).

Specifically 28 U.S.C. § 546 presently provides that:

(a) Except as provided in subsection (b), the Attorney General may appoint a United States attorney for the district in which the office of United States attorney is vacant.

(b) The Attorney General shall not appoint as United States attorney a person to whose appointment by the President to that office the Senate refused to give advice and consent.

(c) A person appointed as United States attorney under this section may serve until the earlier of--

(1) the qualification of a United States attorney for such district appointed by the President under section 541 of this title; or

(2) the expiration of 120 days after appointment by the Attorney General under this section.

(d) If an appointment expires under subsection (c)(2) of this section, the district court for such district may appoint a United States attorney to serve until the vacancy is filled. The order of appointment by the court shall be filed with the clerk of the court.

28 U.S.C. § 546.  The statute does not require the district court to appoint a United States Attorney once the 120-day period has run on the Attorney General's appointment.  See Wiener, supra at 399. "Instead, the statute provides that the district court 'may' make its own appointment." Id. (quoting 28 U.S.C. § 546(d)).  See United States v. Gantt, 194 F.3d 987, 1000 (9th Cir. 1999)(stating that "[t]he judicial branch is not required to appoint a United States Attorney; it is simply empowered

-11-

to do so.").

Mr. Ross Wiener, a Trial Attorney with the Department of Justice, notes that ambiguity exists concerning the Attorney General's appointment authority when no U.S. Attorney has been confirmed by the Senate at the end of the 120-day limit imposed by the statute. See Wiener, supra at 401.

> Because the statute limits the Attorney General-appointed U.S. Attorney's term to 120 days, the position is legally "vacant" after the 120 days have expired. The plain language of the statute appears to vest the Attorney General with the authority to appoint another U.S. Attorney. The paltry legislative history on § 546, however, implies that such a subsequent appointment by the Attorney General was not what Congress intended. As Congressman Berman stated on the floor of the House of Representatives, "[o]nce the appointment of an interim United States Attorney expires, the district court appoints a United States Attorney to serve until a presidentially appointed United States Attorney is qualified." . . . The Justice Department has taken the position that a second appointment by the Attorney General would be inappropriate because "[t]he statutory plan discloses a [c]ongressional purpose that after the expiration of the 120-day period further interim appointments are to be made by the court rather than by the Attorney General." . . . [T]he Department of Justice's Office of Legal Counsel argued that, if the President removed a court-appointed U.S. Attorney, then the Attorney General would have the power to appoint another U.S. Attorney. . . . These competing interpretations have never been reconciled because this authority has apparently never been tested.

Id. at 401-403 (citing Memorandum from Samuel A. Alito, Jr., Deputy Assistant Attorney General, Office of Legal Counsel, to William P. Tyson, Director, Executive Office for United States Attorneys 3 (Nov. 13, 1986)(on file with Wiener)); 132 Cong. Rec. 32707, 32806 (statement of Rep. Burman); Memorandum from Charles J. Cooper, Assistant Attorney General, Office of Legal Counsel, to Arnold I. Burns, Deputy Attorney General 1 (Apr. 15, 1980)(on file with Wiener)). Nevertheless, it appears clear that if the judiciary appoints a United States Attorney, the President remains able to appoint another United States Attorney.

It is important to note that, "[s]ince the Independent Counsel Act expired, the U.S. Attorney

remains the only executive-branch officer who[m] courts have the power to appoint." Wiener, supra

 at 363.  For example, Congress has not granted the district court authority to fill vacancies in the

office of the United States Marshal.  See 28 U.S.C. § 562.

### 4.    How Judicial Appointment Often Works.

Mr. Wiener, in his law review article, provides some information on how the process of

filling the United States Attorney vacancies proceeds after the 120-day appointment by the Attorney

General expires.  See Wiener, supra at 398-99.  Mr. Wiener states:

> In the usual course, very little changes upon the expiration of the 120-day term of the
> Attorney General's appointee.  This is because, as a matter of practice, the
> Department of Justice works behind the scenes to affect smooth transitions.  When
> a vacancy initially arises or is about to arise, where advance notice has been
> provided, representatives of the Attorney General contact the chief judge of the
> appropriate district court to explain the provisions dealing with the interim
> appointment of the U.S. Attorney.  The Department of Justice officials inform the
> chief district court judge of the Attorney General's likely appointee and solicit the
> judge's reaction. The Attorney General almost always selects a career Assistant U.S.
> Attorney from the district in which the vacancy arises.  Sometimes, though
> infrequently, the Attorney General selects a career prosecutor from Main Justice. By
> keeping the chief district court judge "in the loop" during the Attorney General's
> selection process and by choosing, in most instances, a career prosecutor with whom
> the judge is familiar, the Attorney General can reasonably expect that her appointee
> will continue to serve as U.S. Attorney at the expiration of the 120 days.  This may
> occur either through subsequent court appointment of the same individual or through
> court inaction that leaves the Attorney General's appointee, albeit precariously, in
> place.  Near the expiration of the Attorney General's appointee's 120-day tenure,
> representatives of the Attorney General send a letter to the chief district judge
> reminding the judge of the Court's authority to appoint another U.S. Attorney.  The
> letter also includes a proposed court order reappointing the Attorney General's
> appointee.

Id. at 399-400 (citing an interview with David Margolis and Bernie Delia, Associate Deputy

Attorneys General, in Washington, D.C. (December 28, 2000)(on file with Wiener)).

### 5.    History of Removal of United States Attorneys.

The power to remove a United States Attorney is vested exclusively in the President, who

may exercise that power for any reason.  See 28 U.S.C. § 541(c); Parsons v. United States, 167 U.S. 324, 331 (1895).  Thus, only the President can discharge a United States Attorney.  Accordingly, an interim United States Attorney must relinquish the position when a Presidential appointee becomes qualified, either through the nomination and confirmation process or through a recess appointment.  See In re: Farrow, 3 F. 112, 116 (C.C. N.D. Ga. 1880)(noting that predecessor statute authorizing judicial appointment of interim United States Attorney "was not to enable the circuit justice to oust the power of the president to appoint, but to authorize him to fill the vacancy until the president should act, and no longer").

### 6. Supervision of United States Attorneys.

The Attorney General's supervision of United States Attorneys in the modern era is pervasive.  This control began in 1861, when Congress first charged the Attorney General with the "general superintendence and direction of" United States Attorneys.  Act of August 2, 1861, Ch. 37, 12 Stat. 185.  Congress consolidated the Attorney General's control further in 1870 when Congress established the Department of Justice.  See An Act to establish the Department of Justice, 16 Stat. 164.  By 1888, the Supreme Court had observed that the Attorney General "has the authority, and it is made the duty, to supervise and conduct all suits brought by or against the United States . . . and all the district attorneys who do bring them in the various courts in the county are placed under his immediate direction and control."  United States v. San Jacinto Tin, 125 U.S. 273, 278-79 (1888).

The Attorney General continues to exercise control over United States Attorneys, as the First Circuit noted in United States v. Hilario:

> Congress has ceded to the Attorney General plenary authority over United States
> Attorneys.  See 28 U.S.C. § 519; see also id. § 516 (reserving litigation on behalf of
> the United States to officers of the Department of Justice "under the direction of the

> Attorney General"). . . .  The Attorney General can remove a United States Attorney from participation in particular cases whenever she believes that it would be "in the interests of the United States" to do so.  28 U.S.C. § 518(b).  Indeed, she is empowered to determine the location of a United States Attorney's offices, see id. § 545(b), to direct that he file reports, see id. § 547(5), to fix his salary, see id. § 548, to authorize his office expenses, see id. § 549, and to approve his staffing decisions, see id. § 550.

United States v. Hilario, 218 F.3d at 25.  The United States Attorney's Manual ("USAM") further outlines specific activities of the United States Attorneys that require approval from the Attorney General or his subordinates.  A few examples include: (i) recusal of a United States Attorney from a case, see USAM § 3-2.170; (ii) accepting or rejecting settlement offers in many civil cases, see 28 C.F.R. §§ 0.160 to 0.166; USAM § 5-7.620; (iii) initiating a grand jury investigation limited to tax violations, see USAM § 6-4.120; (iv) bringing a RICO prosecution, see USAM § 9-110.101; (v) obtaining immunity to compel a witness to testify, see USAM §§ 9-23.130, 9-90.020; (vi) obtaining search warrants in specified circumstances, see USAM §§ 9-13.420, 9-19.220, 9-90.210; (vii) bringing a federal prosecution based on acts involved in a prior state or federal proceeding, see USAM § 9-2.031; and (viii) seeking the death penalty in a criminal case, see USAM § 9-10.020.

Department of Justice policy sets forth numerous other actions that require United States Attorneys and Assistant United States Attorneys to consult with Department of Justice officials.  See USAM § 3-1.200 (Prior Approvals Requirement Chart regarding Executive Office for United States Attorneys);  USAM  § 4-1.600 (Prior Approvals Chart regarding Assignment of Responsibilities in Civil Matters); USAM § 5-2.000 (Prior Approvals Chart regarding Environment and Natural Resources Matters); USAM  § 6-2.000 (Prior Approvals Chart regarding Tax Matters); USAM  § 7-2.000 (Prior Approvals Chart regarding Antitrust Matters); USAM § 9-2.400 (Prior Approvals Chart regarding Criminal Matters).  Furthermore, with respect to appellate matters, the Solicitor General exercises substantial control over United States Attorneys.  For example, no United States

Attorney may prosecute an appeal without obtaining the Solicitor General's permission.  See 28 C.F.R. § 0.20; USAM § 2-1.000.  In Supreme Court matters, the Solicitor General must either conduct the litigation on behalf of the United States, or assign and supervise the matter.  See 28 C.F.R. § 0.20(a).  In addition, the Tax Division, the Civil Rights Division, and the Civil Division of the Department of Justice possess substantial authority to handle appellate litigation in civil matters that fall within their respective areas of responsibility.  See USAM §§ 2-3.200, 2-3.210, and 2-3.220.

7.      **The Nature of a Judicially Appointed United States Attorney.**

Both Giangola and the United States, at numerous places in their briefing, refer to Mr. Fouratt as an "interim" United States Attorney, but that characterization does not fully capture the uniqueness of his position.  In one sense, all United States Attorneys are interim; there will always be some replacement down the road.  In that sense, the word "interim" gives little meaning.  The Court also does not think "interim" has much meaning when applied to judicially appointed United States Attorneys.  While a judicially appointed United States Attorney serves until the President appoints, and the Senate confirms, a replacement, some judicially appointed United States Attorneys serve for years, and the reality is that Mr. Fouratt may serve at least until the new President is sworn in 2009.  Moreover, an appointment under § 546(d) confers upon the appointee all the powers of a United States Attorney.  See In re: Grand Jury Proceedings, 673 F.Supp. 1138, 1142 (D.Mass. 1987)(explaining that appointment under § 546(d) results in an "actual, fully empowered United States Attorney").  Accordingly, the Court will refer to Mr. Fouratt as a judicially appointed United States Attorney rather than an "interim" United States Attorney.

8.      **Indictments and Role of Assistant United States Attorneys**.

Indictments only need be signed by "an attorney for the government."  Fed. R. Crim. P.

7(c)(1).  Rule 54(c) of the Federal Rules of Criminal Procedure goes on to define the phrase "attorney for the government" as "the Attorney General, an authorized assistant of the Attorney General, a United States Attorney, [or] an authorized assistant of a United States Attorney . . . ." Fed. R. Crim. P. 54(c).

While 28 U.S.C. § 547(1) authorizes the United States Attorney to "prosecute for all offenses against the United States" in his or her district, this authority is not exclusive.  Id.  All the functions of the United States Attorney, including the power to prosecute, are also vested in the Attorney General, and the Attorney General has the power to supervise and direct United States Attorneys and Assistant  United States Attorneys in the discharge of their duties.  See 28 U.S.C. §§ 509, 515, and 519.  Moreover, the Attorney General, not the United States Attorney, appoints and removes Assistant United States Attorneys.  See 28 U.S.C. § 542(a) ("The Attorney General may appoint one or more assistant United States attorneys in any district where the public interest so requires.").

Accordingly, Assistant United States Attorneys derive their power to prosecute directly from the Attorney General, not from a United States Attorney.  While United States Attorneys supervise and direct the Assistant United States Attorneys assigned to their offices, it does not follow that Assistant United States Attorneys lack the power to prosecute in the absence of a duly-appointed United States Attorney.  Indeed, in the event of a vacancy in the office of the United States Attorney, Assistant United States Attorneys retain prosecutorial authority, as originally delegated to them by the Attorney General, subject to the supervision of the Attorney General and the Department of Justice.  See 28 U.S.C. § 519 (granting Attorney General the power to supervise Assistant United States Attorneys in the discharge of their duties).

### 9.      **Federal Public Defender**.

The United States Courts of Appeals appoint the Federal Public Defenders even though the

Federal Public Defender and his or her subordinates regularly represent clients in appellate cases. See 18 U.S.C. § 3006A(g)(2)(A).  Moreover, unlike United States Attorneys appointed under § 546(d), who are supervised exclusively by the Executive Branch, Federal Public Defenders are subject to oversight by the Court of Appeals after their appointment.  The Courts of Appeals set their salaries, direct how many attorneys work in their offices, and determine whether they will be reappointed after their four-year term expires.  See 18 U.S.C. § 3006A(g)(2)(A).  The Courts of Appeals may remove the Federal Public Defenders from office for "incompetency, misconduct in office or neglect of duty."  Id.

The District Court's Order Adopting Criminal Justice Act Plan, Misc. No. 1426, provides that the Court determines membership on the CJA Panel and retains removal power.  See CJA Order at 10-11 (dated May 10, 2004) ("The court shall approve attorneys for membership on the CJA Panel . . . .  Membership on the CJA Panel is a privilege and not a right and members of the CJA Panel serve at the pleasure of the court."), available at http://cms/ metadot/index.pl? iid=4367&isa= Item.  The Court exercises its discretion whether to appoint CJA counsel in individual cases.  See id. at 7.  The Court reviews and approves CJA panel attorneys' billings for legal services, permitting in camera hearings whether a claim for payment "should be cut or reduced."  Id. at 25-26.

## LAW REGARDING THE APPOINTMENTS CLAUSE

The United States Constitution provides that the President appoints principal officers and that Congress may decide who appoints "inferior" officers.  U.S. Const. Art. II, § 2, cl. 2.  While the Constitution has given the President power to appoint many officers, the Constitution gives Congress great discretion to decide how inferior officers are appointed.  The debate has thus largely focused on what offices are superior and what offices are inferior.

## LAW REGARDING CONSTRUCTION OF CONGRESSIONAL
## STATUTES IN CASES CHALLENGING THEIR CONSTITUTIONALITY

"[I]t is the duty of federal courts to construe a statute in order to save it from constitutional infirmities." Morrison v. Olson, 487 U.S. at 682 (citations omitted). "[T]he constitutional avoidance doctrine counsels us to adopt constructions of statutes to avoid decision of constitutional questions, not to deliberately create constitutional questions." McConnell v. Federal Election Comm'n, 540 U.S. 93, 280 n.12 (2003)(internal quotations omitted). "[T]he elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality." Gonzales v. Carhart, --- U.S. ---, 127 S.Ct. 1610, 1631 (2007)(internal quotations omitted). "The canon of constitutional avoidance . . . comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction; and the canon functions as a means of choosing between them." Spector v. Norwegian Cruise Line Ltd., 545 U.S. 119, 140 (2005)(internal quotations omitted).

1.      **The Appointments Clause.**

The Appointments Clause is designed to use the checks and balances of the constitutional structure to ensure a "higher quality of appointments." Edmond v. United States, 520 U.S. at 659. The Appointments Clause makes nomination and confirmation the requisite appointment protocol for what have come to be known as "principal officers" of the United States by allowing Congress to permit a limited class of officials to appoint "inferior officers" without the need for confirmation. Edmond v. United States, 520 U.S. 651, 659-61 (1997). Congress thus cannot delegate the appointment of "principal" officers to anyone other than the Executive Branch, but can validly delegate the appointment of "inferior" officers.

The Appointment Clause "is a bulwark against one branch aggrandizing its power at the

expense of another branch . . . by preventing the diffusion of the appointment power."  Ryder v. United States, 515 U.S. 177, 182 (1995)(internal quotations omitted).  The Appointments Clause dictates that the President, with the advice and consent of the Senate, possesses the sole authority to appoint "principal" officers of the United States.  Buckley v. Valeo, 424 U.S. 1, 132 (1976)(per curiam); United States v. Germaine, 99 U.S. 508, 509 (1878)("[The Clause] declares that the President shall nominate, and by and with the advice and consent of the Senate shall appoint, ambassadors, other public ministers and consuls, judges of the Supreme Court, and all other officers of the United States, whose appointments are not herein otherwise provided for and which shall be established by law.")(internal quotations omitted). On the other hand, Congress is empowered to authorize the appointment of "inferior" officers "in the President alone, in the Courts of Law, or in the Heads of Departments."  U.S. Const. Art. II, § 2, cl. 2.

"On its face, the language of this excepting clause admits of no limitation on interbranch appointments [of inferior officers].  Indeed, the inclusion of as 'they think proper' seems clearly to give Congress significant discretion to determine whether it is proper to vest appointment of, for example, executive officials in the 'courts of Law.'" Morrison v. Olson, 487 U.S. at 673 (quoting U.S. Const. Art. II, § 2, cl. 2.).  Thus, if the position is characterized as an inferior position, Congress has considerable discretion in how the position will be filled.

### 2.    Caselaw Defining Principal and Inferior Offices.

The Supreme Court has had relatively few occasions to define the difference between principal and inferior officers.  Most decisions have proceeded on an ad hoc analysis.

In Ex parte Siebold, 100 U.S. 371 (1870), the Supreme Court examined the court appointment of "judges of election," who watched the polls for congressional elections.  Id. at 373. The defendants, including Siebold, had been convicted of engaging in election fraud.  See id. at 377-

79.  The defendants appealed their convictions and challenged their own interbranch appointments as violative of the Appointment Clause.  See id. at 397.

The Supreme Court recognized, in Ex Parte Siebold, the validity of interbranch appointments and introduced the incongruity analysis to limit such appointments.  See id. at 398 ("[T]he duty to appoint inferior officers, when required thereto by law, is a constitutional duty of the courts; and in the present case there is no such incongruity in the duty required as to excuse the courts from its performance, or to render their acts void.").  The Supreme Court rejected the contention that appointment of supervisors of election by the Circuit Courts is an entirely executive function, and also rejected the contention "that no power can be conferred upon the courts of the United States to appoint officers whose duties are not connected with the judicial department of the government." Id. at 397.  The Supreme Court noted that the Constitution explicitly authorized courts to exercise appointive power.  See id. at 397-98.  Thus, where the law conferred appointive authority on the courts, it became a constitutional duty of the courts to make appointments unless there was "such an incongruity in the duty required as to excuse the courts from its performance, or to render their acts void." Id. at 398.  The Supreme Court determined that appointment of the election supervisors by the district court was not incongruous with appropriate judicial activity.  See id.

Two Supreme Court cases decided within ten years of each other -- Morrison v. Olson and Edmond v. United States -- illustrate the ad hoc nature of Appointments Clause jurisprudence and offer divergent approaches to distinguishing between principal and inferior officers.

**3.     Morrison v. Olson.**

Congress passed the Ethics in Government Act in 1978 as a reaction to the Watergate scandal in an "attempt to remove discretion over criminal investigations and prosecutions of high-level government officials from the political arena."  Wiener, supra  at 406. The Ethics in

Government Act of 1978 gave power to the Special Division, a court that the Congress created, to appoint an independent counsel.  The Supreme Court in Morrison v. Olson noted that the appointing judges were "ineligible to participate in any matters relating to an independent counsel they have appointed."  487 U.S. at 677.  See 28 U.S.C. § 49(f)("[N]o member of such division of the court who participated in a function conferred on the division under chapter 40 of this title involving an independent counsel shall be eligible to participate in any judicial proceeding concerning a matter which involves such independent counsel while such independent counsel is serving in that office or which involves the exercise of such independent counsel's official duties, regardless of whether such independent counsel is still serving in that office.").  The Supreme Court also explained that independent counsel were "subject to removal by a higher Executive Branch official." Morrison v. Olson, 487 U.S. at 671.  The Supreme Court further stated that, "[u]nlike other prosecutors, [the Independent Counsel had] no ongoing responsibilities that extend beyond the accomplishment of the mission that she was appointed for and authorized by the Special Division to undertake." Id. at 672.

    In Morrison v. Olson, the Supreme Court considered and reviewed, among other issues, the constitutionality of the independent counsel provisions of the Ethics in Government Act of 1978. In Morrison v. Olson, three former government officials challenged the authority of independent counsel appointed under provisions of the Ethics and Government Reform Act to issue subpoenas to compel their testimony.  See 487 U.S. at 654.  The former officials challenged the subpoenas as unconstitutional under the Appointments Clause of the United States Constitution.  See id. at 670-77.    The Supreme Court's decision in Morrison v. Olson ultimately rested on the distinction between "principal" and "inferior" officers of the United States.  The Supreme Court noted that the Appointments Clause divides all officers into two classes: inferior and principal.  See id. at 670-71.

"The line between 'inferior' and 'principal' officers is one that is far from clear, and the Framers provided little guidance into where it should be drawn." Id. at 671.

The Supreme Court in Morrison v. Olson emphasized the independent counsel's authority to perform certain limited duties, that the independent counsel's office is limited in jurisdiction, and that the office is limited in tenure. See id. at 671-72. The Supreme Court held that independent counsel are inferior officers. See id. at 673. It held the appointment of an independent counsel as that of an "inferior" officer and ultimately upheld the constitutionality of the Act's appointment provisions. Id. at 677.

The Supreme Court in Morrison v. Olson noted: "Lower courts have also upheld interim judicial appointments of United States Attorneys . . . and Congress itself has vested the power to make these interim appointments in the district courts." 487 U.S. at 677 (citing 28 U.S.C. § 546(d) and United States v. Solomon, 216 F.Supp. 835 (S.D.N.Y. 1963)). In holding the independent counsel to be an "inferior" officer, however, the Supreme Court demurred on delineating any specific test for "decid[ing] exactly where the line falls between" principal and inferior officers. Morrison v. Olson, 487 U.S. at 671.

**4.      Justice Scalia's Dissenting Opinion in Morrison v. Olson.**

Justice Kennedy took no part in the Morrison v. Olson decision. See Morrison v. Olson, 487 U.S. at 697. Justice Scalia was the sole justice to dissent. See id. (Scalia, J., dissenting). Justice Scalia concluded that the level of independence conferred on the Independent Counsel would demand the accountability ensured through presidential control. See id. at 707.

Starting from the proposition that law enforcement -- the power to prosecute individuals for legal transgressions -- is a "quintessentially executive function," id. at 706, Justice Scalia recognized that "the balancing of various legal, practical, and political considerations, none of which is absolute,

is the very essence of prosecutorial discretion," id. at 708.   In a significant recognition for determining the status of United States Attorneys, Justice Scalia stated that "[e]ven an officer who is subordinate to a department head can be a principal officer."  Id. at 722 (referring to debates at the Constitutional Convention).  Justice Scalia argued there is nothing "unusually limited about the independent's counsel's tenure" because "unlike most high-ranking Executive Branch officials, she continues to serve until she (or the Special Division) decides that her work is substantially completed."  Id. at 718.

Justice Scalia also did not agree with the majority that the independent counsel's scope of jurisdiction was small.  See id.  He stated:

> If the mere fragmentation of executive responsibilities into small departments suffices to render the heads of each of those compartments inferior officers, then Congress could deprive the President of the right to appoint his chief law enforcement officer by dividing up the Attorney General's responsibilities among a number of "lesser" functionaries.

Id.  In Justice Scalia's opinion, the pertinent analysis for whether an appointee is an "inferior" officer is whether that appointee is "subordinate."   Id. at 719-20.   "That 'inferior' means 'subordinate' is also consistent with what little we know about the evolution of the Appointments Clause."  Id. at 720.  Justice Scalia explained:

> As originally reported to the Committee on Style, the Appointments Clause provided no "exception"  from the standard manner of appointment (President with the advice and consent of the Senate) for inferior officers.  On September 15, 1787, the last day of the Convention before the proposed Constitution was signed, in the midst of a host of minor changes that were being considered, Gouverneur Morris moved to add the exceptions clause.  No great debate ensured; the only disagreement was over whether it was necessary at all.  Nobody thought it was a fundamental change, excluding from the President's appointment power and the Senate's confirmation power a category of officers who might function on their own, outside the supervision of those appointed in the more cumbersome fashion.  And it is significant that in the very brief discussion Madison mentions (as in apparent contrast to the "inferior officers" covered by the provision) "Superior Officers."  Of course one is not a "superior officer" without some supervisory responsibility, just as, I suggest, one is

> not an "inferior officer" within the meaning of the provision under discussion unless
> one is subject to supervision by a "superior officer."

Id. at 720 (internal citations omitted).  Justice Scalia argued "it is surely a <u>necessary</u> condition for inferior officer status that the officer be subordinate to another officer."  Id. at 722 (emphasis in original).  An appointee is not an inferior officer if she is not subordinate to another officer.  See id. at 723.

### 5.      The Implied Congruity Requirement or Incongruity Limitation.

In <u>Morrison v. Olson</u>, the Supreme Court stated: "We do not mean to say that Congress' power to provide for interbranch appointment of 'inferior offices' is unlimited."  487 U.S. at 675.  Notwithstanding the sweeping constitutional language in the excepting provision of the Appointments Clause, the Supreme Court has stated that even the Appointments Clause has limits if Congress decides to vest the appointment power of an "inferior" officer in a branch which creates an "incongruity" between the functions normally performed by that branch and its interbranch appointment power.  Id. at 675-76 (citing <u>Ex parte Siebold</u>, 100 U.S. at 398).

The Supreme Court has, however, already concluded that there is no "inherent incongruity about a court having the power to appoint prosecutorial officers."  <u>Morrison v. Olson</u>, 487 U.S. at 676.  "Indeed," the Supreme Court declared, "in light of judicial experience with prosecutors in criminal cases, it could be said that courts are especially well-qualified to appoint prosecutors."  <u>Id.</u> at 676 n.13.  The Supreme Court held that, because independent counsel are inferior officers, their appointment by a congressionally created federal court was not unconstitutional, because it did not create any "incongruity between the functions normally performed by the courts and the performance of their duty to appoint."  Id. at 676 (citing <u>Ex parte Siebold</u>, 100 U.S. at 398).

In <u>Morrison v. Olson</u>, the Supreme Court cited the district court's authority to appoint United

States Attorneys under § 546(d) in rejecting the contention that judicial appointment of prosecutors was "incongruous" with court functions:

> We have recognized that courts may appoint private attorneys to act as prosecutor for judicial contempt judgments. . . we approved court appointment of United States commissioners, who exercised certain limited prosecutorial powers. . . . In Siebold, as well, we indicated that judicial appointment of federal marshals, who are "executive officer[s]," would not be inappropriate. Lower courts have also upheld interim judicial appointments of United States Attorneys, and Congress itself has vested the power to make these interim appointments in the district courts . . . .

Morrison v. Olson, 487 U.S. at 676-77 (internal citations omitted).  The Supreme Court further acknowledged "the longstanding judicial practice of appointing defense attorneys for individuals who are unable to afford representation."  Id. at 677 n.14.   See 18 U.S.C. § 3006A(g)(2)(A) (providing for appointment of Federal Public Defender by the Court of Appeals of the Circuit).

The Supreme Court also rejected the contention that exercise of appointment power by the congressionally created federal court was in conflict with Article III of the United States Constitution.  See Morrison v. Olson, 487 U.S. at 679 n.16 ("We do not think that judicial exercise of the power to appoint, per se, is in any way inconsistent as a functional matter with the courts' exercise of their Article III powers.")(emphasis in original).

### 6.      Edmond v. United States.

Subsequently, in Edmond v. United States, the Supreme Court considered whether the Secretary of Transportation constitutionally appointed judges on the military's Coast Guard Court of Criminal Appeals ("CGCCA").  See 520 U.S. at 660-61.   Justice Scalia wrote the majority opinion. See id. at 653.  The constitutionality of the appointments hinged on whether the appointees were principal or inferior officers.  See at 660-61.

The Supreme Court first acknowledged that its "cases have not set forth an exclusive criterion for distinguishing between principal and inferior officers for Appointments Clause

purposes."  Id. at 661.  It noted that "[a]mong the offices [it has] found to be inferior are that of a district court clerk, an election supervisor, a vice consul charged temporarily with the duties of the consul, and a United States commissioner in a district court proceeding . . . [and] the independent counsel created by the provisions of the Ethics in Government Act of 1978."  Id. (internal citations and quotations omitted).  The Supreme Court explained:

> Generally speaking, the term "inferior officer" connotes a relationship with some higher ranking officer or officers below the President: Whether one is an "inferior" officer depends on whether he has a supervisor.  It is not enough that other officers may be identified who formally maintain a higher rank, or possess responsibilities of a greater magnitude. . . .  Rather, in the context of a Clause designed to preserve political accountability relative to important Government assignments, we think it evident that "inferior officers" are officers whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate.

Id. at 662-63.  The Supreme Court concluded in Edmond v. United States that the appointed judges were inferior officers "by reason of the supervision over their work exercised by the General Counsel of the Department of Transportation in his capacity as Judge Advocate General and the Court of Appeals for the Armed Forces."  Id. at 666.  The Supreme Court held the appointments constitutional.  See id.

Justice Souter filed a concurrence in Edmond v. United States, repeating Justice Scalia's admonition in Morrison v. Olson: "Having a superior officer is necessary for inferior officer status, but not sufficient to establish it."  520 U.S. at 667 (Souter, J., concurring)(citing Morrison v. Olson, 487 U.S. at 722 (Scalia, J., dissenting)).  After suggesting, in passing, that the Solicitor General may be a principal officer despite his statutory "inferiority" to the Attorney General, Justice Souter's approach to the principal-versus-inferior dilemma reverted to the Court's functional balancing test: "What is needed . . . is a detailed look at the powers and duties of these judges to see whether reasons favoring their inferior status within the constitutional scheme weigh more heavily than those

-27-

to the contrary." Id. at 668.  Justice Souter explained that a court should review a number of factors to determine if an officer is "inferior" "including tenure, jurisdiction, duties, and removal." Id. at 669.

Thus, while the Constitution gives Congress great discretion to decide how inferior officers are appointed, the ad hoc nature of Appointments Clause jurisprudence offers disparate approaches to distinguishing between principal and inferior officers.

## LAW REGARDING SEPARATION OF POWERS

The separation-of-powers doctrine is a separate limitation that the Supreme Court has recognized on Congress' ability to delegate appointment powers to entities other than the President. The doctrine's parameters, however, are imprecise.  Accordingly, the lower courts must compare their cases with care to the few precedents that the Supreme Court has provided.

### 1.     The Separation-of-Powers Doctrine.

Separation of powers is one of the foundations of the United States' federalist system.  "The Constitution [seeks] to divide the delegated powers of the new Federal Government into three defined categories, Legislative, Executive, and Judicial."  Bowsher v. Synar, 478 U.S. 714, 721 (1986).  The Supreme Court has, accordingly, given both voice and importance to the doctrine.  See Mistretta v. United States, 488 U.S. 361, 380 (1989)("This Court consistently has given voice to, and has reaffirmed, the central judgment of the Framers of the Constitution that, within our political scheme, the separation of governmental powers into three coordinate Branches is essential to the preservation of liberty."); Bowsher v. Synar, 478 U.S. at 722; I.N.S. v. Chadha, 462 U.S. 919, 951-52 (1983)("The Constitution sought to divide the delegated powers of the new federal government into three defined categories, legislative, executive and judicial, to assure, as nearly as possible, that each Branch of government would confine itself to its assigned responsibility. The hydraulic

-28-

pressure inherent within each of the separate Branches to exceed the outer limits of its power, even to accomplish desirable objectives, must be resisted.").  "The fundamental necessity of maintaining each of the three general departments of government entirely free from the control or coercive influence, direct or indirect, of either of the others, has often been stressed and is hardly open to serious question."  Humphrey's Ex'r v. United States, 295 U.S. 602, 629 (1935).

"While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government."  Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 635 (1952)(Jackson, J., concurring).  "That this system of divisions and separations of powers produces conflicts, confusion, and discordance at times is inherent, but it was deliberately so structured to assure full, vigorous, and open debate on the great issues affecting the people and to provide avenues for the operation of checks on the exercise of governmental power."  Bowsher v. Synar, 478 U.S. at 722.  "[T]he doctrine of separated powers serves to eliminate arrangements that threaten to permit one branch either to aggrandize its power or to encroach on functions reserved for another branch."  United States v. Hilario, 218 F.3d at 26 (citing Mistretta v. United States, 488 U.S. 361, 381-82 (1989)).

However, "the Framers did not require -- and indeed rejected -- the notion that the three Branches must be entirely separate and distinct."  Mistretta v. United States, 488 U.S. at 380.  The Appointments Clause enshrined the Framers' rejection of an absolutist position and authorizes Congress to make interbranch delegations of the inferior officer appointment power "as they think proper."  U.S. Const. Art. II, § 2 cl. 2.

Justice Scalia proposed a test, in his dissent in Morrison v. Olson, to measure the separation of powers between the branches of government and to ensure that the Executive Power was not emasculated:

It seems to me, therefore, that the decision of the Court of Appeals invalidating the
present statute must be upheld on fundamental separation of powers principles if the
following two questions are answered affirmatively: [i] Is the conduct of a criminal
prosecution (and of an investigation to decide whether to prosecute) the exercise of
purely executive power?  [ii] Does the statute deprive the President of the United
States of exclusive control over the exercise of that power?

487 U.S. at 705. Justice Scalia explained: "[The independent counsel] is vested with the full power

and independent authority to exercise all <u>investigative and prosecutorial</u> functions and powers of the

Department of Justice [and] the Attorney General."  Id. at 706 (internal quotations omitted,

alterations and emphasis in original). Justice Scalia emphasized that "[i]t is not for [the Supreme

Court] to determine, and [it has] never presumed to determine, how much of the purely executive

powers of government must be within the full control of the President.  The Constitution prescribes

that they all are."  Id. at 709 (emphasis in original).

## 2.      A "Bifurcated Inquiry."

In Mistretta v. United States, the Supreme Court stated:

Our constitutional principles of separated powers are not violated, however, by mere
anomaly or innovation. Setting to one side, for the moment, the question whether the
composition of the Sentencing Commission violates the separation of powers, we
observe that Congress' decision to create an independent rulemaking body to
promulgate sentencing guidelines and to locate that body within the Judicial Branch
is not unconstitutional unless Congress has vested in the Commission powers that are
more appropriately performed by the other Branches or that undermine the integrity
of the Judiciary.

488 U.S. at 385.  In Mistretta v. United States, the Supreme Court acknowledged that it has "sought

to give life to Madison's view of the appropriate relationship among the three coequal Branches."

 Id. at 380.  The Supreme Court explained:

Accordingly . . . while our Constitution mandates that "each of the three general
departments of government [must remain] entirely free from the control or coercive
influence, direct or indirect, of either of the others," Humphrey's Executor v. United
States, 295 U.S. 602, 629 . . . (1935), the Framers did not require -- and indeed
rejected -- the notion that the three Branches must be entirely separate and distinct.

Mistretta v. United States, 488 U.S. at 380.  Thus, "the greatest security against tyranny -- the accumulation of excessive authority in a single Branch -- lies not in a hermetic division among the Branches, but in a carefully crafted system of checked and balanced power within each Branch." Id. at 381.  The Supreme Court noted that it has "recognized the particular danger of the Legislative Branch's accreting to itself judicial or executive power," but "[b]y the same token, . . . have upheld statutory provisions that to some degree commingle the functions of the Branches, but that pose no danger of either aggrandizement or encroachment."  Id. at 382 (citing Morrison v. Olson, 487 U.S. 833 (1988)).  Further, "[i]n cases specifically involving the Judicial Branch, we have expressed our vigilance against two dangers: [i] that the Judicial Branch neither be assigned nor allowed tasks that are more properly accomplished by [other] branches, and, [ii] that no provision of law impermissibly threatens the institutional integrity of the Judicial Branch."  Mistretta v. United States, 488 U.S. at 383 (internal citations and quotations omitted).  The Supreme Court ultimately found the Sentencing Commission constitutional.  See id. at 384.  See also Young v. United States ex rel. Vuitton et Fils, 481 U.S. 787, 800-801 (1987)(explaining that courts have authority to appoint a private prosecutor for contempt proceedings because, "[w]hile contempt proceedings are sufficiently criminal in nature to warrant the imposition of many procedural protections, their fundamental purpose is to preserve respect for the judicial system itself. As a result, courts have long had, and must continue to have, the authority to appoint private attorneys to initiate such proceedings when the need arises.").

    **3.**      **Executive Branch Powers and Functions.**

    Article II, Section 1, Clause 1, of the United States Constitution provides that "[t]he executive Power shall be vested in a President of the United States of America."  U.S. Const. art. II, § 1, cl. 1.  As the Supreme Court stated in Nixon v. Fitzgerald, 457 U.S. 731 (1982): "[The President is] entrusted with supervisory and policy responsibilities of utmost discretion and

sensitivity.  These include the enforcement of federal law -- it is the President who is charged constitutionally to 'take Care that the Laws be faithfully executed.'"  Id. at 750 (quoting U.S. Const. art. II, § 3).   "[T]he President's constitutionally assigned duties include complete control over investigation and prosecution of violations of the law, and that the inexorable command in Article II is clear and definite: the executive power must be vested in the President of the United States." Morrison v. Olson, 487 U.S. at 710 (Scalia, J., dissenting).

The Constitution thus endows the President with the immense power to initiate criminal proceedings against individuals that may deprive them of life, liberty, and property.  See U.S. Const. art. II, § 3 (stating that the President "shall take Care that the Laws be faithfully executed.").  It is without question that governmental investigation and prosecution of crime is a quintessentially executive function.  See Heckler v. Chaney, 470 U.S. 821, 832 (1985)(noting that "the decision of a prosecutor in the Executive Branch not to indict . . . [is] a decision which has long been regarded as the special province of the Executive Branch, inasmuch as it is the Executive who is charged by the Constitution to take Care that the Laws be faithfully executed.")(internal quotations omitted); Buckley v. Valeo, 424 U.S. 1, 138-40 (1976)("The Commission's enforcement power, exemplified by its discretionary power to seek judicial relief, is authority that cannot possibly be regarded as merely in aid of the legislative function of Congress. . . . and it is to the President, and not to the Congress, that the Constitution entrusts the responsibility to take Care that the Laws be faithfully executed."); United States v. Nixon, 418 U.S. 683, 693 (1974)(explaining that, "the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case.").

## LAW REGARDING CONSTITUTIONAL CHALLENGES TO JUDICIALLY APPOINTED UNITED STATES ATTORNEYS

The courts that have examined the issues Giangola raises have uniformly rejected the

challengers' arguments. Indeed, it is difficult to find a single judge that has agreed with Giangola's arguments. On the other hand, the Court does not believe that Giangola's concerns lack any merit.

      1.     **United States Attorneys as "Inferior" Officers.**

The Supreme Court has not directly addressed the issue of judicially appointed United States Attorneys. The Supreme Court has come close, however, to saying that United States Attorneys are "inferior" officers. Myers v. United States, 272 U.S. 52, 159 (1926)(stating that Parsons v. United States, 167 U.S. 342 (1895), "conclusively establishe[d]" that a "United States attorney [was] an inferior officer"). In Myers v. United States, the question presented to the Supreme Court was "whether under the Constitution the President has the exclusive power of removing executive officers of the United States whom he has appointed by and with the advice and consent of the Senate." Id. at 106. In that context, the Supreme Court noted that a legislative decision of 1789, a "declaration that the power to remove officers appointed by the President and the Senate vested in the President alone," id. at 114, "applied to a United States attorney, an inferior officer," id. at 159.

In Parsons v. United States, the question was "whether the president of the United States has power to remove a district attorney, who has been duly appointed, when such removal occurs within the period of four years from the date of his appointment, and to appoint a successor to that officer by and with the advice and consent of the senate." 167 U.S. at 327. The Supreme Court quoted the Attorney General from 1847:

> No one over thought of maintaining that the inferior offices, so called in the constitution, should be held during life. The doubt which arose was whether the concurrence of the senate was not requisite to effect a removal in all cases where it is required to consummate the appointment. The power was finally affirmed to be in the president alone, by a majority of both houses of congress, after great deliberation, and, perhaps, one of the ablest discussions in the history of the country.

<u>Parsons v. United States</u>, 167 U.S. at 332.  The Supreme Court then explained why United States

Attorneys are removable by the President:

> By section 35, c. 20, Laws 1789, entitled "An act to establish the judicial courts of the United States," it was provided, among other things, as follows: "And there shall be appointed in each district a meet person learned in the law to act as attorney for the United States in such district, who shall be sworn or affirmed to the faithful execution of his office, whose duty it shall be to prosecute in such district all delinquents," etc. 1 Stat. 73, 92. No provision was made in the act for the removal of such officer.
>
> * * * *
>
> The provision for a removal from office at pleasure was not necessary for the exercise of that power by the president, because of the fact that he was then regarded as being clothed with such power in any event. Considering the construction of the constitution in this regard as given by the congress of 1789, and having in mind the constant and uniform practice of the government in harmony with such construction, we must construe this act as providing absolutely for the expiration of the term of office at the end of four years, and not as giving a term that shall last at all events for that time, and we think the provision that the officials were removable from office at pleasure was but a recognition of the construction thus almost universally adhered to and acquiesced in as to the power of the president to remove.

<u>Id.</u> at 338-39.

The Supreme Court's analysis in <u>Morrison v. Olson</u>, however, informs much of the recent

caselaw that has addressed the issue of judicially appointed United States Attorneys.  The Supreme

Court noted:  "Lower courts have also upheld interim judicial appointments of United States

Attorneys . . . and Congress itself has vested the power to make these interim appointments in the

district courts."  <u>Morrison v. Olson</u>, 487 U.S. at 677 (citing 28 U.S.C. § 546(d)).

**2.      Tenth Circuit Law on this Issue.**

The United States Court of Appeals for the Tenth Circuit has not addressed the issue of

judicially appointed United States Attorneys.  The Tenth Circuit has, however, addressed the

separation-of-powers doctrine and the Appointments Clause.  The Tenth Circuit has rejected an

argument "that the power of the SEC to commence a civil enforcement action in federal court is in violation of the separation of powers principle."   SEC v. Blinder, Robinson & Co.,Inc., 855 F.3d 677, 681 (10th Cir. 1988).

The Tenth Circuit in SEC v. Blinder, Robinson & Co.,Inc. noted made several conclusions regarding the SEC:

> First, as the President has the power to choose the chairman of the SEC from its commissioners to serve an indefinite term, it follows that the chairman serves at the pleasure of the President.  Second, as the chairman controls key personnel, internal organization, and the expenditure of funds, the chairman exerts far more control than his one vote would seem to indicate. Third, it can safely be assumed that in exercising his power of appointment, even as to commissioners who are not members of his party, the President will tend to appoint those persons who are sympathetic to his own views.

Id.  The Tenth Circuit explained that "[i]t is a matter of fundamental law that the Constitution assigns to Congress the power to designate duties of particular officers."  Id. at 682.  "The President is not obligated under the Constitution to exercise absolute control over our government executives. The President is not required to execute the laws; he is required to take care they be executed faithfully."  Id.  The Tenth Circuit concluded that, because the President has the power to appoint the SEC commissioners, choose the chairman of the SEC, who serves at the President's pleasure, and the power to remove the chairman, the President exercises sufficient control "and the removal restrictions do not impede the President's ability to perform his constitutional duty."  Id.  See In re Investment Bankers, Inc., 4 F.3d 1556, 1562-63 (10th Cir. 1993)(rejecting the argument that appointment of bankruptcy judges violates the Appointments Clause, because there was no impermissible intrusion on the President's appointment power and thus, no encroachment on separation of powers principles.).

3.      **Law from Other Jurisdictions.**

The challenged statute has withstood considerable constitutional scrutiny.    Other jurisdictions have held that a United States Attorney is an "inferior" officer and that the appointment of a United States Attorney by the judiciary is not unconstitutional.  See United States v. Sotomayor-Vasquez, 249 F.3d 1, 20 (1st Cir. 2001); United States v. Hilario, 218 F.3d at 21, 29; United States v. Gantt, 179 F.3d 782, 788-89 (9th Cir. 1999); United States v. Solomon, 216 F.Supp. at 840-43. Specifically, the lower courts have continued to find that United States Attorneys are inferior officers and therefore their appointments by district court judges are constitutional under both the Appointments Clause, the separation-of-powers doctrine and Article III of the United States Constitution.

In United States v. Solomon, a defendant challenged the validity of the information charging him based upon the appointment of the United States Attorney who signed it.  See 216 F.Supp. at 836.  The charge against the defendant

> was brought on by information (filed October 10, 1962), signed by Vincent L. Broderick, United States Attorney, who after the resignation of his former superior, Robert M. Morgenthau, was appointed by the judges of the United States District Court, Southern District of New York, by order dated September 5, 1962, as the interim United States Attorney, pursuant to the provisions of Section 506 of Title 28, United States Code.

216 F.Supp. at 836.  The language of 28 U.S.C. § 506 provided:  "'The district court for a district in which the office of United States attorney is vacant, may appoint a United States attorney to serve until the vacancy is filled.  The order of appointment shall be filed with the clerk of the court.'"  Id. (quoting 28 U.S.C. § 506).

The defendant in United States v. Solomon argued that the information was invalid because the district court judges' appointment of Mr. Broderick was unconstitutional as violative of the

separation-of-powers doctrine.  See 216 F.Supp. at 836.  The district court held that the appointment

of the United States Attorney did not violate the United States Constitution and the separation-of-

powers doctrine.  See id. at 840-43.  The district court reasoned that the Constitution vests Congress

with the power to make appointments.  See id. at 841 (citing U.S. Const. art. II, § 2, cl. 2).  It found

that Congress implemented that constitutional clause by passing 28 U.S.C. § 506.  See United States

v. Solomon, 216 F.Supp. at 841.  It reasoned that the Supreme Court rejected an argument that "no

power can be conferred upon the courts of the United States to appoint officers whose duties are not

connected with the judicial department of the government."  Id. (discussing Ex parte Siebold, 100

U.S. 371 (1879)). The district court's decision was also based upon the "temporary nature" of the

judiciary's power to appoint, and "the exercise of the appointive power by the judiciary in no wise

binds the executive" because "the executive branch is free to choose another United States Attorney

at any time . . . ."  United States v. Solomon, 216 F.Supp. at 842.

The District of Puerto Rico appointed a United States Attorney in 1993, resulting in multiple

opinions discussing the issue of judicial appointment under 28 U.S.C. § 546(d).  As explained by

the First Circuit in United States v. Hilario:

> Thus, when the United States Attorney for the District of Puerto Rico resigned in
> May of 1993, Attorney General Janet Reno appointed an Assistant United States
> Attorney (AUSA), Charles Fitzwilliams, to fill the resulting vacancy. Because the
> President failed to name a replacement within 120 days, Fitzwilliams' appointment
> lapsed and the position once again became vacant. On September 9, 1993, the judges
> of the United States District Court for the District of Puerto Rico responded to the
> exigency and appointed a career Justice Department lawyer, Guillermo Gil, as
> interim United States Attorney. Although more than six years have passed, the
> President has yet to nominate a United States Attorney. Thus, Gil continues to serve
> in an interim capacity.

218 F.3d at 21 (internal citations omitted).  "As the length of Gil's tenure increased, criminal

defendants began to challenge his authority. Most of these challenges failed."  Id. (citing United

States v. Torres-Rosa, 209 F.3d 4, 6 (1st Cir. 2000); United States v. Colon-Muñoz, 192 F.3d 210, 216 (1st Cir. 1999); United States v. Ruiz Rijo, 87 F.Supp.2d 69, 70-72 (D.P.R. 2000), aff'd sub nom by United States v. Valdez-Santana, 279 F.3d 143 (1st Cir. 2002); United States v. Santana, 83 F.Supp.2d 224, 230-32 (D.P.R. 1999); United States v. Sosa, 78 F.Supp.2d 20, 21 (D.P.R. 1999); United States v. Sotomayor Vazquez, 69 F.Supp.2d at 296.

In United States v. Sotomayor Vazquez, the district court held that "United States Attorneys, including interim United States Attorneys, are 'inferior' officers for Appointments Clause purposes." 69 F.Supp.2d at 291. The district court noted that "[t]he next conceivable challenge is that the Appointments Clause bars judicial appointment of interim United States Attorneys." Id. The district court found "this position to be patently unsupportable." Id. The district court noted that the "authority . . . codified at 28 U.S.C. § 546(d) . . . alone would seem to answer the question." United States v. Sotomayor Vazquez, 69 F.Supp.2d at 291.

The district court in United States v. Sotomayor Vazquez explained that interbranch appointments, "in which judicial officers appoint an executive official, are not inherently antithetical to the Appointments Clause." Id. at 292. The district court noted that the potential conflict of interest presented by having district courts appoint an interim United States Attorney was not an issue. See id. It rejected the argument that judicial appointment of a United States Attorney under 28 U.S.C. § 546(d) would violate separation of powers, because it found "the President retains all supervisory and removal controls over interim United States Attorneys" and that "the power to make certain appointments does not, by its very essence, interfere or abrogate [judges' adjudicatory role]." United States v. Sotomayor Vazquez, 69 F.Supp.2d at 294. Lastly, the district court noted that the history of appointment of interim United States Attorneys supported the constitutionality of 28 U.S.C. § 546(d):

In 1863, Congress began the practice at issue . . . by vesting the Circuit Justice with the authority to fill a vacancy in the office of United States Attorney until the President appointed a duly-qualified candidate.  Thirty-six years later, Congress transferred the power to the district courts because the circuit justice is not always to be found in the circuit and time is wasted in ascertaining his whereabouts.

* * * *

The only change in the structure occurred in 1995 after the Attorney General explicitly requested that the power to appoint interim United States Attorneys be transferred to his office.  Congress' reaction was the enactment of the current section 546(d) which vests the Attorney General with the power to appoint an interim United States Attorney subject to a one-hundred and twenty-day limitation, after which time the power is reserved to the district courts to make an interim appointment.  Thus, section 546(d), in its current form performs a dual function: It ensures that a crucial Executive office is not permitted to be vacant while at the same time providing an incentive for the President to exercise his statutory power under 28 U.S.C. § 541.

United States v. Sotomayor Vazquez, 69 F.Supp.2d at 295 (internal citations omitted).  See United States v. Hilario, 218 F.3d at 24-29 (holding that the United States Attorney appointed by the district court judges of the District of Puerto Rico, who had held the office for six years at the time of the challenge, did not violate the statutory scheme for United States Attorney appointments, that United States Attorneys are inferior officers under the Appointments Clause, and that the appointment did not violate separation of powers).

In United States v. Santana, the United States District Court for the District of Puerto Rico held that the judicial appointment of a United States Attorney by the district court judges of the District of Puerto Rico under 28 U.S.C. § 546(d) was not unconstitutional.  See 83 F.Supp. 2d at 231.  The court reasoned that it did not violate the Appointments Clause nor the separation-of-powers doctrine, because "section 546(d) is an essential analogue to the President's power to appoint" and appointment powers under 28 U.S.C. § 546(d) "are permissive, and the President, with the advice and consent of the Senate, at all times retains the power to essentially veto the judicially selected interim U.S. Attorney and appoint someone of his choosing."  Id.  See United States v.

-39-

<u>Sosa</u>, 78 F.Supp.2d at 21-22 (noting that judicial appointment of United States Attorney "under section 546(d) was <u>functus</u> <u>officio</u>, and [that the district courts have] had absolutely no oversight or control over the U.S. Attorney's Office since that act . . . . The supervision of [the United States Attorney's] position, as well as his tenure, lies entirely with the executive branch."). <u>See</u> <u>also</u> <u>In re:</u> <u>President's Commission on Organized Crime Subpoena of Scarfo</u>, 783 F.2d 370, 376 (3d Cir. 1986)(noting that "[f]lexibility in the power of appointment has persisted . . . . For example, in the event of a vacancy, a district court may appoint an acting United States Attorney, an executive officer, to serve until the President fills the office.")(citing 28 U.S.C. § 546); <u>United States v. Dehghani</u>, No. 06-0168-01-CR-W-GAF, 2007 WL 1796219 at * 5 (W.D.Mo. June 20, 2007)(noting that 28 U.S.C. § 546(d) has been deemed constitutional and "it seems settled that there is no Constitutional defect with the employment of a method for appointing a United States Attorney without the advice and consent of the Senate.")(citing <u>United States v. Hilario</u>, 218 F.3d at 24-29; <u>United States v. Solomon</u>, 216 F.Supp. at 840-43); <u>United States v. Cardarella</u>, No.07-00007-02/03-CR-W-FJG, 2007 WL 1545849 at *4 (W.D.Mo. May 29, 2007)(same); <u>Commonwealth of the Northern Mariana Islands v. Yi Xiou Zhen</u>, No. CRIM 99-338-D, 2002 WL 32983879 at *8-10 (N.Mar.I. Feb. 26, 2002)(rejecting defendant's contention that her conviction was invalid because it was commenced by an Acting Attorney General who had not been confirmed by the Senate)(citing <u>United States v. Whitehead</u>, 200 F.3d 634, 641 (9th Cir. 2000) and <u>United States v. Gantt</u>, 194 F.3d at 998).

In <u>United States v. Torres-Rosa</u>, 209 F.3d 4 (1st Cir. 2000), a defendant contended that the indictment against him should have been dismissed because the judicially appointed United States Attorney had continued to serve in that capacity for upwards of six years. <u>See</u> <u>id.</u> at 6. The defendant argued that he was "adopt[ing] the reasoning and authorities set forth by the parties in

other cases where the same, identical issue has been recently raised.")  Id. at 6 (internal quotations omitted).  The First Circuit refused to consider the defendant's argument because "[h]is lackadaisical attempt to incorporate by reference others' arguments thus did not adequately develop the status issue as it pertains to his appeal."  Id. at 7.

In United States v. Luciano Del Rosario, 90 F.Supp.2d 171 (D.P.R. 2000), the defendant moved to dismiss his indictment, contending that it was defective because the judicially appointed United States Attorney for the District of Puerto Rico was unconstitutional.  See id. at 172.  The defendant contended that the appointment violated the Appointments Clause, separation of powers, and congressional intent in enacting 28 U.S.C. §§ 541 (1966) and 546 (1986), and that the district court lacked subject-matter jurisdiction.  See United States v. Luciano Del Rosario, 90 F.Supp.2d at 172. The court rejected the defendant's argument.  See id. at 174 (citing  United States v. Sotomayor Vazquez, 69 F.2d at 288-92).  The court also rejected the defendant's argument that "it is 'incongruous' for the judiciary to appoint interim United States Attorneys because judges would be adopting a stance that is inapposite with their obligations of impartiality."  United States v. Luciano Del Rosario, 90 F.Supp.2d at 174 (citing United States v. Sotomayor Vazquez, 69 F.2d at 292-95).  The court did not reach the issue whether the district court would lack subject-matter jurisdiction because it held the interim appointment constitutional.  See United States v. Luciano Del Rosario, 90 F.Supp.2d at 175.

In rejecting Appointments-Clause arguments nearly identical to the one Giangola makes here, both the United States Court of Appeals for the Ninth Circuit in United States v. Gantt, 194 F.3d at 998-1000, and the First Circuit in United States v. Hilario, 218 F.3d at 24-26, have held that United States Attorneys and, specifically, judicially appointed United States Attorneys, are "inferior" officers under the Appointments Clause.  In United States v. Hilario, the First Circuit

stated:

> They are subject to much closer supervision by superiors than, say, the judges of the Coast Guard Court of Criminal Appeals, whom the Edmond Court classified as inferior officers "by reason of the supervision [of others] over their work." 520 U.S. at 666, 117 S.Ct. 1573. . . .Under so pervasive a supervisory regime, United States Attorneys plainly pass the Edmond test. Accord Gantt, 194 F.3d at 999-1000.

United States v. Hilario, 218 F.3d at 25.  As for the separation-of-powers argument, the First Circuit interpreted the language from Mistretta v. United States to mean that courts must engage in a "bifurcated inquiry":

> [i] we must ask whether Congress, in vesting the powers to appoint interim United States Attorneys in the district court, conferred upon the judges a power that usurped the prerogatives of another branch of government and, thus, "effected an unconstitutional accumulation of power within the Judicial Branch." [Mistretta v. United States, 488 U.S.] at 383. . . .  [ii], we must ask whether the exercise of the power to appoint someone somehow impedes the proper functioning of the Judicial Branch.  See id.

United States v. Hilario, 218 F.3d at 27.

As to the first question, the First Circuit in United States v. Hilario stated: "[O]ur system of government rests on the assumption that officers can be independent of their appointers." Id. at 27. "Were this not so, all interbranch appointments would be barred."  Id.  "Under [these] circumstances, it is unreasonable to think that merely making an interim appointment impermissibly entangles judges in the functioning of the Executive Branch."  Id.

The First Circuit in United States v. Hilario stated that, notwithstanding the judicial appointment, "insofar as interim United States Attorneys are concerned, the Executive Branch holds all the trump cards . . . [as t]hese features make it crystal clear that the district court's appointment of an interim United States Attorney is not an unconstitutional encroachment on executive authority."  Id. at 27-28.  "[T]he Supreme Court has indicated in straightforward terms that having judges appoint prosecutors will not, in and of itself, impugn the judiciary's institutional integrity."

-42-

Id. at 28.  The First Circuit concluded that the judicial appointment of United States Attorneys is not

"incompatible with judicial functions."  See id. at 28 (citing Morrison v. Olson, 487 U.S. at 676-77).

The First Circuit commented that "the appointment of defense counsel for indigent criminal

defendants would seem to be a necessary step for judges to take in order to provide for fair process.

That rationale applies to the appointment of interim United States Attorneys with equal force."

United States v. Hilario, 218 F.3d at 28-29.

      The First Circuit in United States v. Hilario explained that, far from impeding the proper

functioning of the Judicial Branch, "[i]t is in keeping with preserving the institutional integrity of

the judiciary that judges, faced with an indefinite vacancy in the office of United States Attorney,

seek out a . . . lawyer to represent the government."  Id. at 29.  The First Circuit stated that, in the

absence of Executive Branch action, the court's exercise of the appointment power "assists the

functioning of the court: at bottom, it assures the skillful processing of cases in which the United

States is a party."  Id. at 29.  The First Circuit reasoned that

> just as judicial appointment of defense counsel has not fostered the belief that courts
> are biased in favor of either the lawyers whom they appoint or the criminal
> defendants whom those lawyers represent, so too judicial appointment of a
> prosecutor is unlikely to foster the belief that the court is biased in favor of the
> government.

Id. at 29.

      In United States v. Gantt, the defendant argued that a certification under 18 U.S.C. § 3731

was invalid because the current United States Attorney for the Southern District of California was

appointed by the judges of that district under 28 U.S.C. § 546(d).  See 194 F.3d at 998.  The Ninth

Circuit began by noting that the alleged constitutional infirmity in § 546(d) "would not affect the

validity of indictments . . . as indictments need only be signed by an attorney for the government."

Id. (citing Fed. R. Crim. P. 7(c)(1)).  The Ninth Circuit held that such an appointment does not

violate the Appointments Clause, because United States Attorneys are inferior officers.  See <u>United States v. Gantt</u>, 194 F.3d at 999.  The Ninth Circuit further noted that the Supreme Court cited 28 U.S.C. § 546(d) "in support of the proposition that judicial appointment of prosecutors does not necessarily create an incongruity."  <u>United States v. Gantt</u>, 194 F.3d at 1000 (citing <u>Morrison v. Olson</u>, 487 U.S. at 676-77).  See <u>United States v. Whitehead</u>, 200 F.3d at 641 (rejecting the defendant's argument that the district court lacked jurisdiction over his case because the interim appointment of the United States Attorney for the Southern District of California by the judges of the district court pursuant to 28 U.S.C. § 546(d) violated the Appointments Clause of the United States Constitution)(citing <u>United States v. Gantt</u>, 194 F.3d at 998-1000).

The United States Court of Appeals for the Eleventh Circuit rejected the defendant's contention that his conviction was infirm because he was tried by an Assistant United States Attorney acting under the authorization or supervision of a judicially appointed United States Attorney appointed by a district court in the Southern District of Florida.  See <u>United States v. Suescun</u>, 237 F.3d 1284, 1285, 1287 (11th Cir. 2001).   "A district court lacks jurisdiction to entertain a criminal case if it appears that the Government lacked power to prosecute the defendant." <u>Id.</u> at 1287 (internal quotations omitted).  "An appointment of a United States Attorney that is not made as provided by the Appointments Clause does not affect the Government's power to prosecute."  <u>Id.</u>

In <u>United States v. Ruiz-Rijo</u>, the District of Puerto Rico noted that, even assuming that an appointment of a judicially appointed United States Attorney was unconstitutional, "Defendant's remedy would not be the dismissal of his indictment, for the appointment does not affect Defendant's basic constitutional rights" and noting that Federal Rules of Criminal Procedure 7(c)(1) and 54(c) "provide that a criminal indictment signed by an assistant United States Attorney is valid."

87 F.Supp.2d at 71.  See United States v. Santana, 83 F.Supp.2d at 232 (rejecting the defendant's contention that the district court lacked subject-matter jurisdiction, because it found the interim appointment of a United States Attorney under 28 U.S.C. § 546(d) constitutional); United States v. Kouri-Perez, 47 F.Supp.2d 164, 166 (D.P.R. 1999)(rejecting the defendants' contention that their indictment was legally flawed because only Assistant United States Attorneys had signed it stating that, under rule 54(c) of the Federal Rules of Criminal Procedure, an indictment need only be signed by an "attorney[ ] for the government."). See also In re Application of President's Comm'r on Organized Crime, 763 F.2d 1191, 1196-97 (11th Cir. 1985)(holding federal judges could not set on advisory panel investigating organized crime because imposition of powers interfered with their ability to perform their constitutionally delegated duties because it would necessarily impair their impartiality).

## ANALYSIS

Giangola asserts that 28 U.S.C. § 546(d) is facially unconstitutional.  Giangola argues that Mr. Fouratt's appointment violated the Appointments Clause, Article II, Section 2, Clause 2 of the United States Constitution, because the United States District Court for the District of New Mexico, not the Attorney General, ultimately supervises Mr. Fouratt.  Giangola also asserts that the appointment of Mr. Fouratt violates the separation-of-powers doctrine set forth in the first three Articles of the United States Constitution.  Giangola contends that, because there is not a constitutionally appointed United States Attorney whose authority flows from the Executive Branch of government, the continued prosecution of Giangola is constitutionally impermissible, and the Court must dismiss the case without prejudice until a constitutionally valid United States Attorney is appointed.

## I.   THE COURT NEED NOT OPINE ON THE WISDOM OF § 546(d).

The issues before the Court are sui generis in that the judiciary appoints no other member of the Executive Branch, and the value of past precedent is limited.  The courts could thus declare this unique statute unconstitutional without effecting broad areas of the law.  Nevertheless, the Court's obligation is to address this unique situation as carefully and throughly as necessary to address Giangola's challenges.

It is important to note the limits of the Court's decision.  The Court need not, and should not, opine on the soundness of § 546(d).  Nor does the Court need to discuss the wisdom of the United States District Court for the District of New Mexico's decision to exercise its discretion under § 546(d).  For a court to say that a statute or action may be constitutional is no compliment.  "[T]o call a statute constitutional is no more of a compliment than it is to say that it is not intolerable.  In the eyes of the Court, constitutionality is as low a standard of legislative and political morals as we could have, and yet have any at all."  C. Curtis, A Modern Supreme Court in a Modern World, 4 Vand. L. Rev. 427, 433 (1951).

The Court's narrow task is to find whether § 546(d) is constitutional against the limited constitutional challenges that Giangola makes.  The Court is not prepared to say, and need not decide, whether the avenue of appointment that Giangola challenges is within the plain language of the Appointments Clause of the Constitution.  It is sufficient for the Court to say that, given the limited arguments that Giangola raises, the Court cannot say that § 546(d) is unconstitutional under those arguments.

## II.   THERE IS NO SOUND BASIS FOR DISMISSING A VALIDLY OBTAINED INDICTMENT AGAINST GIANGOLA.

Giangola seeks dismissal of the indictment on the grounds that there is no constitutionally

appointed United States Attorney for the District of New Mexico.  Giangola does not explain why the alleged infirmity in Mr. Fouratt's appointment should entitle a defendant in his position to this remedy.  The indictment against Giangola was filed before Mr. Fouratt's appointment as United States Attorney and was signed by an Assistant United States Attorney.  See Indictment, filed April 10, 2007 (Court Only)(Doc. 1); Administrative Order (dated January 25, 2008), available at http://www.nmcourt.fed.us/web/DCDOCS/dcindex.html.

Giangola offers no explanation why the Court should dismiss a validly obtained indictment, filed during the tenure of a duly-appointed United States Attorney and signed by an Assistant United States Attorney, if the Court defectively appoints a subsequent United States Attorney.  As the Ninth Circuit noted in United States v. Gantt,  "[t]he constitutionality of Section 546(d) would not affect the validity of indictments . . . as indictments need only be signed by an attorney for the government." United States v. Gantt, 194 F.3d at 998 (citing Fed. R. Crim. P. 7(c)(1)).  Giangola has described no cognizable injury from the Court's appointment of Mr. Fouratt.  Giangola has provided no meaningful legal discussion why, assuming that the United States Attorney's appointment was invalid, he should be entitled to any remedy at all.  The constitutionality of an appointment under § 546(d) has no bearing upon the validity of an indictment against him.  Assuming that the appointment of an interim United States Attorney, pursuant to § 546(d) violated the Constitution, indictments filed during the tenure of the appointee would still be valid if an authorized Assistant United States Attorney signed them.

Neither would a defect in the appointment of a United States Attorney divest the Court of jurisdiction to hear this case.  See United States v. Suescun, 237 F.3d at 1287 (11th Cir. 2001)(explaining that "[a]n appointment of a United States Attorney that is not made as provided by the Appointments Clause does not affect the Government's power to prosecute.").  Accordingly,

the Court will reject Giangola's implicit argument that a defect in the appointment of the United States Attorney would extinguish the United States' power to prosecute this case. The Court will, regardless of how -- or if -- it rules on the constitutional issues, deny the motion to dismiss the indictment.

The threshold issue is thus whether the Court should even pass on Giangola's constitutional issues given that it will not dismiss the valid indictment against him. The Supreme Court has repeatedly cautioned that the federal courts should not give advisory opinions and should avoid constitutional issues if the decision can rest on non-constitutional grounds. The question is whether, given that the indictment against Giangola is valid, it is necessary to determine whether a majority of judges in the District of New Mexico constitutionally appointed Mr. Fouratt.

The Court notes that the Honorable M. Christina Armijo, United States District Judge for the District of New Mexico, recently issued a Memorandum Opinion and Order on a defendant's motion raising issues similar to those that Giangola raises in this case. See Memorandum Opinion and Order, filed February 15, 2008 (Doc. 130) in United States v. Tafoya, No. CR07-697 (D.N.M.)(Armijo, J.)("Tafoya Order"). In United States v. Tafoya, the defendant's motion was untimely under rule 12(e) of the Federal Rules of Criminal Procedure. See id. at 3. Judge Armijo alternatively concluded that the defendant had "not demonstrated grounds for mounting a facial challenge to the constitutionality of the Court's statutory appointment power under 28 U.S.C. § 546(d)." Tafoya Order at 3. Judge Armijo explained: "The mere possibility that a court's exercise of the appointment power under 28 U.S.C. § 546(d) might operate in violation of the Constitution or to the detriment of a criminal defendant under some conceivable set of circumstances is insufficient to render a statute wholly invalid." Tafoya Order at 3. Judge Armijo also rejected that defendant's "as applied" challenge to 28 U.S.C. § 546(d)'s constitutionality, because "Mr. Fouratt

-48-

was not acting as the United States Attorney at the time the <u>Superceding</u> <u>Indictment</u> was filed in this case, nor did he sign that document or file any motions in this case while acting in his former capacity as an Assistant United States Attorney." <u>Tafoya</u> Order at 4.  Judge Armijo did not address the merits of that defendant's constitutional claims because:

> Determining whether the statute or <u>Administrative</u> <u>Order</u> at issue in this case is unconstitutional would not serve to redress Defendant's alleged injuries, because such a ruling would not require the dismissal of the <u>Superceding</u> <u>Indictment</u>, nor would it serve to redress Defendant's alleged injuries, because such a ruling would not require the dismissal of the <u>Superceding</u> <u>Indictment</u>, nor would it preclude the duly appointed Assistant United States Attorneys from taking the case to trial.

<u>Id.</u> at 5.

The Court believes that the reason it may be necessary to decide the constitutional issues is to resolve whether Mr. Fouratt can participate in the cases in his offices as the United States Attorney and, specifically, whether he can personally prosecute the case against Giangola as United States Attorney.  There is little evidence that Mr. Fouratt is actively participating in this case, but there is some. <u>See</u> United Sates' Response to Defendant's Motion to Dismiss Indictment on the Basis that the Current United States Attorney Has Been Unconstitutionally Appointed at 21, filed February 13, 2008 (Doc. 47)(stating: "Respectfully submitted, GREGORY J. FOURATT, United States Attorney"); Response to Defendant's Supplemental Briefing on Motion to Suppress Evidence at 1, filed March 11, 2008 (Doc. 52)(stating: "The United States of America by and through its counsel, Gregory J. Fouratt, United States Attorney for the District of New Mexico . . .  hereby responds in opposition to the Defendant's Supplemental Briefing on his Motion to Suppress Evidence."); <u>id.</u> at 10 (stating: "Respectfully submitted, GREGORY J. FOURATT, United States Attorney"); Motion to Continue the Evidentiary Hearing on Defendant's Motion to Suppress Evidence at 1, filed March 12, 2008 (Doc. 53)(stating: "COMES NOW the United States of America

by and through Gregory J. Fouratt, United States Attorney for the District of New Mexico . . .

respectfully move this Court for its order continuing the evidentiary hearing on defendant's Motion

to Suppress Evidence set for March 28, 2008."); id. at 2 (stating: "Respectfully submitted,

GREGORY J. FOURATT, United States Attorney"); Unopposed Motion to Continue Trial Setting

of April 24, 2008 at 1, filed March 24, 2008 (Doc. 55)(stating: "COMES NOW the United States

of America, by and through its attorneys, Gregory J. Fouratt, United States Attorney . . . and

respectfully moves this Court for its order continuing the trial setting of April 14, 2008 in this

matter."); id. at 2 (stating: "Respectfully submitted, GREGORY J. FOURATT, United States

Attorney").

      Moreover, Mr. Fouratt did not recuse, excuse, withdraw, shield, or abstain in any way from

participating in this case.  Neither party suggests that Mr. Fouratt is not involved in the prosecution

of the case.  Indeed, Giangola argues that Mr. Fouratt has important decisions to make in his case,

"including whether to institute prosecutions, whether and under what terms to plead a case, and

other important decisions which affect citizens' liberty."  Reply at 10.  While the remedy for any

constitutional violation in this case is not dismissal of the indictment and remains somewhat unclear,

the Court concludes that the constitutional issues remain live and that its decision on the

constitutional issues would not be theoretical or merely advisory.  Moreover, neither party suggests

that the Court does not need to decide the constitutional issues.  The Court also notes that the other

courts, including the Supreme Court in similar situations, have decided these issues. Thus, because

Mr. Fouratt appears to be participating in this case as United States Attorney, and because Giangola

does not want Mr. Fouratt to prosecute him as United States Attorney, it appears necessary for the

Court to decide the constitutional challenges that Giangola has raised.

III.   **THE APPOINTMENT DOES NOT VIOLATE THE APPOINTMENTS CLAUSE IN THE MANNER THAT GIANGOLA SUGGESTS.**

Giangola contends that § 546(d) is in direct conflict with Article II, Section 1, Clause 1 of the United States Constitution.  Giangola thus argues that Mr. Fouratt's appointment violates the Appointment Clause.  Giangola requests that, because he is being prosecuted by a United States Attorney who has been unconstitutionally appointed, the Court dismiss his current indictment without prejudice.

A.   **THE COURT NEED NOT DECIDE WHETHER THE UNITED STATES ATTORNEY IS AN INFERIOR OFFICER.**

If United States Attorneys are regarded as "principal" officers under the Constitution, then the only method for appointment is through nomination by the President and confirmation by the Senate.  U.S. Const. art II, §2, cl. 2; Buckley v. Valeo, 424 U.S. at 132.  Giangola gives away much of his Appointments-Clause argument when he states that the constitutionality of 28 U.S.C. § 546(d) should not turn on the characterization whether a United States Attorney is a "principal" or "inferior" officer.  Twice in his response, Giangola declines to maintain that the United States Attorney is a "principal" officer.  See Motion at 7 (stating that Giangola does not contest that "a United States Attorney is an "inferior" officer."); Motion at 9 ("Here, Giangola does not contest that the Office of the United States Attorney is an inferior office.").  Because Giangola does not contest that United States Attorneys are "inferior" officers under the Appointments Clause, the Court need not, and should not, decide that constitutional issue.

There appears to be a sound reason for Giangola to take the position that he does.  Giangola does not take issue with 28 U.S.C. § 546(b) and with the authority of the Attorney General, a Presidentially appointed member of the Executive Branch, to appoint an interim United States Attorney.  While he refers at times to the Presidential appointment as the "proper appointment,"

Motion at 3, elsewhere he appears to concede that there is nothing wrong with the Attorney General appointing United States Attorneys under § 546(b).  "Instead, Mr. Giangola asserts that the Appointment Clause is violated when a collage of Article III judges appoint the individual who has the responsibility to ensure that the laws of the United States are faithfully executed, yet who will keep his job only if he placates the very same supposedly neutral and detached judicial officers." Motion at 9.  Because Giangola did not challenge the indictment that arose while Mr. Gomez, who was appointed by the Attorney General and not by the President, was the United States Attorney, he is in a poor position to now say that the office was a principal office to which only the President may make appointments.

While the Court will, for purposes of this motion, assume, as have the parties, that the United States Attorney position is an inferior office, the Court will not decide that issue.  The Court is not prepared to say that there is no Appointments Clause violation or that there is no Appointments Clause concerns.  It is sufficient for the Court to state that it need not decide whether United States Attorneys, however they are appointed, are "inferior" officers within the meaning of the Appointments Clause.  Given Giangola's particular arguments, the Court may assume, for purposes of Giangola's constitutional challenges, that United States Attorneys are "inferior" officers.

Without deciding the issue, however, the Court notes that, under the standard that the Supreme Court set forth in <u>Edmond v. United States</u>, there is a strong argument that the United States Attorney is an "inferior" officer.  The Supreme Court in <u>Edmond v. United States</u> defined an "inferior" officer as one "whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate." 520 U.S. at 662-63.  On the other hand, the Court cannot say that there is no force to the argument that the President should appoint United States Attorneys.  <u>See</u> Wiener, <u>supra</u> at 442-46 (arguing that United States

Attorneys are principal officers who must be nominated by the President and confirmed by the Senate).

### B.  THE ATTORNEY GENERAL AND THE PRESIDENT MAINTAIN CONTROL OVER THE UNITED STATES ATTORNEYS.

Notwithstanding the authorities against him, and despite his concession, Giangola still attempts to make an Appointments-Clause argument that, because Mr. Fouratt is a judicially appointed United States Attorney, the Court supervises him.  Giangola's legal arguments appear to flow from a flawed understanding of how the statutes governing United States Attorneys work.  Giangola describes the district judges as "Mr. Fouratt's bosses."  Motion at 6.  Giangola's argument that Mr. Fouratt is now accountable to the District Court of the District of New Mexico, however, does not accurately characterize the relationship between the Court and Mr. Fouratt or the Court and the United States Attorney's Office.

Giangola contends that 28 U.S.C. § 546(d) eviscerates Executive Branch authority and action, because a judicially accountable official has been trusted with faithfully executing the law.  In actuality, however, Mr. Fouratt is not accountable to the United States District Court for the District of New Mexico any more than any other lawyer, save for the fact that all attorneys of the Department of Justice owe the courts and the public a special obligation to ensure that justice is done.

In light of the President's sole power of removal, see 28 U.S.C. § 541(c), and the Attorney General's pervasive supervisory authority over United States Attorneys, it does not appear that § 546(d) is weighted with the freight that Giangola contends dooms the statute's constitutionally.  Giangola asks the Court to read more into the statute than is there.  Rather than reading into or adding things that are not in the statute to render it unconstitutional, the Court should read the statute

in a way, if at all possible, that upholds the statute's constitutionality.  Moreover, while the Court

does not believe that the statute is "susceptible of more than one construction," <u>Spector v.</u>

<u>Norwegian Cruise Line Ltd.</u>, 545 U.S. at 140, even if it were, "the elementary rule is that every

reasonable construction must be resorted to, in order to save a statute from unconstitutionality,"

<u>Gonzales v. Carhart</u>, 127 S.Ct. at 1631.

     For example, Giangola asks what happens if Mr. Fouratt does not toe a perceived judicial

line.  <u>See</u> Motion at 7.  Giangola contends that 28 U.S.C. § 546(d) does not bar the District Court

of the District of New Mexico from replacing him with its next judicial choice.  But nothing in §

546(d)'s plain language grants the judges of a district any power to infringe upon the President's

prerogative and remove a judicially appointed United States Attorney after the District Court

appoints him.  Likewise, nothing in § 546(d) confers upon district judges any supervisory power

over a judicially appointed United States Attorney after his appointment.  Rather, the pervasive

controls of the President and the Attorney General remain over a judicially appointed United States

Attorney just as they have over other United States Attorneys and as they have for more than a

century.  Giangola cites no authority suggesting that § 546(d) shifts such controls to the District

Court, and the Court should not read the statutory provision in such a way that would raise

unnecessary constitutional issues.  <u>See</u> <u>McConnell v. Federal Election Comm'n</u>, 540 U.S. at 280

n.12 (internal quotations omitted)("[T]he constitutional avoidance doctrine counsels us to adopt

constructions of statutes to avoid decision of constitutional questions, not to deliberately create

constitutional questions.").

    **C.**    **<u>MORRISON V. OLSON</u> EFFECTIVELY FORECLOSES ANY INCONGRUITY ARGUMENT.**

     Giangola's primary argument is that the judicial-appointment prcess of United States

Attorneys is incongruous with the constitutional function of the judiciary.  See Reply at 1-5.  The United States acknowledges that, even if the United States Attorneys are "inferior" officers under the Constitution, which other courts have held, the appointment of United States Attorneys by federal district judges may yet be invalid under the Appointments Clause if the appointment is: (i) incongruous with appropriate judicial activity; or (ii) violates separation-of-powers principles.  See Reply at 1 (citing Morrison v. Olson, 487 U.S. at 675-76).

Passages from Morrison v. Olson effectively foreclose any argument that the judicial appointment of United States is "incongruous" under the Appointments Clause.  But see Wiener, supra at 442-46 (arguing, in the alternative, that 28 U.S.C. § 546 "is incongruous with appropriate judicial activity" and "a function more naturally exercised by the executive-branch department to which U.S. Attorneys belong.").   Giangola appears to recognize this problem, because he acknowledges that the Supreme Court addressed an issue similar to his in Morrison v. Olson.  Nevertheless, he attempts to avoid Morrison v. Olson's incongruity discussion by attempting to distinguish the Supreme Court's case.  See Reply at 4 n.2 (stating that "Morrison did not squarely address the issues before this Court or the same factual circumstances.  Appointment of the U.S. Attorney for the district over which the judges serve is materially different than the circumstances present in Morrison with the appointment of Independent Counsel by judges who would not oversee the prosecutor's actions.").

It is true that the majority's decision in Morrison v. Olson is materially distinguishable from this case on several important factors.  First, in Morrison v. Olson, the judicially made appointment was arguably necessary because an intrabranch conflict had arisen.  Here, no intrabranch conflict existed before Mr. Fouratt's appointment.  Instead, the statute itself created, and thus triggered, the opportunity to effectively replace the Attorney General's interim United States Attorney with a

designee selected by the Article III judges who comprise the United States District Court for the District of New Mexico.  The District of New Mexico's situation arguably lacked the necessity or exigent circumstances that existed in Morrison v. Olson.

While the Court shares Giangola's observation that the judicial appointment was not necessary, it does not, however, see Morrison v. Olson's incongruity analysis turning on that point. Many scholars, judges, and observers have also wondered how necessary it really has been to appoint independent counsel.  Thus, Giangola's argument goes to the wisdom of § 546(d) and does not appear to be a factor that is particularly relevant in the incongruity calculus.

Similarly, unlike in Morrison v. Olson, the Attorney General did not request assistance from the United States District Court for the District of New Mexico to select the chief federal law enforcement officer for the state.  Nonetheless, the United States District Court for the District of New Mexico decided to select its designee, knowing that he would discharge Executive Power as the United States Attorney for the District of New Mexico.  This distinction appears to be one about the proper means of choice, rather than the propriety of a delegation.  Again,  if the position is an inferior office, the express language of the Appointments Clause gives Congress considerable discretion in choosing the manner of appointment.  See U.S. Const.  Art. 2, § 2, cl. 3 (states that "the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.")(emphasis added).

Finally, while in Morrison v. Olson the appointing judges were "ineligible to participate in any matters relating to an independent counsel they have appointed," 487 U.S. at 677, the opposite is true in this case.  Every case, even civil cases prosecuted or defended by the United States in the United States District Court for the District of New Mexico, come under Mr. Fouratt's control, direction, and supervision, and the cases will be heard and adjudicated before the judges who

appointed him.

While the Court shares some concern with Giangola about the wisdom of having district judges select an attorney appearing before it unless there is great necessity for the appointment, there is nothing constitutionally incongruent with judicial functions under Article III about such appointments. The Supreme Court and inferior courts often are called on to appoint attorneys to advance positions, to defend criminal defendants, to represent witnesses, and to examine the interests of minors. Such appointments are often made to improve the adversarial process, which is so necessary for the proper operation of the American judicial system. While the appointing judges must, of course, be careful that they do not spoil the adversarial process that they seek to advance with a particular appointment, there is nothing incongruent with judicial functions in appointing lawyers who will appear before the same judges.

In conclusion, Giangola's Appointments-Clause challenge to Mr. Fouratt's appointment is largely to the wisdom of Congress' chosen means of filling the spot. While the Court shares some concern about the wisdom of involving district judges in a personnel decision for an office within the Executive Branch, and would not, at this time in the District's and the Nation's history, exercise Congress' invitation to appoint a United States Attorney to a position that the political branches have not chosen to fill, the plain language of the Constitution gives Congress considerable discretion to decide the means of appointment once it is determined that the office is an inferior office. The Court should not upset Congress' view with one of its own unless the means that Congress has chosen is constitutionally incongruent with a court being a court. The Court cannot say that Giangola's concerns reach that high standard.

## IV.     THE APPOINTMENT DOES NOT VIOLATE THE SEPARATION OF POWERS.

Giangola asserts that 28 U.S.C. § 546(d), facially and as applied in this case, violates the

separation of powers and is patently unconstitutional.  The Court agrees that there is separation-of-powers tension inherent in a judicially appointed prosecutor.  The question is whether those issues rise to constitutional dimensions.  The Court concludes that there is no separation-of-powers doctrine violation.

A.    **THE COURT WILL EMPLOY THE SEPARATION-OF-POWERS TEST THAT THE FIRST CIRCUIT EMPLOYED IN <u>UNITED STATES V. HILARIO</u>.**

The Supreme Court in <u>Morrison v. Olson</u> anticipated that there might be situations where the  officer is "inferior" and then provided some guidance.  Accordingly, the holding in <u>Morrison v. Olson</u> should not be recklessly expanded, and the inquiry cannot end upon a determination of the Appointments-Clause issue alone.  In other words, it is appropriate for Giangola to raise, and for the Court to consider, whether the judicial appointment of an United States Attorney violates the separation-of-powers doctrine.

While the separation-of-powers doctrine has long roots in the nation's federal constitutional system, the test that the courts must employ to determine whether a particular action violates the doctrine is unclear.  What is relatively clear, however, is what test the Court, as a district court, is not free to employ.  The Court is not free to employ Justice Scalia's test proposed in his dissent in <u>Morrison v. Olson</u> unless that test is consistent with other Supreme Court precedent.

The primary legal authority upon which Giangola relies to support his position  -- which he urges the Court to adopt -- is Justice Scalia's dissenting opinion in <u>Morrison v. Olson</u>, a position that seven of eight Justices rejected.  Giangola contends that both prongs of Justice Scalia's dissent in <u>Morrison v. Olson</u> are met here.  First, the conduct of criminal prosecution is the exercise of executive power.  <u>See</u> <u>Heckler v. Chaney</u>, 470 U.S. at 832.  Second, Giangola contends that the statute deprives the President of exclusive control over the exercise of that power.

The Court has concerns that Justice Scalia's test does not, once it is determined that the office is an inferior one, give enough deference to Congress' choice of appointment methods, whether the text of the Appointment Clause allocates to Congress "as they think proper."  While there is no dispute that Mr. Fouratt is exercising executive power, Justice Scalia's proposed test could be read as setting forth a fairly low standard.  It is difficult to imagine a separation-of-powers dispute where one branch is not exercising the power of another.  Any incursion by one branch on another branch's powers limits the exclusive control of that latter branch over its domain.  Thus, Justice Scalia's standards may not give enough deference to Congress' exercise of discretion under the Appointment Clause's language to choose the method of filling inferior offices. The Court believes that it should recognize the considerable discretion the Framers gave Congress to fill inferior offices.  See U.S. Const.  Art. 2, § 2, cl. 3 ("the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.")(emphasis added).

In any case, the Court is not free to use Justice Scalia's dissent in Morrison v. Olson as controlling law, as Giangola seems to suggest, unless it is consistent with Supreme Court precedent.  And the Court is not certain that it sees another proposed standard in Giangola's motion.  While the United States maintains that Giangola is advancing an absolutist position, it is unclear to the Court precisely what the limitations of Giangola's position are.  Even though there is a dearth of legal support for Giangola's claims of constitutional infirmities, there is not an insignificant basis for his arguments.  The Court must determine whether Giangola's arguments are no more than differences of opinion with Congress about how the position should be filled, or whether the problems with the statute rise to constitutional dimensions.  Accordingly, the Court must carefully determine whether Justice Scalia's test in Morrison v. Olson is consistent with other Supreme Court cases, fashion its

own test, or adopt one that other courts have used.

Giangola has not dealt comprehensively with the decisions from other jurisdictions. Specifically, Giangola has not fully dealt with the well-reasoned merits of decisions squarely on point from the First and Ninth Circuits, which have both rejected his arguments. Giangola does not explain why the Court should not use the separation-of-powers test that the First Circuit employed in United States v. Hilario, which it distilled from Mistretta v. United States. The Court believes that the two dangers that the Supreme Court identified in Mistretta v. United States provide more guidance as to what the separation-of-powers analysis should be than Justice Scalia's test in his dissent in Morrison v. Olson.

The first issue is precisely what the test is for when "'Congress has vested in the [judges] powers that are more appropriately performed by other Branches.'"  United States v. Hilario, 218 F.3d at 26-27 (quoting Mistretta v. United States, 8 U.S. at 385).  In one sense, the Supreme Court's general language could be read as an invitation for the Court to substitute its judgment for that of Congress', and decide that it is more appropriate for the Executive Branch to make this appointment. The Court believes that is a low standard for unconstitutionality, and that "appropriately" must be a higher standard to measure statutes' constitutionality.  Otherwise, the Court would be reading out entirely the considerable discretion that the Appointment Clause's plain language gives to Congress when it is dealing with inferior offices.  The Court agrees with the First Circuit in United States v. Hilario that the standard is whether Congress is giving the Judicial Branch so much power that this power threatens to upset the balance of power that the Framers intended to keep separate and give to another branch.  The First Circuit explained:

> [W]e must ask whether Congress, in vesting the power to appoint interim United
> States Attorneys in the district court, conferred upon the judges a power that usurped
> the prerogatives of another branch of government and, thus, "effected an

unconstitutional accumulation of power within the Judicial Branch. It is not for the courts to determine the best or most efficient repository for a power of appointment vis-à-vis inferior officers. The Constitution specifies that the members of Congress should delegate the appointment power as they think proper.  It follows, then, that Congress's choice always deserves appreciable deference.

United States v. Hilario, 218 F.3d at 27 (internal citations and quotations omitted).

The second part of the language in United States v. Mistretta is concerned about the integrity of the judicial branch.  See 488 U.S. at 385.  Again, the Court does not believe that the Supreme Court in United States v. Mistretta was inviting courts to lightly replace their views for that of Congress.  The standard must be higher than a difference of opinion to result in overturning Congress' judgment and exercise of discretion under the Appointment Clause.  The Court agrees with the First Circuit's assessment that the second part of the bifurcated inquiry in United States v. Mistretta asks whether the power to appoint the United States Attorney impedes the proper functioning of the Judicial Branch.  See United States v. Hilario, 218 F.3d at 27 ("[w]e must ask whether the exercise of the power to appoint somehow impedes the proper functioning of the Judicial Branch.").

Thus, the Court believes that the dangers identified in United States v. Mistretta provide the best guidance for a separation-of-powers analysis.  The Court also believes that the First Circuit in United States v. Hilario has appropriately incorporated these dangers into a workable test for a separation-of-powers analysis.  Because the Court believes that the First Circuit's test more faithfully reflects the Supreme Court's concerns in United States v. Mistretta, the Court will, as an initial matter use the First Circuit's analysis rather than Justice Scalia's.

**B.    GIANGOLA FAILS TO SATISFY EITHER SIDE OF THE "BIFURCATED INQUIRY."**

"Of course, section 546(d) cannot be said to violate the separation-of-powers principle

simply because it requires two branches of government to interact." United States v. Hilario, 218

F.3d at 26.   Thus, the mere fact that the District Court appointed Mr. Fouratt as United States

Attorney does not give rise to a separation-of-powers violation.   Rather, the District Court's

appointment power under § 546(d) "is not unconstitutional unless Congress has vested in the

[judges] powers that are more appropriately performed by other Branches or that undermine the

integrity of the Judiciary."   United States v. Mistretta, 488 U.S. at 385.

> ### 1.   There is No Unconstitutional Accumulation of Power Within the Judicial Branch.

While Giangola urges the Court to declare § 546(d) unconstitutional, he does not explain

why other interbranch appointments are constitutional and this one is not.   Because the language of

Article II, Section 2, Clause 2 of the United States Constitution gives Congress considerable

discretion over the procedure to be used for the appointment of inferior officers, Congress' limited

delegation of interbranch appointive power of United States Attorneys is entitled to substantial

deference.   See Ex parte Siebold, 100 U.S. at 397-98 ("[A]s the Constitution stands, the selection

of the appointing power, as between the functionaries named, is a matter resting in the discretion

of Congress").   Giangola's arguments have no discernable limits that would allow any interbranch

appointments, which the Appointments Cause appears to contemplate.

While it may appear obvious, it deserves emphasis that Mr. Fouratt is part of the Executive

Branch and is not part of the Judicial Branch.   While there is no question that a majority of the

Article III judges who constitute the United States District Court for the District of New Mexico

have appointed Mr. Fouratt to his position, and while there can also be no question that Mr. Fouratt

is now exercising the fundamental power of the Executive to prosecute alleged violations of federal

law, he is not part of the judiciary, nor has he ever been.   At all times, Mr. Fouratt has been a

member of the Executive Branch, and he remains so.

It is probably true that Congress cannot delegate the power to prosecute, and ultimately the responsibility and accountability to ensure that the Nation's laws are faithfully executed, to a federal court.  But the judiciary's power to appoint United States Attorneys, in limited circumstances, is far from that delegation.  The independence of a judicially appointed United States Attorney from the district court is not merely customary and is protected by a series of statutes preserving executive power.  While § 546(d) gives the district court a limited power of appointment, it does not grant the district court any authority to supervise or to remove a judicially appointed United States Attorney.  Section 546(d) does not give the district court any power to influence how the appointee will enforce the laws.

Giangola queries to whom Mr. Fouratt reports -- to the Court or to the President.  Giangola contends that this question demonstrates the statute's unconstitutionality.  Giangola concludes that Mr. Fouratt is ultimately accountable to the judiciary and not to the President. The Court disagrees.

Section 546(d) is a single thread in a statutory fabric that otherwise gives the Executive Branch the resources to prosecute offenses against the laws of the United States.  The fabric as a whole places judicially appointed United States Attorneys in the Executive Branch.  For example, after the judicial appointment of a United States Attorney, the President retains the power to override the district court's appointment and remove the appointee.  See 28 U.S.C. § 541(c).  The President further retains the power to nominate a United States Attorney whose confirmation by the Senate automatically will oust the judicially appointed appointee.  See 28 U.S.C. § 546(c)(1).  Moreover, the Attorney General has the power to divest the judicially appointed United States Attorney of authority to act in any given case.  See 28 U.S.C. § 518.

The statutory framework for the relationship among the United States Attorneys, the

Attorney General, and the President, thus ensures that a judicially appointed United States Attorney remains under the supervision and control of the Executive Branch.  Because judicially appointed United States Attorneys remain under the Executive Branch's supervision and control, Congress' decision to grant a limited power of appointment of United States Attorneys to the district courts does not result in an unconstitutional accretion of power in the Judicial Branch.  Section 546(d) accordingly comports with the first part of the bifurcated inquiry that the Supreme Court suggested in Mistretta v. United States and made clearer in United States v. Hilario.

### 2.   The Lack of Impediment to the Proper Functioning of the Judicial Branch.

The answer to the second prong of the test, the Court believes, partly lies in how limited and unusual the opportunity for the judiciary to appoint is.  An interim United States Attorney appointed by the Attorney General may serve no longer than 120 days.  See 28 U.S.C. §§ 546(a) and (c)(2).  The district court's limited power of appointment takes effect only upon the expiration of this 120-day period.  See 28 U.S.C. § 546(d).  The opportunity for the judiciary to make appointments will be rare and, because of their infrequency, do not seriously undermine the integrity of the judiciary in the minds of most of the public and of the participants in court proceedings.

While the Court shares some concern that Congress' invitation to appoint United States Attorneys draws the Court into arguably unnecessary involvement in one of the parties routinely before it, the Court does not believe that Congress' decision so undermines the Court's integrity or functioning that the Court should set Congress' judgment aside.  While the Court would prefer that it not be involved in an Executive Branch's internal personnel decision that is normally a political one, the Court cannot say that Congress' decision to ask the Court to use its discretion in limited situations where the position remains unfilled by the political branches so undermines the integrity

of the judicial branch that the Court should declare Congress' considered judgment unconstitutional.

Giangola raises a number of scenarios that he contends shows that there is a violation of the separation-of-powers doctrine.  First, Giangola queries what happens in a case now prosecuted in the District of New Mexico when a balance has to be struck in a prosecution between enforcement of the criminal law and national security concerns or treaty obligations.  There is no dispute that these are Executive Branch policy choices.  While a designee of the judiciary will make the decision, the decision remains an Executive Branch decision.  The Court assumes that Mr. Fouratt will make that decision in consultation, if appropriate, with officials in Washington, D.C., and the Court will have to live with those prosecutorial decisions.  The Court's dissatisfaction, if any, with those policy decisions must be expressed, on the public record, in its decisions in particular cases, and not with any attempt to exercise any other personnel control over Mr. Fouratt.

Giangola also poses the scenario of scandal and malfeasance in the United States Attorney's Office for the District of New Mexico.  Giangola queries whom voters should, in the ultimate check and balance of our constitutional system, hold accountable: the judges who appointed him or a President who had little or nothing to do with the appointment.  While the Court shares some concern that shifting the appointment power to the unelected Court dilutes the accountability that United States Attorneys have when the political branch chooses them, the Court does not think this factor renders the judicial appointment unconstitutional.  The reality is that the public will probably blame the Court for a while, but the longer Mr. Fouratt remains in office, he becomes the choice, by acquiescence, of the Executive Branch.

Because the judicial appointment of United States Attorneys results neither in an unconstitutional accumulation of power in the Judicial Branch, nor imposition of the proper functioning of that branch, § 546(d) is consistent with the separation-of-powers doctrine.  While

Giangola raises a number of issues that challenge the wisdom of the delegation in § 546(d), none of the problems that Giangola perceives rise to constitutional problems.  Accordingly, the Court will deny Giangola's motion.

### C.    THE JUDICIAL APPOINTMENT OF A UNITED STATES ATTORNEY SURVIVES JUSTICE SCALIA'S TEST IN MORRISON V. OLSON.

While the Court does not believe that Justice Scalia's test in Morrison v. Olson is the appropriate one for the Court to use, the Court is not convinced that it would, if applied, doom Section 546(d).  While prosecution of criminal cases is certainly an executive function, that function remains squarely in the Executive Branch after Mr. Fouratt's appointment.  Moreover, that executive function remains under the exclusive control of the President, with his power to remove Mr. Fouratt, and under the Attorney General, who supervises all United States Attorneys.  Thus, even if the Court were to employ Justice Scalia's test, it would not declare § 546(d) unconstitutional.

### V.    GIANGOLA'S "AS APPLIED" ARGUMENT ALSO FAILS.

Giangola asserts that § 546(d) is "patently unconstitutional" "on its face, and as applied in this case."  Motion at 4.  By way of his "as applied" challenge, Giangola notes that the Court appointed Mr. Fouratt on January 25, 2008, and argues that "Mr. Fouratt is now exercising the fundamental power of the Executive to prosecute alleged violations of federal law, yet has been appointed by, and in essence is accountable to the Article III judges who constitute the United States District Court for the District of New Mexico."  Motion at 1.  Giangola's "as applied" argument fails as a matter of law, because Mr. Fouratt is accountable to the Executive Branch, not to the Court.

Section 546(d) confers no authority upon the Court to supervise Mr. Fouratt, to influence his enforcement of the laws of the United States, or to remove him.  These powers remain with the Executive Branch.  The President retains the power to remove Mr. Fouratt.  See 28 U.S.C. § 541(c).

-66-

The President further retains the power to nominate a United States Attorney whose confirmation by the Senate will automatically oust Mr. Fouratt.  See 28 U.S.C. § 546(c)(1).  Moreover, the Attorney General has the power to divest Mr. Fouratt of authority to act in any given case.  See 28 U.S.C. § 518.  Mr. Fouratt is also subject to an extensive framework of Department of Justice controls.

The Court appointed Mr. Fouratt, but he is not, as Giangola contends, "in essence . . . accountable to the Article III judges" who appointed him.  Motion at 1.  The Court is, by contrast, much more robustly engaged in the ongoing supervision of the Federal Public Defenders and of private attorneys appointed to represent indigent defendants under the Criminal Justice Act, without damage to the Court's independence or to the public's perception of the administration of justice. The authority of the Court in this matter is limited to the appointment power Congress has given it under 28 U.S.C. § 546(d), which the Court exhausted upon its appointment of Mr. Fouratt.

Giangola's strongest argument is that the Court could influence his enforcement of federal law by appointing him.  While the Court shares Giangola's concern that the process of judicial appointment could influence the United States Attorney's policy decisions, Giangola produces no evidence of how, if at all, that occurred in Mr. Fouratt's appointment.  Moreover, whatever the judiciary's thoughts about policy decisions, once Mr. Fouratt became the United States Attorney, what the President and the Attorney General think about enforcement is probably much more important to him than what the individual judges of the Court think.

In conclusion, at this stage of proceedings, the appointment of Mr. Fouratt is largely in the past  both for the Court and for Mr. Fouratt and his office.  It is unlikely that the appointment will have much, if any, influence on how the Assistant United States Attorneys will prosecute this case against Giangola. Accordingly, the Court will deny Giangola's "as applied" challenge to the

constitutionality of § 546(d), and will not dismiss the indictment, with or without prejudice.

**IT IS ORDERED** that the Defendant's Motion to Dismiss the Indictment Without Prejudice on the Basis that the Current United States Attorney has Been Unconstitutionally Appointed is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Gregory J. Fouratt
  United States Attorney for the District of New Mexico
Larry Gomez
Fred J. Federici, III
Roberto D. Ortega
  Assistant United States Attorneys for the District of New Mexico
Albuquerque, New Mexico

     *Attorneys for the Plaintiff*

Louren M. Oliveros
Gorence & Oliveros, P.C.
Albuquerque, New Mexico

     *Attorneys for the Defendant*