**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                     No. CR 07-0706  JB

BILLY GIANGOLA,

       Defendant.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on the Defendant's Motion to Suppress and Request for a <u>Franks</u> Hearing, filed September 21, 2007 (Doc. 26)("Motion").  The Court held evidentiary hearings on April 25, 2008, and on April 28, 2008.  The primary issues are: (i) whether the police officers had reasonable suspicion to stop Defendant Billy Giangola; (ii) whether the officers had reasonable suspicion to search Giangola; (iii) whether the officers had probable cause to arrest Giangola for resisting arrest; and (iv) whether the Court should suppress evidence obtained after Giangola was arrested.  Because the United States concedes that the officers did not have probable cause to arrest Giangola before the stop under <u>Terry v. Ohio</u>, 392 U.S. 1 (1968), and because the officers did not have probable cause to arrest Giangola before the officers searched him, the Court will grant the motion to suppress evidence resulting from the unlawful arrest.  The Court denies Giangola's request to suppress evidence obtained from 1320 Tapia and his request for a <u>Franks</u> hearing as moot because Giangola has withdrawn his challenge to the search warrant executed at 1320 Tapia.  The Court finds that the officers had a reasonable suspicion that supported their investigative detention of Giangola, but that the officers exceeded the scope of the investigative

detention.  The Court also finds that the detention was not supported by a concern that Giangola would interfere with the execution of the search warrant at 1320 Tapia.  Because the officers also lacked probable cause to arrest Giangola, their search of Giangola was unlawful and any evidence obtained after his illegal arrest will be suppressed.

## FACTUAL BACKGROUND

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues.  The findings of fact in this Memorandum Opinion and Order shall serve as the Court's essential findings for purposes of rule 12(d).  The Court makes these findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure and the voluntariness of an individual's confession or consent to search.  See United States v. Merritt, 695 F.2d 1263, 1269 (10th Cir. 1982). In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind the Court.  See Fed. R. Evid. 1101(d)(1).  Thus, the Court may consider hearsay in ruling on a motion to suppress.  See United States v. Merritt, 695 F.2d at 1269.

1.      On March 2, 2007, a Public Service Company of New Mexico ("PNM") meter reader went to a residence located at 1320 Tapia S.W., Apartment A, in Albuquerque, New Mexico, to read the electric meter for billing purposes.[1]  See Transcript of Hearing at 10:17-11:6 (taken April 25,

---

[1]  In Giangola's motion to suppress, he challenges the information set forth in the sworn affidavit to support the search warrant.  See Motion at 2.  Specifically, Giangola contended that "there is no electric meter located in the area described in the Affidavit and that no PNM employee would have been reading such meter" on the date stated in the affidavit, because PNM reads the meters in that area in the middle of the month.  Id.  Because Giangola has withdrawn his challenge to the search warrant, this potential conflict in the evidence is not relevant.  See Transcript of Hearing (taken April 25, 2008) at 7:2-12 (Court & Oliveros).

2008)("Tr. 1")(Ortega & Sabaugh);[2] Supplemental Briefing on Defendant's Motion to Suppress, filed February 18, 2008 (Doc. 48)("Supplemental Brief"), Exhibit 1, Det. Sabaugh Narrative Report Form at 1(dated March 3, 2007)("Sabaugh Report").[3]

1.       That same day, March 2, 2007, the PNM employee called the Bernalillo County Sheriffs Department ("BCSO") 911 dispatcher to report that, as he leaned down to read the meter, a strong, ether-like smell emitted from the front-door area of the apartment, which the meter reader believed was indicative of a methamphetamine laboratory.   See Tr.1 at 10:17-11:6 (Ortega & Sabaugh); Sabaugh Report at 1.

2.       On that same date, BCSO officers investigated the call and proceeded to Apartment A located at 1320 Tapia S.W.   See Tr.1 at 10:17-11:6 (Ortega & Sabaugh); Sabaugh Report  at 1.

3.       With this information, BCSO Detectives Theresa Sabaugh and Detective Taylor went to the location, and they smelled a similar, strong chemical odor emitting from the front door.   See Tr.1 at 11:16- 12:4 (Ortega & Sabaugh); id. at 15:5-9 (Ortega & Sabaugh); id. at 16:6-20 (Ortega & Sabaugh).

4.       The detectives noticed that the door and windows of the residence were boarded and taped from inside, and concluded that these window coverings were likely to prevent anyone from looking inside. See id. at 11:16-12:1 (Ortega & Sabaugh); Sabaugh Report at 1.   Sabaugh testified that the windows and doors may have had only sheets of cardboard on them from the inside.   See Tr.1 at 34:21-25 (Sabaugh).  Sabaugh could not be sure if the windows were boarded or just covered

_____

[2]  The Court's citations to the transcripts of the hearings refer to the Court Reporter's original, unedited versions.  Any final transcripts may contain slightly different page and/or line numbers.

[3]  Although Sabaugh's report was dated March 3, 2007, that date was inaccurate and the report was written on March 2, 2007.  See Tr.1 at 31:25-32:2 (Oliveros & Sabaugh).

with cardboard.  <u>See</u> <u>id.</u> at 35:1-12 (Sabaugh & Oliveros).  Sabaugh did not photograph the windows.  <u>See</u> <u>id.</u> at 35:18-20 (Oliveros & Sabaugh).

5.      Based upon her training and experience, Taylor believed that the ether-chemical smell was consistent with the process of creating and manufacturing cocaine base or crack, where powder cocaine is cooked with baking soda.  <u>See</u> <u>id.</u> at 16:14-20 (Ortega & Sabaugh).

6.      Sabaugh and Taylor were not concerned that 1320 Tapia posed a danger to the community.  <u>See</u> <u>id.</u> at 37:6-10 (Oliveros & Sabaugh).

7.      As the detectives were leaving the area, they saw a maroon-colored Ford Expedition back into a parking area for the apartment.  <u>See</u> <u>id.</u> at 17:3-6 (Sabaugh).

8.      Two heavily-tattooed men got down from the Expedition and entered the front door of the apartment.  <u>See</u> <u>id.</u> at 18:2-5 (Sabaugh).

9.      Sabaugh described one of the men, later identified as Giangola, as "a Hispanic male, approximately 25 years old.  He is heavily tattooed.  He had tattooed eyebrows and tattoos on his [neck]."  <u>Id.</u> at 18:10-12 (Sabaugh).

10.     Giangola is of Anglo and Asian ethnicity.  <u>See</u> Transcript of Hearing (taken April 28, 2008)("Tr.2") at 6:8-9 (Oliveros & Giangola).  Giangola is not Hispanic.  <u>See</u> Tr.1 at 6:10-11 (Oliveros & Giangola).

11.     Sabaugh was able to clearly see his eyebrow and neck tattoos.  <u>See</u> <u>id.</u> at 46:20-25 (Ortega & Sabaugh).

12.     Based on their investigation on March 2, 2007, Sabaugh and Taylor began surveillance on the apartment.  <u>See</u> <u>id.</u> at 21:17-22 (Ortega & Sabaugh); Sabaugh Report at 2.

13.     In the following days, through various law enforcement databases, Sabaugh determined that the Expedition was registered to Charlene Curtis.  <u>See</u> Tr.1 at 21:23-22:2; Sabaugh

Report at 2.

14.     Upon further investigation, Sabaugh learned that Curtis has a son named Giangola.
See id. at 22:5-6 (Sabaugh); Sabaugh Report at 2.

15.     Sabaugh found and observed a photograph of Giangola, and determined that Giangola
was the same person whom she saw driving and parking the Ford Expedition at the Tapia address,
and entering 1320 Tapia on March 2, 2007.  See id. at 22:7-9 (Sabaugh); Sabaugh Report at 2.

16.     BCSO officers observed the maroon Ford Expedition at the residence on several
occasions.  See Tr.1 at 23:7-11 (Sabaugh); Sabaugh Report at 2.

17.     On March 12, 2007, Sabaugh prepared an affidavit for a search warrant for 1320
Tapia.  See Tr.1 at 23:20-23 (Sabaugh).

18.     The relevant facts presented in Sabaugh's affidavit were:

(i)     On March 3, 2007, the BCSO received a citizen's tip via information from
a PNM meter reader who had been at Giangola's residence that day and
smelled an ether odor consistent with narcotics and/or manufacture;

(ii)    Sabaugh and Taylor followed up on the tip and went to 1320 Tapia on the
same day and smelled a similar chemical odor emitting from the front door
and front windows;

(iii)   Taylor, a certified clandestine laboratory investigator, recognized the smell
to be consistent with the smell that is created when powder cocaine is
combined with and "cooked" with baking soda to create cocaine base, also
known as "crack cocaine";

(iv)    Sabaugh and Taylor observed a maroon-colored Ford Expedition at the
residence occupied by two Hispanic males;

(v)     Further investigation by Sabaugh revealed that the Expedition was registered
to a Charlene Curtis who has a son named Billy Giangola and that Giangola
has an extensive criminal background.

(vi)    In a separate investigation regarding a domestic violence incident,  BCSO
Deputy Royal stopped a Cadillac on Tapia S.W. that was turning into the
driveway at 1320 Tapia S.W. Once the deputy engaged his emergency lights,

-5-

> the driver, Christopher Marquez, abruptly changed his direction and stopped
> down the street.  During this traffic stop, Taylor observed occupants at 1320
> Tapia S.W. come outside to act as "look-outs" consistent with drug dealing.
> Marquez told Royal that he was going to visit friends at 1320 Tapia and, in
> a consent search of Marquez' vehicle, deputies located a small amount of
> marijuana, twenty loose "Trazodone" prescription pills, and $1,000.00 in
> cash.  Marquez was arrested for possession of controlled substances.

Supplemental Brief, Exhibit 2, Affidavit for Search Warrant by Detective Sabaugh (executed March 12, 2007) at 1-5 ("Sabaugh Aff.").

19.     Sabaugh's affidavit averred that "[c]ocaine, and other controlled substances, in any form, in an unknown quantity, including but not limited to Cocaine; paraphernalia used for the packaging, distribution, weighing, smoking, cooking, sale or other possession, use or sale of Cocaine and other controlled substances" were being concealed in 1320 Tapia.  Sabaugh Aff. at 1.

20.     On March 12, 2007, the Honorable Albert Murdoch, District Judge for the Second Judicial District of New Mexico, approved the petition for the search warrant and issued the search warrant for the residence at 1320 Tapia S.W., Apt. A.  See Tr.1 at 23:22-25 (Ortega & Sabaugh).

21.     On March 13, 2007, BCSO deputies were prepared to execute the narcotic search warrant for the Tapia S.W. residence.  See id. at 24:9-13 (Ortega & Sabaugh); Sabaugh Aff. at 1.

22.     Before the execution of the search warrant on March 13, 2007, officers were briefed on the warrant to be executed. See Tr.1 at 25:2-11 (Ortega & Sabaugh); Sabaugh Report at 3.

23.     At the briefing, Sabaugh gave officers a physical description of Giangola and of his vehicle, the maroon Expedition. See Tr.1 at 25:2-11 (Ortega & Sabaugh); id. at 73:18-20 (Maestas); Sabaugh Report at 3.

24.     Sabaugh told the officers that Giangola had previous arrests, for aggravated assault on a police officer and bringing contraband into jail, so that the officers would be aware that Giangola had a tendency to be violent.  See Tr.1 at 25:8-11 (Sabaugh).

25.     Sabaugh told BCSO Detective Ramon Maestas[4] that Giangola was suspected of trafficking crack cocaine out of 1320 Tapia.  See id. at 73:13-18 (Maestas).

26.     Sabaugh instructed Maestas to keep surveillance on 1320 Tapia before the search warrant was executed.  See id. at 73:20-22 (Maestas).

27.     Before executing the search warrant on March 13, 2007, Maestas went to the area near 1320 Tapia S.W. to determine if the Expedition was present. See Tr.1 at 26:10-14 (Sabaugh); Sabaugh Report at 3.

28.     Maestas drove an undercover vehicle to 1320 Tapia and then parked where he would have a good view of the front driveway[5] and the door.  See Tr.1 at 74:15-19 (Ortega & Maestas). When Maestas arrived at 1320 Tapia, he determined that the Expedition was not present. See Tr.1 at 26:17-18 (Sabaugh); id. at 74:19-22 (Maestas); Sabaugh Report at 3.

29.     Maestas told Sabaugh he would keep watch on 1320 Tapia until somebody arrived at it or until the officers decided to execute the search warrant on it.  See Tr.1 at 74:22-24 (Maestas).

30.     After Maestas communicated the information about the Expedition to his supervisors, Sabaugh instructed Maestas to wait for the Expedition to arrive at 1320 Tapia S.W. and to make sure, if it arrived, that it did not leave before the other officers got there.  See id. at 26:10-14 (Sabaugh); Sabaugh Report Form at 3.

31.     While conducting surveillance on the residence before execution of the warrant, law

---

[4] Maestas has received training in basic narcotics identification and investigation, drug interdiction, and methamphetamine labs.  See Tr.1 at 73:2-5 (Ortega & Maestas).  Maestas is certified to recognize methamphetamine labs.  See id. at 73:5-6 (Maestas).  Maestas has also received basic interrogation training.  See id. at 73:6-7 (Maestas).

[5] Maestas later clarified that there was no driveway at 1320 Tapia, and the building has only a dirt lot in front of all three apartments.  See Tr.1 at 84:12-22 (Oliveros & Maestas).

enforcement personnel observed an unidentified male arrive at the residence driving the same maroon-colored Expedition that law enforcement knew to be associated with that residence. See id. at 26:18-21 (Sabaugh); Sabaugh Report at 3.

32.     Maestas watched the apartment for approximately twenty or thirty minutes and then observed a Maroon Expedition pull up to 1320 Tapia.  See Tr.1 at 75:1-2 (Maestas).

33.     At approximately 2:30 p.m., Maestas observed the Expedition arrive at 1320 Tapia and leave minutes later. See id. at 26:5 (Sabaugh); id. at 26:18-19 (Sabaugh); Sabaugh Report at 26.

34.     Maestas described the unidentified male as a Hispanic male who got out of the driver's seat, went to the front door, "messed with . . . the lock, used a key to open the door, went inside, stayed." Tr.1 at 75:2-5 (Maestas).  The male entered the residence, with a key, stayed very briefly, returned to the Expedition, and drove away.  See id. at 26:20-22 (Sabaugh); Sabaugh Report at 3.

35.     Maestas called out on dispatch for a fully-marked unit to stop the Expedition because it was associated with a residence subject to a search warrant.  See Tr.1 at 26:25-27:7 (Sabaugh); Sabaugh Report at 3-4.

36.     Maestas followed the Expedition until a marked unit could stop it.  See id. 1 at 75:17-18 (Maestas).

37.     Maestas' instructions were to detain the Expedition and the driver, whenever Maestas stopped the Expedition, so that the search warrant could be executed.  See id. at 83:18-23 (Oliveros & Maestas).

38.     BCSO Deputy Hernandez, in a marked vehicle, stopped the Expedition.  See id. at 27:8-10 (Sabaugh); id. at 75:19-21 (Ortega & Maestas).

39.     Hernandez stopped the Expedition approximately three or four miles away from 1320

Tapia.  See id. at 59:1-5 (Oliveros & Hernandez).

40.    Maestas observed Hernandez approach the Expedition, speak with the driver, "pull the driver out of the car," and bring the driver to the back of the Expedition.  Id. at 76:2-5 (Maestas).

41.    Hernandez testified that he stopped the Expedition because he was advised by the Narcotics Division that there was a warrant for the Expedition.  See id. at 51:20-25 (Ortega & Hernandez).  Hernandez asked if he needed probable cause to stop the Expedition.  See id. at 51:25-52:1 (Hernandez).

42.    The warrant was the only reason why Hernandez stopped the Expedition.  See id. at 60:2-5 (Oliveros & Hernandez).  The Expedition did not violate any traffic laws.  See id. at 59:22-24 (Oliveros & Hernandez); id. at 84:3-5 (Oliveros & Maestas).  Hernandez did not know what kind of a warrant was the reason for him stopping the Expedition.  See id. at 52:2-5 (Ortega & Hernandez).

43.    Maestas put on a "red uniform" identifying him as a police officer while he watched Hernandez "pull the driver out of the car."  Id. at 76:4-8 (Maestas).  Maestas wore a vest that had his badge of office on his chest stating "Sheriff's Department" in 12-inch gold letters across the back of it.  See id. at 76:10-12 (Maestas).

44.    Maestas went to speak with the driver of the Expedition.  See id. at 76:13-14 (Maestas).

45.    Maestas asked the driver of the Expedition where he lived.  See id. at 76:15 (Maestas).

46.    The driver of the Expedition told Maestas he lived at 1320 Tapia and that his name

was Frank Garcia.  See id. at 76:15-16 (Maestas).[6]

47.    When Maestas asked Garcia if he knew Giangola, Garcia told Maestas that he knew Giangola and that Giangola was his brother.  See id. at 76:16-17 (Maestas).  Maestas could not recall whether Garcia identified Giangola by his surname or not.  See id. at 76:18-20 (Ortega & Maestas).

48.    Garcia told Maestas that he was on his way to pick up Giangola from a barbershop and pointed down the street.  See id. at 76:22-25 (Maestas).

49.    Maestas told Hernandez to detain Garcia.  See id. at 52:23-25 (Hernandez).

50.    Hernandez told Garcia that he was being held in investigative detention, placed Garcia in handcuffs, and placed Garcia in the back of his patrol car.  See id. at 53:2-5 (Hernandez); id. at 76:25-77:1 (Maestas).  Hernandez advised Garcia that there was a warrant and an investigation, and that Hernandez did not have any other information.  See id. at 53:2-5 (Hernandez).

51.    Hernandez detained Garcia while the search warrant was being executed at 1320 Tapia.  See id. at 61:1-4 (Oliveros & Hernandez).

52.    Hernandez could not recall whether he discovered where Garcia lived.  See id. at 53:13-14 (Ortega & Hernandez).[7]

53.    Maestas and Hernandez began to walk back towards the Expedition when they looked down the street towards where the barbershop would be located.  See id. at 77:1-3 (Maestas).

_____

    [6] Sabaugh later learned that the unidentified male driving the Expedition was Garcia.  See Tr.1 at 27:11-14 (Sabaugh); Sabaugh Report at 4.  Sabaugh was not present at Hernandez' traffic stop of Garcia.  See  id. at 27:17-18 (Sabaugh).

    [7] Sabaugh testified that, during the course of the stop, and upon questioning by Hernandez, Garcia advised the detectives that he lived at 1320 Tapia S.W. with his brother, Giangola, who stayed with him.  See Tr.1 at 27:15-16 (Sabaugh).  Because Sabaugh did not participate in the stop of the Expedition and Hernandez' investigative detention of Garcia, the Court credits Hernandez' recollection of the stop.

54.     Maestas pointed to a person walking near where he and Hernandez were located, but closer to Isleta Boulevard, between a store and a Sonic drive-in.  See id. at 55:25-54:3 (Hernandez).

55.     Maestas recognized Giangola from the picture he was shown at the briefing, and saw "consistent tattoos on his neck."  Id. at 77:6-8 (Maestas).

56.     There was nothing peculiar about how Giangola was walking.  See id. at 60:17-19 (Oliveros & Hernandez).

57.     Giangola was leaving a barbershop when he encountered Hernandez and Maestas. See Tr.2 at 6:15-19 (Oliveros & Giangola).

58.     Giangola was approximately 50 yards away when Maestas saw him.  See Tr.1 at 77:8-9 (Maestas); Tr.2 at 7:10-12 (Oliveros & Giangola).

59.     Giangola was watching Maestas and Hernandez, but was not violating any traffic laws.  See Tr.1 at 87:11-15 (Oliveros & Maestas).

60.     Giangola considered the Expedition his vehicle and his responsibility, so he crossed the street to confront the situation and see what was going on.  See Tr.2 at 11:23-25 (Giangola).

61.     Maestas told Hernandez that the person they saw walking was the other targeted person on the warrant, Giangola.  See Tr.1 at 54:3-4 (Hernandez).  Maestas did not have an arrest warrant for Giangola on March 13, 2007.  See id. at 85:20-22 (Oliveros & Maestas).

62.     Hernandez motioned and told Giangola to come towards him and Maestas.  See id. at 54:4-6 (Hernandez).  Hernandez did not summon Giangola over because of Giangola's conduct. See id. at 60:23-25 (Oliveros & Hernandez).  Hernandez did not know who Giangola was, and acted based on the information Maestas gave him.[8]  See id. at 54:7-10 (Ortega & Hernandez).

_____

[8] Hernandez identified Giangola in court on April 25, 2008.  See Tr.1 at 54:16-25 (Ortega, Hernandez & Court).

63.     Hernandez' purpose in summoning Giangola was to detain Giangola while the search warrant was being executed at 1320 Tapia.  See id. at 61:1-4 (Oliveros & Hernandez).

64.     Giangola was on the telephone when one of the officers, who was in uniform, yelled out at him and motioned for Giangola to approach him.  See Tr.2 at 7:1-9 (Oliveros & Giangola).

65.     Giangola had talked to Garcia, and Garcia told Giangola he was pulled over across the street.  See id. at 11:21-23 (Giangola).

66.     Giangola was on the telephone with his girlfriend, letting her know that Garcia had been pulled over in Giangola's truck and Giangola told her that he would not be home right away.  See id. at 12:4-7 (Oliveros & Giangola).

67.     Giangola hung up his phone and walked up to Hernandez and Maestas.  See id. at 7:13-16 (Oliveros & Giangola).

68.     Giangola came towards Hernandez, complying with Hernandez' summons.  See Tr.1 at 54:11-15 (Ortega & Hernandez); id. at 61:16-17 (Oliveros & Hernandez).

69.     Once Giangola and Garcia were detained, and unable to use a telephone, they could not interfere with the search warrant.  See id. at 86:14-20 (Oliveros & Maestas).

70.     Giangola was unaware that a search warrant was being executed at 1320 Tapia until Maestas told him.  See id. at 88:5-8 (Oliveros & Maestas).

71.     Giangola was facing both Hernandez and Maestas.  See Tr.2 at 7:17-20 (Oliveros & Giangola).  Hernandez was directly in front of Giangola approximately two or three feet away.  See Tr.1 at 7:21-23 (Oliveros & Giangola).

72.     Once Giangola came towards Hernandez, Hernandez asked Giangola "if he was Billy."  Id. at 55:13-14 (Hernandez).  Hernandez did not recall himself or Maestas asking Giangola

for identification.  See id. at 61:24-62:2 (Oliveros & Hernandez).[9]

73.    Giangola identified himself to Hernandez.  See id. at 55:14-16 (Ortega & Hernandez).

74.    Maestas began asking Giangola questions and asking Giangola if he was familiar with the Expedition.  See id. at 55:22-56:1 (Hernandez); id. at 77:18-20 (Maestas).

75.    Maestas did not read Giangola his Miranda rights.  See id. at 88:2-4 (Oliveros & Maestas).

76.    Giangola told Maestas that his brother was driving the Expedition, and that whatever they had stopped Garcia for, or whatever was in the Expedition, was Garcia's and not Giangola's. See id. at 77:20-23 (Maestas).

77.    Giangola identified the Expedition as his mother's vehicle and stated that "whatever's in the vehicle at that time he's not involved with."  Id. at 56:4-5 (Hernandez).  Giangola told the officer that "whatever Franky [Garcia] had done, that was on him, but the vehicle was registered to [Giangola's] mother, that it was [his] vehicle and [he] drove it, that it was insured, at which time [he] gave his . . . driver's license."  Tr.2 at 12:19-23 (Giangola).

78.    When Maestas asked Giangola if Giangola lived at 1320 Tapia, Giangola confirmed that he did live at that address.  See Tr.1 at 78:1-2 (Maestas).[10]

79.    Maestas gave Hernandez a look that Hernandez interpreted as an instruction to place

_____

[9]  Giangola testified that one of the officers told him to place his hands behind his back immediately after he complied with their instructions to come to them.  See Tr.2 at 7:24-25 (Oliveros & Giangola).  The Court finds it more believable that the officers identified Giangola before asking him to put his hands behind his back.

[10]  Giangola testified that, immediately after he gave his driver's license to Hernandez, Hernandez put his license in his pocket and told Giangola to put his hands behind his back.  See Tr.2 at 13:4-6 (Giangola).  The Court finds it credible that Hernandez kept Giangola's license, but finds it more likely that the officers attempted to coordinate their efforts before telling Giangola to put his hands behind his back.

handcuffs on Giangola.  See id. at 56:10-12 (Hernandez); id. at 64:1-3 (Oliveros & Hernandez).

Maestas never verbally instructed Hernandez to handcuff Giangola.  See id. at 64:1-3 (Oliveros &

Hernandez).  Maestas nodded at Hernandez, giving him "the nonverbal confirmation that you know

this is our guy he needs to be taken back to the [location where the] search warrant [is being

executed]."  Id. at 78:10-12 (Maestas).  Maestas testified that it is common among officers to

communicate nonverbally to let them "know the situation." Id. at 78:15-16 (Maestas).

80.     Maestas testified that, sometimes when an officer places someone in handcuffs, the

situation can get out of control, so the officer tries to do it as discretely as possible.  See id. at 78:18-

19 (Maestas).

81.     Maestas and Hernandez did not inform Giangola that he was going to be handcuffed.

See id. at 88:19-20 (Oliveros & Maestas).

82.     Hernandez told Giangola to turn around and attempted to handcuff Giangola.  See

id. at 56:12-13 (Hernandez).

83.     Hernandez had "difficulty" when Hernandez asked Giangola to turn around to be

handcuffed.  Id. at 78:20-23 (Ortega & Maestas).

84.     Maestas described the difficulty:  As Giangola was turning around compliantly to

place his hands behind his back, he asked Hernandez and Maestas why he was being handcuffed.

See id. at 79:1-3 (Maestas); Tr.2 at 12-17 (Oliveros & Giangola).

85.     Maestas told Giangola that he had a warrant for Giangola.  See Tr.1 at 79:3-4

(Maestas).  Maestas told Giangola they were executing a search warrant on his residence.  See Tr.2

at 13:17-22 (Ortega & Giangola).

86.     Giangola did not cooperate.  See Tr.1 at 56:14-15 (Ortega & Hernandez).

87.     Giangola tried to slip away, because he did not understand what was going on and

-14-

was confused.  See Tr.2 at 8:20-23 (Giangola).

88.     Hernandez was concerned about the presence of contraband on persons not cooperating with him.  See Tr.1 at 70:7-8 (Ortega & Hernandez).  He was concerned that a person who is not cooperating might be trying to conceal something.  See id. at 70:9-10 (Hernandez).

89.     Hernandez grabbed Giangola's arm to handcuff him, and Giangola attempted "roughly" to leave.  Id. at 56:17-18 (Hernandez).

90.     Giangola resisted Hernandez arresting him.  See id. at 70:20-24 (Ortega, Oliveros, Court & Hernandez).

91.     Hernandez considered Giangola to be resisting arrest because Giangola was "actively fleeing [Hernandez'] control."  Id. at 70:25-71:2 (Ortega & Hernandez).

92.     Giangola never struck Hernandez or Maestas.  See id. at 65:11-16 (Oliveros & Hernandez); id. at 68:25-69:1 (Ortega & Hernandez).

93.     Giangola spun around.  See id. at 56:21-22 (Ortega & Hernandez).

94.     Giangola spun "violently" out of Hernandez' grasp, turned and faced Maestas, and attempted to flee.  Id. at 79:6-8 (Maestas).

95.     Giangola took a couple steps away to flee, but Hernandez had either Giangola's wrist or hand, so Giangola could not take off.  See id. at 79:9-12 (Ortega & Maestas).  Maestas considered Giangola taking one or two steps "fleeing."  Id. at 90:13-22 (Oliveros & Giangola).

96.     Hernandez caught something on Giangola's person[11] with his fingers and held onto Giangola.  See id. at 56:19-20 (Hernandez).

_____

[11]   Hernandez initially testified that he caught Giangola's watch, see Tr.1 at 56:19-20 (Hernandez), but after he was advised that Giangola was not wearing a watch that day, he testified: "Well, my fingers got caught in something, so whether it was a watch or something, my fingers got caught."  Id. at 62:19-24 (Oliveros & Hernandez).

-15-

97.     Hernandez had a tight grip on Giangola's wrist.  See Tr.2 at 8:18-20 (Oliveros & Giangola).

98.     Hernandez never felt threatened by Giangola.  See Tr.1 at 69:2-3 (Ortega & Hernandez).[12]

99.     Maestas testified that it has been his experience that persons arrested for aggravated assault may be capable of attacking him.  See id. at 79:18-20 (Maestas).

100.    Maestas knew Giangola was suspected of trafficking narcotics and did not know if Giangola had any weapons on his person.  See id. 1 at 79:23-24 (Maestas).

101.    Maestas was afraid that Giangola was going to hit or attack him at that time.  See id. at 79:23-24 (Maestas).

102.    Although Maestas testified that he was concerned that Giangola might have a weapon,  see id. at 79:25-80:1 (Ortega & Maestas), the Court does not find that Maestas was concerned that Giangola might have a weapon.

103.    Giangola did not verbally threaten Maestas.  See id. at 90:3-4 (Oliveros & Maestas).

104.    Maestas and Hernandez were both struggling with Giangola.  See id. at 80:21-25 (Ortega & Maestas).

---

[12] Giangola did not threaten to hit either officer and testified that he did not attempt to flee the scene.  See Tr.2 at 9:12-16 (Oliveros & Giangola).  Maestas testified that Giangola took an aggressive stance, meaning that Giangola "separated his legs" and put his fists up towards Maestas facing Maestas directly.  Tr.1 at 79:10-15 (Maestas & Ortega). Maestas testified that, after he observed Giangola taking a stance and balling up his fists, Maestas used a "distracting technique." Id. at 80:2-4 (Ortega & Maestas), id. at 91:2-4 (Oliveros & Maestas). Hernandez later testified that Giangola could square off directly in front of him, because Giangola pulled away from Hernandez who had one of Giangola's arms.  See id. at 90:5-12 (Oliveros & Maestas).  Giangola testified that he was unable to assume any kind of fighting stance because an officer had his left wrist.  See Tr.2 at 14:19-23 (Ortega & Giangola). The Court does not believe that it needs to find whether Giangola assumed a fighting stance, or whether Giangola attempted to flee, because these actions took place after the officers attempted to handcuff Giangola.

105.     Maestas used a "distracting technique." Id. at 80:2-4 (Ortega & Maestas).  See id. at 91:2-4 (Oliveros & Maestas).

106.     Maestas hit Giangola in the nose with an empty fist.  See id. at 80:4-5 (Maestas).

107.     Maestas knocked Giangola down[13] by striking him.  See Tr.2 at 9:3 (Giangola).[14]

108.     Hernandez had control of Giangola's hand, but Maestas took Giangola to the ground. See Tr.1 at 57:5-8 (Ortega & Hernandez).

109.     Maestas took Giangola to the ground by striking Giangola.  See id. at 65:17-22 (Oliveros & Hernandez); id. at 80:5-6 (Maestas).

110.     When Giangola fell to the ground, he kept one hand stuck underneath himself, and Maestas instructed Giangola to take his arm out and put it behind his back.  See id. at 80:7-8 (Maestas).

111.     When Giangola did not comply, Maestas hit Giangola two or three more times with his fist and his knee, in Giangola's arm and leg, until Giangola put his arm behind his back.  See id. at 80:9-13 (Maestas & Ortega).

112.     While Maestas was hitting Giangola, he was telling Giangola not to resist and to put his hand behind his back.  See id. at 80:15-17 (Maestas).

_____

[13]  Giangola testified that he "woke up" already handcuffed and being hit in the body by one of the officers.  See Tr.2 at 9:3-4 (Giangola).  The Court finds it more credible that Maestas knocked Giangola down.  The Court is skeptical that someone who is hit in the nose would immediately be knocked out.

[14]  Maestas testified that, after he punched Giangola, Giangola attempted to run.  See Tr.1 at 80:5-6 (Maestas).  Hernandez testified that Maestas took Giangola to the ground by striking him. See Tr.1 at 65:17-22 (Oliveros & Hernandez); Tr.1 at 80:5-6 (Maestas). The Court finds it more credible that Giangola fell to the ground after Maestas punched him.  The Court also finds that there is no conflict between Maestas' testimony and Giangola's testimony.  Giangola did not comply with Maestas' requests because Giangola was already knocked down from Maestas punching Giangola in the nose with an empty fist.

113.    When Giangola was on the ground, Hernandez was able to place Giangola in handcuffs.  See id. at 56:24-57:1 (Hernandez).

114.    Hernandez did not read Giangola his Miranda rights.  See id. at 66:18-20 (Oliveros & Hernandez).

115.    The struggle took less than thirty seconds.  See id. at 57:13-15 (Ortega & Hernandez); id. at 81:1-4 (Ortega & Maestas).

116.    Hernandez observed injuries to Giangola that the struggle caused.  See id. at 57:19-20 (Ortega & Hernandez).

117.    Hernandez observed that Giangola had blood on his face, but Hernandez did not know from where the blood was coming.  See id. at 57:20-21 (Hernandez).

118.    Giangola received injuries to his top lip and his nose.  See Tr.2 at 9:9-11 (Oliveros & Giangola).[15]

119.    Giangola received medical treatment at the scene of the arrest.  See id. 1 at 57:22-58:1 (Ortega & Hernandez); id. at 82:9-11 (Ortega & Maestas).

120.    Maestas put Giangola under arrest for evading, obstructing, and assault on a peace officer.  See id. at 81:5-8 (Ortega & Maestas).

121.    Maestas began patting Giangola down and felt a large object in Giangola's right front pant pocket.  See id. at 81:10-11 (Maestas).

122.    Maestas reached into Giangola's pocket and pulled out the object.  See id. at 81:11-12 (Maestas).

123.    Maestas found a bag that he believed to be filled with crack cocaine, because it was

_____

[15]  Maestas did not notice that Giangola had a swollen lip, but admitted that it was possible Giangola had a swollen lip.  See Tr.1 at 91:21-23 (Oliveros & Maestas).

an off-white, yellowish, hard substance, with the same consistency as crack cocaine, based on his experience.  See id. at 81:14-18 (Ortega & Maestas).

124.    Maestas continued to search Giangola's person and found in his left pant pocket a white powder substance consistent with powder cocaine, based on Maestas' training and experience. See id. at 81:23-82:5 (Maestas & Ortega).

125.    Giangola admitted that these two baggies contained crack cocaine and powder cocaine.  See Tr.2 at 16:3-8 (Giangola & Ortega).

126.    Giangola had forty-two grams of crack cocaine and twenty-one grams of powder cocaine.  See id. at 16:15-19 (Giangola & Ortega).

127.    Maestas did not field-test any of the substances found on Giangola's person.  See Tr.1 at 82:6-8 (Ortega & Maestas).

128.    Hernandez detained Garcia and brought him back to the apartment.  See id. at 27:20-21 (Sabaugh); Sabaugh Report at 4.

129.    Hernandez never submitted a report regarding his arrest of Giangola.  See Tr.1 at 62:3-5 (Oliveros & Hernandez).

130.    The officers drove Garcia and Giangola to the apartment on 1320 Tapia.  See Tr.2 at 10:14-17 (Oliveros & Giangola); Tr.1 at 41:20-22 (Ortega & Sabaugh).

131.    Sabaugh read Garcia and Giangola their constitutional rights pursuant to Miranda[16] and interviewed them.  See Tr.1 at 28:7-10 (Sabaugh); Tr.2 at 17:5-7 (Ortega & Giangola).  Garcia and Giangola stated that they understood their rights.  See Tr.1 at 28:10-11 (Sabaugh).

_____

[16] At one point in his testimony, Giangola testified that he was never read his Miranda rights at the police station, see Tr.2 at 10:9-10 (Oliveros & Giangola), but later admitted that Sabaugh did read him his rights, see id. at 11:4-5 (Giangola).  The Court finds Sabaugh's assertion that she read Garcia and Giangola their Miranda rights credible.

-19-

132.    Garcia told Sabaugh that he was the primary resident at 1320 Tapia and that Giangola frequently stayed there.  See id. at 28:15-16 (Sabaugh).

133.    Sabaugh asked Garcia which bedroom was his and Garcia indicated that he slept on the couch.  See id. at 28:15-18 (Sabaugh).

134.    Giangola told Sabaugh that he stayed at the apartment at 1320 Tapia S.W. on and off, but lived somewhere else.  See Tr.2 at 18:12-17 (Ortega & Giangola); Tr.1 at 47:10-14 (Ortega & Sabaugh).[17]

135.    Garcia would not tell Sabaugh which room Giangola slept in.  See id. at 28:18-20 (Sabaugh).

136.    During Sabaugh's interview of Giangola, Giangola told Sabaugh that he had been employed as a scaffolder, but had been fired two weeks before the arrest.  See id. at 29:17-18 (Sabaugh).

137.    Sabaugh observed that Giangola had visible injuries because he had a swollen and bloody lip, and he had dried blood on his face.  See id. at 42:12-24 (Oliveros & Sabaugh).  Sabaugh knew that officers had struck Giangola.  See id. at 42:25-43:1 (Oliveros & Sabaugh).

138.    When Sabaugh asked Giangola if he "rocked up[18] the cocaine himself," Giangola said he did not know how to do that and then asked Sabaugh whether the officers found any baking soda in the apartment.  Id. at 29:21-24 (Sabaugh).  Sabaugh thought that Giangola's response was significant because mixing cocaine and baking soda makes crack cocaine.  See id. at 29:25-30:2

---

[17]  Giangola initially testified that, while at the apartment, he did not make any statements to any of the deputies or detectives.  See Tr.2 at 10:18-20 (Oliveros & Giangola).

[18]  Sabaugh testified that the term "rocked up" means "converting powder cocaine into rock cocaine."  Tr.1 at 30:3-6 (Ortega & Sabaugh).

(Ortega & Sabaugh).[19]

139.   During the search of 1320 Tapia, officers found cocaine powder residue on the coffee table in the apartment.   See id. at 30:16 (Sabaugh); Tr.1 at 30:20-21 (Sabaugh).

140.   Officers found .4 grams of heroin inside a stereo in one of the bedrooms.   See id. at 30:18-19 (Sabaugh); id. at 30:22-24 (Ortega & Sabaugh).   .4 grams of heroin is considered a user amount of heroin.   See id. at 30:25-31:1 (Ortega & Sabaugh).

141.   Officers found documents with Frank Garcia's name on them inside the apartment. See id. at 30:17 (Sabaugh).   The officers did not find documents with Giangola's name on them. See id. at 36:4-6 (Oliveros & Sabaugh).

142.   After the search warrant was executed, Giangola was transported to a police substation located on Isleta.   See Tr.2 at 9:21-23 (Oliveros & Giangola); Tr.1 at 42:6-9 (Ortega & Sabaugh).

143.   Before Giangola went inside the substation, officers took pictures of him outside standing up against a wall.   See Tr.2 at 9:25-10:1-2 (Giangola).

144.   At the substation, an officer told Giangola he was being charged with trafficking, and Giangola told the officer he was using the cocaine for personal use.   See Tr.2 at 17:16-23 (Ortega & Giangola).

145.   Officers placed Giangola in a holding cell where he remained for approximately fifteen or twenty minutes before a female officer let him out.   See id. at 10:2-4 (Giangola).

---

[19] Giangola testified that he told Sabaugh he did not know how to cook crack cocaine.   See Tr.2 at 19:9-14 (Ortega & Giangola).   Giangola initially did not recall asking Sabaugh if the officers found any baking soda in the house, see id. at 19:19-22 (Ortega & Giangola), but later denied making that statement, see id. at 20:2-4.   The Court finds that Giangola made the statement, because it finds Sabaugh's testimony more credible on this point, and because, while Giangola ultimately denied the statement, he also testified he could not recall if he made that statement.

## PROCEDURAL BACKGROUND

On September 21, 2007, Giangola submitted a motion to suppress evidence seized from him in violation of his rights under the Fourth Amendment of the United States Constitution. See Doc. 26. In his original motion, Giangola requested the Court grant him a Franks hearing to assess the veracity of the affidavit upon which the search warrant was based and which resulted in Giangola's arrest. See id. at 1. The United States opposed Giangola' motion for several reasons. See Response to Defendant's Motion to Suppress Evidence, filed October 24, 2007 (Doc. 33)("Response").

After Giangola retained new counsel, Ms. Louren M. Oliveros, and after Ms. Oliveros entered an appearance on January 9, 2008 (Doc. 38), and obtained the file from former counsel, Giangola filed a Motion for Leave to Supplement Briefing on Defendant's Motion to Suppress. See Doc. 40. On April 13, 2008, Giangola, through Ms. Oliveros, moved the Court, unopposed, for an order allowing supplemental briefing on his motion to suppress. See Motion for Leave to Supplement Briefing on Defendant's Motion to Suppress, filed January 13, 2008 (Doc. 40). Ms. Oliveros stated that, after reviewing the pleadings and discovery, Giangola sought to supplement the briefing to raise additional grounds for the suppression of evidence. See id. ¶ 2, at 1.

At the April 25, 2008 hearing, Giangola withdrew his arguments requesting a Franks hearing, and proceeded only on the arguments he raised in his supplemental brief. See Tr.1 at 7:2-12 (Court & Oliveros). Ms. Oliveros also explained that Garcia and Giangola are not brothers nor half brothers. See Tr.2 at 23:7-17 (Court & Oliveros). Ms. Oliveros noted that Garcia and Giangola might have referred to themselves as brothers. See id. at 23:22-24 (Court & Oliveros).

Giangola distinguished his detention from other detentions because it occurred away from the residence being searched. See id. at 24:16-20 (Court & Oliveros). Giangola contended that a Terry stop must have a temporal connection with criminal activity. See id. at 26:15-24 (Court &

Oliveros).  Ms. Oliveros stated that "in every case [she] ha[s] read in preparing for this there has always been a temporal proximity."  Id. at 26:19-20 (Oliveros).  Giangola contended that the officers only had information about Giangola's prior criminal history and "that he had a conviction for assault against a police officer." Id. at 27:1-3 (Oliveros). Giangola argued that his detention was an arrest, not an investigative detention, because the officers intended to arrest him as soon as they saw him.  See id. at 30:3-8 (Oliveros).

Giangola conceded that caselaw supports the principle that occupants of a premises being searched pursuant to a search warrant may be detained because of safety concerns or other concerns about destruction of evidence or interference with the execution of the search warrant.  See id. at 30:22-31:1-2 (Oliveros).  Giangola argued that he had no ability to interfere with the search warrant, because he did not know about it.  See id. at 33:14-16 (Oliveros).  Giangola contended that the officers formally arrested him when they put handcuffs on him.  See id. at 36:8-9 (Oliveros). Giangola noted that he is not asking the Court to suppress the evidence that came from the search warrant executed at the residence, and is only asking the Court to suppress the evidence that the police found in his pockets incident to his arrest and any statements he made after that arrest.  See id. at 37:3-9 (Court & Oliveros).  Giangola asserted that he never actually ran away.  See id. at 39:15-18 (Oliveros).

The United States conceded that Giangola was arrested on March 13, 2007.  See Tr.2 at 20:22-21:3 (Court & Ortega).  The United States conceded that the officers did not have probable cause to arrest Giangola before they encountered Giangola on Isleta.  See id. at 21:4-12 (Court & Ortega).  The United States conceded that the officers intended to put handcuffs on Giangola and detain him when they saw Giangola walking up the street.  See id. at 21:20-22 (Court & Ortega). The United States contended that the officers intended to detain Giangola because of the search

warrant that was about to be executed and because they had authority under the search warrant to search Giangola's person.  See id. at 21:22-25 (Ortega).  The United States asserted that the officers conducted a Terry-stop of Giangola.  See id. at 22:1-5 (Court & Ortega).

The United States argued that the officers thought it was necessary to handcuff Giangola because of officer safety and because the officers needed to make sure that Giangola and Garcia were not going to cause harm, were not armed, and were not carrying contraband.  See id. at 22:14-18 (Ortega).  The United States' position was that the officers can handcuff Giangola without formally arresting him.  See id. at 22:19-22 (Court & Ortega).  The United States contended that a reasonable suspicion could be of criminal activity days before, or in the past.  See id. at 41:5-13 (Court & Ortega).  The United States argued that placing handcuffs on Giangola was reasonable because Sabaugh had done research on Giangola's criminal history and knew that Giangola had previously assaulted a police officer.  See  id. at 42:16-22 (Court & Ortega).  The United States contended that handcuffing Giangola was reasonable also because the officers were in a public venue, and wanted to keep control of the scene and maintain their safety as well as the public's safety.  See id. at 43:1-3 (Ortega).  The United States asserted that the officers' conduct was justified at its inception when they asked Giangola to cooperate and put his hands behind his back because they thought he was engaged in criminal activity based on the information that Sabaugh had given them.  See id. at 44:22-24 (Ortega).

The United States maintained that the officers' pat-down of Giangola was a search incident to arrest, and was not a Terry frisk.  See id. at 46:12-15 (Court & Ortega).  The United States argued that Giangola's detention became an arrest as soon as Giangola stopped cooperating and had to be taken to the ground.  See id. at 50:19-22 (Ortega).  The United States contended that the distance between where Giangola was arrested and 1320 Tapia is a red herring, because the distance does not

matter; the ability of Giangola to interfere with officers executing the search warrant is what matters. See id. at 50:10-16 (Ortega).

## RELEVANT FOURTH AMENDMENT LAW

The Fourth Amendment protects a person's right to be secure against unreasonable seizure. The hallmark of the Fourth Amendment is reasonableness. Accordingly, there are categories of police/citizen encounters, see United States v. Griffin, 7 F.3d 1512, 1516 (10th Cir. 1993), and what the police may do turns on the category of encounter.[20]

### 1.     Reasonable Suspicion.

In Terry v. Ohio, the Supreme Court of the United States held that a police officer can temporarily detain an individual suspected of criminal activity if the officer can point to specific, articulable facts that, when taken together with rational inferences from those facts, reasonably warrant the intrusion. See 392 U.S. at 21. The officer's stop or seizure of a person must be based on reasonable suspicion that he or she was involved in wrongdoing that can be supported by specific articulable facts. See id.

Officers may ask the person questions during the Terry stop to dispel or confirm the officers' suspicions that a law is being violated. See Florida v. Royer, 460 U.S. 491, 498 (1983); United States v. Brignoni-Ponce, 422 U.S. 873, 881-82 (1975). The detainee, however, is not obliged to respond. See Berkemer v. McCarty, 468 U.S. 420, 439 (1984)(stating that "the detainee is not obliged to respond. And, unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released."). A police-citizen encounter which goes beyond the limits of a Terry stop is an arrest that must be supported by probable cause or consent to be valid. See

_____

[20] No party contends the encounter here was consensual. The Court will therefore confine its discussion to Terry stops and arrests.

United States v. Perdue, 8 F.3d 1455, 1462 (10th Cir. 1993)("An encounter between police and an individual which goes beyond the limits of a Terry stop, however, may be constitutionally justified only by probable cause or consent.").

An officer may "stop and frisk" an individual under the Fourth Amendment if a reasonably prudent person "in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry v. Ohio, 392 U.S. at 27. "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Id. A frisk "must . . . be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." Id. at 29. In evaluating the validity of the stop-and-frisk, the totality of the circumstances must be considered. Florida v. Bostick, 501 U.S. 429, 436 (1991).

These stop-and-frisk principles apply with equal weight to motorists and to pedestrians. Michigan v. Long, 463 U.S. 1032, 1050-51 (1983). The United States Court of Appeals for the Tenth Circuit has adopted the Terry doctrine for an investigative detention -- "stop" -- and for a protective search -- "frisk." United States v. King, 990 F.2d 1552, 1557 (10th Cir. 1997)("Terry has come to stand for two distinct propositions -- an investigative detention ('stop') in which a police officer, for the purpose of investigation, may briefly detain a person on less than probable cause, . . . and a protective search ('frisk') which permits an officer, in the course of an investigative detention, to conduct a limited search for weapons for his or her own protection.")(internal citations omitted). The legal standard is whether a "stop and frisk" is reasonable under the Fourth Amendment. United States v. King, 990 F.2d at 1557.

The court must conduct a two-part inquiry to determine whether an investigative detention

is reasonable under the Fourth Amendment.  See id.

> To determine whether an investigative detention or a protective search is reasonable under the Fourth Amendment, the inquiry is twofold. First, the officer's action must be justified at its inception. . . .  For an investigative detention, the officer must have an articulable and reasonable suspicion that the person detained is engaged in criminal activity. . . . For a protective search to be "justified at its inception," the officer must not only harbor an articulable and reasonable suspicion that the person is armed and dangerous, the officer must also be entitled to make a forcible stop.

> The second prong of the reasonableness inquiry of either an investigative detention or a protective search is whether the officer's action is reasonably related in scope to the circumstances which justified the interference in the first place.

United States v. King, 990 F.2d at 1557 (internal citations and quotation marks omitted).

Neither "inarticulable hunches," nor "inchoate and unparticularized suspicion," will suffice to justify an investigatory detention.  Terry v. Ohio, 392 U.S. at 22, 27.  In determining the reasonableness of an investigation detention, however, "'common sense and ordinary human experience must govern over rigid criteria.'" United States v. Walraven, 892 F.2d 972, 975 (10th Cir. 1989)(quoting United States v. Sharpe, 470 U.S. 675, 685 (1985)).  An investigative detention may be unreasonable when it is a more serious intrusion on one's liberty than is allowable on the mere suspicion of criminal activity.  See United States v. King, 990 F.2d at 1557.

Reasonable suspicion cannot be based on stale information or only on knowledge of a person's prior criminal involvement.  "[K]nowledge of a person's prior criminal involvement (to say nothing of a mere arrest) is  alone insufficient to give rise to the requisite reasonable suspicion." United States v. Sandoval, 29 F.3d 537, 542 (10th Cir. 1994).  The Tenth Circuit noted in United States v. Sandoval that it had found "no case elsewhere that even suggest[s] the contrary." 29 F.3d at 542.  The Tenth Circuit in United States v. Sandoval explained that, "[i]f the law were otherwise, any person with any sort of criminal record -- or even worse, a person with arrests but no convictions -- could be subjected to a Terry-type investigative stop by a law enforcement officer at

any time without the need for any other justification at all." 29 F.3d at 543.  In United States v. Sandoval, the officer's use of the defendant's earlier involvement in a hit-and-run incident and a five-year old arrest, without conviction, for a claimed narcotics violation did not provide a reasonable suspicion to believe that the defendant was violating drug laws at the time the officer stopped him.  See 29 F.3d at 543.

An officer lacked reasonable suspicion to detain a defendant solely based on his knowledge of the defendant's previous driving record.  See United States v. Laughrin, 438 F.3d 1245, 1247 (10th Cir. 2006).  The Tenth Circuit stated: "To find reasonable suspicion in this case could violate a basic precept that law-enforcement officers not disturb a free person's liberty solely because of a criminal record." Id. "Under the Fourth Amendment our society does not allow police officers to 'round up the usual suspects.'" Id.

In United States v. Cortez-Galaviz, 49 F.3d 1203 (10th Cir. 2007), the Tenth Circuit explained that "timeliness of information [possessed by an officer] is but one of many factors in the mix when assessing whether reasonable suspicion for an investigatory detention exists, and the relative importance of timeliness in the mix depends on the nature of the criminal activity at issue." Id. at 1209.  The Tenth Circuit stated:

> Thus, for example, when the legal infraction at issue typically wears on for days or weeks or months (like, say, driving without a license or appropriate emissions and safety certifications), rather than concludes quickly (like, say, jaywalking or mugging), the timeliness of the information on which the government relies to effect an investigative detention "recedes in importance" compared to other factors, such as the type and duration of offense at issue.

United States v. Cortez-Galaviz, 49 F.3d at 1209.  The Tenth Circuit held in United States v. Cortez-Galaviz that the officer could rely on a twenty-day old alert regarding insurance possessed that the defendant possessed, because:

> [The defendant] offered . . .  no other evidence or argument to suggest that reliance
> on a 20 day old alert is in any way or wise unreasonable given the nature of available
> technology, the offense or detention at issue, or the practical challenges associated
> with coordinating the dissemination of registration and insurance information for
> every motor vehicle on the road. Under these circumstances and on this record,
> therefore, we agree with the district court that a delay of 20 days between an alert
> and an officer's inquiry does not, by and of itself, nullify a traffic stop on the basis
> of a "not found" insurance report.

Id. at 1209.

### 2.        Probable Cause for Search Warrants.

Probable cause is established when the facts described in a search warrant affidavit would enable "a reasonably prudent person to believe that a search of the described  premises would uncover evidence of a crime."   United States v. Burns, 624 F.2d 95, 99 (10th Cir. 1980). Furthermore, "[i]n determining whether probable cause exists to issue a search warrant, a magistrate's task is to make a 'practical, common-sense decision' based on the totality of the circumstances as set forth in the affidavit." United States v. Rowland, 145 F.3d 1194, 1204 (10th Cir. 1998)(quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)).  See United States v. Simpson, 152 F.3d 1241, 1245 (10th Cir. 1998)(stating that a judge issuing a warrant must decide whether, under a totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place and thus probable cause exists to issue the warrant).

Moreover, the Tenth Circuit has held that federal law controls federal prosecutions involving Fourth Amendment issues, even when the police actions are those of state police officers.  See United States v. Miller, 452 F.2d 731, 733 (10th Cir. 1971)(stating that "this court has held that in federal prosecutions the test of reasonableness in relation to Fourth Amendment protected rights must be determined by Federal law even though the police actions are those of state police officers.")(citing United States v. Self, 410 F.2d 984 (10th Cir. 1969); Sablowski v. United States,

403 F.2d 347 (10th Cir. 1968)).

> Reasonable suspicion to search is not the same standard as search incident to arrest.
>
> A pat-down search, however, requires additional suspicion that the suspect may be armed and dangerous. Although [an o]fficer . . . could remove [a defendant] from the car as a part of a routine traffic stop, he could not perform a pat-down search for weapons unless he reasonably suspected that [the defendant] might be carrying one.

United States v. Rice, 483 F.3d 1079, 1084 (10th Cir. 2007). The Tenth Circuit has explained that:

> Reasonable suspicion is a less demanding standard than probable cause  because reasonable suspicion can arise from information that is less reliable than that required to show probable cause. . . . . Unlike probable cause, reasonable suspicion is merely a particularized and objective basis for suspecting criminal activity. . . . To determine whether the investigating officers had reasonable suspicion, we consider both the quantity of information possessed by law enforcement and its reliability.

United State v. Fiscus, 64 Fed.Appx. 157, 161 (10th Cir. 2003).

Search incident to an arrest is also a warrantless search.  See United States  v. Franco, 981 F.2d 470, 472 (10th Cir. 1992).  The purpose of a search incident to arrest, however, is to "prevent . . . the arrestee from reaching weapons or destructible evidence."  Id.  For a search incident to an arrest to be legitimate, the following must be true: "(1) a legitimate basis for the arrest existed before the search, and (2) the arrest followed shortly after the search."  United States v. Anchondo, 156 F.3d 1043, 1045 (10th Cir. 1998).  A search incident to arrest must be performed contemporaneously with the arrest.  See United States v. Walker, 33 Fed.Appx. 921, 923 (10th Cir. 2002)(stating that "[w]e have clearly held in this circuit that officers may not search an automobile incident to an arrest after the defendant has been removed from the scene of the arrest.")(citing United States v. Edwards, 242 F.3d 928, 937-38 (10th Cir. 2001)("Because [the defendant] was incapacitated with handcuffs and sitting in the back of a police car approximately 100-150 feet away from the rental car, any justification to conduct a search incident to arrest had dissipated.")).

**3.     Warrantless Arrests.**

Under certain circumstances, a police officer may lawfully arrest an individual without an arrest warrant, including when the officer witnesses an individual commit an offense in the officer's presence. See United States v. Watson, 423 U.S. 411, 418 (1976)("The cases construing the Fourth Amendment thus reflect the ancient common-law rule that a peace officer was permitted to arrest without a warrant for a misdemeanor or felony committed in his presence as well as for a felony not committed in his presence if there was reasonable ground for making the arrest."); Romero v. Fay, 45 F.3d 1472, 1476 (10th Cir. 1995)("A police officer may arrest a person without a warrant if he has probable cause to believe that person committed a crime.").  Thus, to protect the Fourth Amendment's right to be free from unreasonable seizure, probable cause must support formal arrests or seizures that resemble formal arrests.  See Michigan v. Summers, 452 U.S. 692, 700 (1981)(stating that "every arrest, and every seizure having the essential attributes of a formal arrest, is unreasonable unless it is supported by probable cause.").

Probable cause to arrest means a  police officer has a reasonable belief that the person arrested has committed or is committing a crime.  As the Supreme Court explained in  Wong Sun v. United States, 371 U.S. 471(1963):

> It is basic that an arrest with or without a warrant must stand upon firmer ground than mere suspicion . . .  though the arresting officer need not have in hand evidence which would suffice to convict. The quantum of information which constitutes probable cause -- evidence which would warrant a man of reasonable caution in the belief that a felony has been committed [ -- ] . . . must be measured by the facts of the particular case.

Id. at 479 (internal citations omitted).

> The crucial question for us then is whether knowledge of the related facts and circumstances gave the officer "probable cause" within the meaning of the Fourth Amendment, and "reasonable grounds" . . . to believe that petitioner had committed or was committing a violation of the narcotic laws. If it did, the arrest, though without a warrant was lawful and the subsequent search of petitioner's person and the seizure of the found heroin were validly made incident to a lawful arrest, and

therefore the motion to suppress was properly overruled and the heroin was competently received in evidence at the trial.

Draper v. United States, 358 U.S. 307, 310-11 (1959).  See United States v. Valenzuela, 365 F.3d 892, 896 (10th Cir. 2004)(stating that probable cause to arrest exists when facts and circumstances within an officer's knowledge are sufficient to warrant a man of reasonable caution to believe that an offense has been or is being committed).  "Probable cause to arrest exists only when the facts and circumstances within the officer's knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed."  United States v. Valenzuela, 365 F.3d at 896 (10th Cir. 2004)(internal quotation marks omitted).

An arrest or seizure occurs "when the officer, by means of physical force or shadow of authority, has in some way restrained the liberty of a citizen."  Terry v. Ohio, 392 U.S. at 19 n.16. A show "of official authority such that 'a reasonable person would have believed he was not free to leave'" indicates that an arrest has occurred.  Florida v. Royer, 460 U.S. at 502 (quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980)).  An arrest is distinguished by the involuntary, "highly intrusive or lengthy search or detention" nature of the encounter.  Oliver v. Woods, 209 F.3d 1179, 1186 (10th Cir. 2000)(internal quotation marks omitted).  "[T]he use of firearms, handcuffs, and other forceful techniques does not necessarily transform a Terry detention into a full custodial arrest -- for which probable cause is required -- when the circumstances reasonably warrant such measures."  United States v. Melendez-Garcia, 28 F.3d 1046, 1052 (10th Cir. 1994)(internal quotation marks omitted).

In United States v. Melendez-Garcia, the Tenth Circuit noted that, "[s]ince police officers should not be required to take unnecessary risks in performing their duties, they are authorized to

-32-

take such steps as are reasonably necessary to protect their personal safety and maintain the status quo during the course of a Terry stop." 28 F.3d at 1051 (internal quotation marks and brackets omitted). If police officers' actions exceed "what is reasonably necessary under the totality of the circumstances, the stop may only be justified by probable cause or consent." Id. The Tenth Circuit explained "[t]here is no bright-line rule to determine whether the scope of police conduct was reasonably related to the goals of the stop; rather our evaluation is guided by common sense and ordinary human experience." Id. at 1052 (internal quotation marks omitted). The court "must avoid unrealistic second-guessing of police officers' decisions . . . and . . . not require them to use the least intrusive means in the course of a detention, only reasonable ones." Id. While de minimus intrusions on a person detained by a Terry stop for officer safety are permissible, "the use of force such as handcuffs . . . is a far greater level of intrusion, and requires the government to demonstrate that the facts available to the officer would warrant a man of reasonable caution in the belief that the action taken was appropriate." Id. (internal quotation marks omitted).

In United States v. Melendez-Garcia, the officers "gave no reasons why the circumstances of the stop reasonably necessitated the display of firearms and the use of handcuffs." 28 F.3d at 1052. The Tenth Circuit noted that "[d]rugs and guns and violence often go together, and thus [that the stop was based on suspicion of trafficking drugs] might be a factor tending to support an officer's claim of reasonableness." Id. There was no evidence from the officers' testimony in United States v. Melendez-Garcia, however, that suggested that they had reason to believe that "these particular suspects had guns or were violent or that the circumstances of this particular encounter warranted the unusual intrusiveness of handcuffing the defendants during the Terry stop." Id. at 1052-53. The Tenth Circuit held that, "[i]n the absence of such evidence, the naked fact that drugs are suspected will not support a per se justification for use of guns and handcuffs in a Terry

stop."  Id. at 1053.  The Tenth Circuit stated:

> The government does not explain or offer evidence to support an explanation why the officers in this case needed to execute a "felony stop" when they outnumbered the defendants, executed the stop on an open highway during the day, had no tips or observations that the suspects were armed or violent, and the defendants had pulled their cars to a stop off the road and stepped out of their cars in full compliance with police orders. Based on this record, the government has not met its burden of showing that, under the totality of the circumstances, the intrusiveness of this seizure was reasonably necessary for officer safety.

Id. at 1053.  The Tenth Circuit also noted "given that [the defendant] was handcuffed and strapped into an officer's car, it is obvious that a reasonable person in [the defendant's] condition would not have felt free to terminate the encounter and leave."  Id.  The Tenth Circuit concluded that the defendant was illegally arrested.  See id.

In United States v. Shareef, 100 F.3d 1491 (10th Cir. 1996), the Tenth Circuit held that the officers were justified in handcuffing a defendant who they suspected was a wanted felon in handcuffs while they attempted to investigate his identity.  Id. at 1507.  "It is not unreasonable to fear that a wanted felon will attempt to flee and may jeopardize the safety of officers in such an attempt."  Id.  Once the officers confirmed the defendant's identity, however, and ascertained that he was not a wanted felon, "the continued use of handcuffs constituted an unlawful arrest."  Id.

In United States v. Bennett, 329 F.3d 769 (10th Cir. 2003), the Tenth Circuit held that the officers did not transform their detention of the defendant into an arrest by using their firearms and handcuffs.  See id. at 774.  The Tenth Circuit noted that the United States had a tip from a confidential informant that the defendant was dealing drugs and carrying a firearm, a state court judge determined that there was probable cause to search the defendant's home for illegal drugs and drug-related paraphernalia, the defendant initially disobeyed police orders to stop and entered his garage at the residence where the search warrant was to be executed, and the police were unaware

-34-

of the defendant's activities in the garage.  See id. at 774.  The police "acted reasonably in minimizing the risk of harm to themselves and others by securing the defendant to determine if he had any weapons."  Id.  "Police may use firearms and handcuffs as part of a permissible detention when they reasonably believe it is necessary for their safety and protection."  Id.

In United States v. Perea, 374 F.Supp.2d 961 (D.N.M. 2005)(Browning, J.), the Court held that it was reasonable for officers to place the defendant in handcuffs "for their safety while they conducted their brief investigative questioning of him to establish his identity and dispel their reasonable suspicions of criminal activity . . . . The officers thus did not transform their investigative detention of [the defendant] into an arrest when they  . . . placed him in handcuffs."  Id. at 977.  In United States v. Perea, "the officers' belief that a homicide suspect may be an occupant in [a] vehicle distinguished it from . . . [United States v. ]Melendez-Garcia . . . which lacked any such belief or suspicion of possible threat to officer safety."  United States v. Perea, 374 F.Supp.2d at 976 n.21.  Thus, because the "officers had a belief that a suspect wanted for homicide may have been in the [car], . . . it was reasonable to conduct a felony stop and place [the defendant] in handcuffs in the rear seat of a police car."  Id. at 976.  The Court declined to decide whether the officers had probable cause to arrest the defendant.  See id. at 976 n.22.

The Tenth Circuit has identified several factors that are relevant in determining whether a person has been seized within the meaning of the Fourth Amendment.  They include:

> [(i)] The threatening presence of several officers; [(ii)] the brandishing of a weapon by an officer; [(iii)] some physical touching by an officer; [(iv)] the use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; [(v)] prolonged retention of a person's personal effects; [(vi)] a request to accompany the officer to the station; [(vii)] interaction in a nonpublic place or a small, enclosed space; [(viii)] and absence of other members of the public.

Jones v. Hunt, 410 F.3d 1221, 1226 (10th Cir. 2005)(internal quotation marks omitted).  The Tenth

Circuit has "refused to treat any of the factors cited above as dispositive." Id. "Nor are these factors exclusive." Id. Instead, "[w]hen viewing the totality of the circumstances, it may be that the strong presence of two or three factors demonstrates that a reasonable person would not believe that he was not free to terminate an encounter with government officials." Id.

An officer may seize a person by using physical force on him. See United States v. Harris, 313 F.3d 1228, 1235 (10th Cir. 2002). In United States v. Harris, the defendant ignored an officer and continued walking both times that the officer requested the defendant's identification. See id. The officer then ordered the defendant to remove his hands from his pockets, and when the defendant failed to do so, the officer removed the defendant's "hands from his pockets, and escorted him to the front part of his police car." Id. at 1234. The Tenth Circuit noted that "[a] police officer's assertion of authority without submission by the individual does not constitute a seizure." Id. (citing Bella v. Chamberlain, 24 F.3d 1251, 1255 (10th Cir. 1994)). "Accordingly, Defendant was not seized for purposes of the Fourth Amendment until [the officer] implemented physical force by removing Defendant's hands from his pockets and escorting him to the police car." United States v. Harris, 313 F.3d at 1235.

"An arrest is characterized by highly intrusive or lengthy search or detention, and must therefore be supported by probable cause. Probable cause to arrest exists only when the facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." United States v. Valenzuela, 365 F.3d 892, 896 (10th Cir. 2004)(internal citations and quotation marks omitted). "To determine if probable cause exists, a court looks to "whether at that moment the facts and circumstances within [the officer's] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a

prudent [officer] in believing that the petitioner had committed or was committing an offense." United States v. Snow, 82 F.3d 935, 942 (10th Cir. 1996)(internal quotation marks omitted). "[P]robable cause must exist at the moment of the arrest."  United States v. Hansen,  652 F.2d 1374, 1388 (10th Cir. 1981).

Probable cause is "evaluated in light of circumstances as they would have appeared to a prudent, cautious, trained police officer." Id. (internal quotation marks omitted).  "Probable cause exists where the facts and circumstances within an officer's knowledge and of which he had reasonably trustworthy information are sufficient to warrant a prudent [officer] in believing that an offense has been or is being committed. This is an objective standard; the subjective belief of an individual officer as to whether there is probable cause is not dispositive. " Boydston v. Isom, 224 Fed.Appx. 810, 814 (10th Cir. 2007)(internal citation and quotation marks omitted).  "Probable cause to arrest does not require facts sufficient to establish guilt, but does require more than mere suspicion."  United States v. Vazquez-Pulido, 155 F.3d 1213, 1216 (10th Cir. 1998).

The quantum of evidence sufficient to satisfy probable cause is higher than that for reasonable suspicion.  As the Tenth Circuit stated in United States v. Valenzuela, 365 F.3d 892 (10th Cir. 2004): "Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause." Id. at 896 (internal quotation marks omitted)."That the facts may not support a conclusion that [the defendant] actually violated  the law is irrelevant; reasonable suspicion requires a showing considerably less than preponderance of the evidence, and may be justified on a quantum of evidence far less than that required to establish probable cause."  United States v. Vercher, 358 F.3d 1257, 1263 (10th Cir.

2004)(internal citation and quotation marks omitted).

"[T]he primary concern is whether a reasonable officer would have believed that probable cause existed to arrest the defendant based on the information possessed by the arresting officer." United States v. Valenzuela, 365 F.3d at 896-97.  Probable cause may be based on the collective information of the officers involved in the arrest, "rather than exclusively on the extent of the knowledge of the particular officer who may actually make the arrest."  Karr v. Smith, 774 F.2d 1029, 1031 (10th Cir. 1985).

A court may not "arrive at probable cause by simply piling hunch upon hunch."  United States v. Valenzuela, 365 F.3d at 897.  "To defer to an officer's interpretation of the facts without applying judgment informed by the Fourth Amendment would eviscerate the need for a judicial determination of probable cause."  Id. at 902.

**4.  Search Incident to a Lawful Custodial Arrest.**

"'[A] lawful custodial arrest creates a situation which justifies the contemporaneous search without a warrant of the person arrested and of the immediately surrounding area.'"  United States v. Edwards, 242 F.3d 928, 937 (10th Cir. 2001)(quoting New York v. Belton, 453 U.S. 454, 457 (1981)).  "[T]he scope of a search [incident to arrest] must be strictly tied to and justified by the circumstances which rendered its initiation permissible."  Chimel v. California, 395 U.S. 752, 762 (1969)(internal citations and quotation marks omitted).  Searches incident to arrest are permissible under the law because they allow law-enforcement officers to discover any weapons that may be hidden.

Further, searches to prevent the destruction of evidence by a suspect are permissible within the scope of a search incident to arrest.  As a result, searches incident to arrest can extend to the area within the immediate "control" of the suspect.  Chimel v. California, 395 U.S. at 763 ("mean[ing]

the area from within which he might gain possession of a weapon or destructible evidence").  "A

warrant is not required for a search incident to an arrest because the search prevents the arrestee

from reaching weapons or destructible evidence. . . . The scope of the warrantless search under this

exception is restricted to the person of the arrestee and to any area into which the arrestee could

reach." United States v. Franco, 981 F.2d 470, 472 (10th Cir. 1992).

**5.      The Exclusionary Rule.**

Evidence is not considered

> fruit of the poisonous tree simply because it would not have come to light but for the
> illegal actions of the police. Rather, the more apt question in such a case is whether,
> granting establishment of the primary illegality, the evidence to which instant
> objection is made has been come at by exploitation of that illegality or instead by
> means sufficiently distinguishable to be purged of the primary taint.

Wong Sun v. United States, 371 U.S. at 487-88.  "To suppress evidence as the fruit of [an] unlawful

detention, [the defendant] must make two showings: [(i)] that the detention did violate his Fourth

Amendment rights; and [(ii)] that there is a factual nexus between the illegality and the challenged

evidence."  United States v. DeLuca, 269 F.3d 1128, 1132 (10th Cir. 2001)(internal quotation marks

omitted). Once the defendant has made those showings, then the government must prove that the

evidence the defendant seeks to suppress "is not fruit of the poisonous tree, either by demonstrating

that the evidence would have been inevitably discovered, was discovered through independent

means, or was so attenuated from the illegality as to dissipate the taint of the unlawful conduct."

Id. (internal quotation marks omitted).  A defendant must at least show that "the evidence sought

to be suppressed would not have come to light but for the government's unconstitutional conduct."

Id. (internal quotation marks omitted).

**NEW MEXICO LAW REGARDING ARREST**

New Mexico provides that law-enforcement officers have the authority to arrest a person

without a warrant if the arresting officer has reasonable grounds, based on personal investigation, to believe the person arrested has committed a crime.  See N.M.S.A. 1978, § 66-8-125(B)("To arrest without warrant, the arresting officer must have reasonable grounds, based on personal investigation which may include information from eyewitnesses, to believe the person arrested has committed a crime.").  The Supreme Court of New Mexico has noted:

> [A] crime is committed in the presence of an officer when the facts and circumstances occurring within his observation, in connection with what, under the circumstances, may be considered as common knowledge, give him probable cause to believe or reasonable grounds to suspect that such is the case. . . . Over time, the common law rule has been further limited by both the legislature and the courts. The legislature has created specific exceptions to the "presence" requirement. See, e.g., NMSA 1978, § 66-8-125(B) (1978) (permitting officers in specific circumstances to make a warrantless arrest if "the arresting officer [has] reasonable grounds, based on personal investigation which may include information from eyewitnesses, to believe the person arrested has committed a crime"); NMSA 1978, § 31-1-7(A) (1979) ("Notwithstanding the provisions of any other law to the contrary, a peace officer may arrest a person and take that person into custody without a warrant when the officer is at the scene of a domestic disturbance and has probable cause to believe that the person has committed an assault or a battery upon a household member."). Similarly, New Mexico courts have limited the scope of the misdemeanor arrest rule with the police-team exception to the "presence" requirement.

State v. Ochoa, 2008-NMSC-023, ¶¶ 11-12 , 182 P.3d 130 (internal citation omitted).

## ANALYSIS

Giangola asserts in his supplementary memorandum that the Court should suppress the evidence for two reasons.  First, he asserts that the deputies' initial stop of him was an unreasonable seizure under the Fourth Amendment.  Second, Giangola argues that, even if the police officers acted reasonably in stopping him initially, the officers did not have probable cause to arrest him. Because Giangola has withdrawn his challenge to the search warrant executed at 1320 Tapia, the Court denies Giangola's request to suppress evidence obtained from 1320 Tapia and his request for a Franks hearing as moot.  The Court finds that the officers had a reasonable suspicion that

supported their investigative detention of Giangola, but that the officers exceeded the scope of the investigative detention.  The Court also finds that the detention was not supported by a concern that Giangola would interfere with the execution of the search warrant at 1320 Tapia.  Because the officers also lacked probable cause to arrest Giangola, their frisk of Giangola was unlawful and any evidence obtained after his illegal arrest will be suppressed.

I.     **THE COURT WILL DENY THE MOTION TO SUPPRESS EVIDENCE SECURED FROM THE SEARCH AND THE REQUEST FOR A <u>FRANKS</u> HEARING AS <u>MOOT</u>.**

In his original motion, Giangola argued that the information in the search-warrant affidavit was false, because the electric meter is not located in the area described in the affidavit and because no PNM meter reader would have been at the residence on March 3, 2007.  <u>See</u> Motion ¶ 1, at 1-2. The United States responded that the lawfulness of the search warrant should not be in question, because the police officers had sufficient probable cause to believe that there was crack cocaine use or manufacture within the residence.  <u>See</u> Response at 4.  Finally, the United States argued that, even if the officers did not have complete information for the search warrant, they relied in "good faith" on the information provided and on their independent investigation, which collectively formed the basis of the warrant application.  Response at 10-11.

Based upon the pertinent facts set forth in Sabaugh's affidavit, Judge Murdoch approved and signed the search warrant.  <u>See</u> Supplemental Brief, Exhibit B, Search Warrant at 1(dated March 15, 2007)("Search Warrant").  The state court determined that, under the circumstances, there was, given the PNM employee's tip and the independent investigation detailed by Sabaugh's affidavit, a probability that contraband or evidence of a crime would be found at 1320 Tapia.  <u>See id.</u> Giangola no longer disputes that the deputies had probable cause to apply for and to obtain the search warrant.  <u>See</u> Tr.1 at 7:2-12 (Court & Oliveros)(withdrawing  his argument requesting a

-41-

<u>Franks</u> hearing and proceeding only on the arguments he raised in his supplemental brief).  Hence, there is no strong basis to challenge the validity of the search warrant.  Giangola's request to suppress evidence discovered from execution of the search warrant and his request for a <u>Franks</u> hearing are denied as moot.

## II.    THE COURT NEED NOT DECIDE WHETHER THE OFFICERS ACTED IN <u>GOOD</u> <u>FAITH IN OBTAINING THE SEARCH WARRANT</u>.

The United States argues that, even if the Court were to find that the state search warrant was invalid, the Court should still suppress the evidence against Giangola because the officers executing that warrant had faith in its validity.  <u>See</u> Response 10-11.  The Court has overruled Giangola's challenge to the search warrant as moot.  There is therefore no need for the Court to decide whether the officers acted in good faith in obtaining the search warrant.

## III.   THE DEPUTIES DID NOT HAVE PROBABLE CAUSE TO ARREST GIANGOLA <u>BEFORE THEY CONDUCTED A</u> TERRY <u>STOP ON HIM</u>.

Giangola asserts that the sheriff's deputies arrested him without probable cause.  <u>See</u> Supplemental Brief at 7-10.  The United States concedes that the deputies did not have an arrest warrant, but contend that the officers were authorized to detain Giangola because of their concern for their safety and the safety of the "motoring public who were driving on Isleta Blvd. S.W." Response to Brief at 7.  The United States contends that, once Giangola "resisted arrest and threatened to assault the sheriff's deputy, these law officers had probable cause to arrest him and pat him down for weapons or contraband." <u>Id.</u> at 4.  The United States does not argue that they had probable cause to arrest before the <u>Terry</u> stop.

Moreover, these officers arrested Giangola, not for drugs, but for attempting to assault Maestas and for resisting.  <u>See</u> Response to Brief at 9.  The United States has not argued that they arrested Giangola because of his involvement with drugs.  The United States argued that Giangola's

detention became an arrest as soon as Giangola stopped cooperating and had to be taken to the ground.  See Tr.2 at 50:19-22 (Ortega). While the officers had probable cause to search 1320 Tapia, there was no information particular to Giangola that, before the execution of that search warrant, would allow the officers to arrest him for a narcotics violation.  Accordingly, unless the arrest following the Terry stop was legal, the arrest of Giangola was unlawful.

## IV. BECAUSE THE OFFICERS HAD REASONABLE SUSPICION TO STOP GIANGOLA, THE STOP WAS JUSTIFIED AT ITS INCEPTION.

The Court must conduct a two-part inquiry to determine whether an investigative detention is reasonable under the Fourth Amendment.  See United States v. King, 990 F.2d at 1557.  First, "the officer's action must be justified at its inception."  Id. (internal quotation marks omitted).  The first part of the two-part Terry v. Ohio inquiry is satisfied in this case.

"For an investigative detention, the officer must have an articulable and reasonable suspicion that the person detained is engaged in criminal activity."  United States v. King, 990 F.2d at 1557. The Court concludes that the officers lawfully subjected Giangola to a Terry stop, because the officers had a reasonable suspicion that he was involved in drug trafficking and because they did not want him to interfere with the execution of the search warrant.

The United States offers two justifications for the Terry stop of Giangola.  The United States first maintains that the officers had authority to detain Garcia and Giangola at the traffic stop.  The United States also contends that the deputies were justified in conducting a Terry stop of Giangola and Garcia to ensure that they did not interfere with the execution of the search warrant.  The Court believes that both rationales support the initiation of the Terry stop.

The officers had enough information to have a reasonable suspicion that Giangola had committed, was committing, or was going to commit a narcotics crime.  Maestas knew that Giangola

-43-

was suspected of trafficking crack cocaine at 1320 Tapia.  See Tr.1 at 73:13-18 (Maestas).  At the briefing on the search-warrant execution, Sabaugh told the officers, including Maestas, that Giangola had previous arrests for aggravated assault on a police officer and for bringing contraband into jail so that the officers would be aware that Giangola had a tendency to be violent.  See Tr.1 at 25:8-11 (Sabaugh).  Maestas was aware that a maroon-colored Expedition was associated with 1320 Tapia where the search warrant was going to be executed.  See Tr.1 at 26:18-21; id. at 26:10-14 (Sabaugh).  Hernandez testified that he only stopped the Expedition in a marked unit because he was advised by the Narcotics Division that there was a warrant for the Expedition.  See Tr.1 at 51:20-25 (Ortega & Hernandez); id. at 60:2-5.  Hernandez did not know what kind of a warrant was the basis for his stop of the Expedition.  See Tr.1 at 52:2-5 (Ortega & Hernandez).  Nevertheless, the information within the officers' possession linked Giangola to 1320 Tapia, where officers were going to execute a search warrant; to the Ford Expedition; and to possible narcotics activity at 1320 Tapia.  Maestas and Hernandez were permitted to ask Giangola questions during the Terry stop to dispel or confirm their suspicions that a law had been, or was being, violated.  See Florida v. Royer, 460 U.S. at 498; United States v. Brignoni-Ponce, 422 U.S. at 881-82.  Giangola was under no obligation to respond.  See Berkemer v. McCarty, 468 U.S. at 439.

Giangola's responses, however, did not dispel the officers' suspicions that Giangola was involved in criminal activity and perhaps added to the suspicions that the officers already had.  Once the Expedition was stopped, Maestas spoke with Garcia, and Garcia told him that he lived at 1320 Tapia.  See Tr.1 at 76:15-16 (Maestas).  Garcia told Maestas he knew Giangola and that Giangola was his brother.  See Tr.1 at 76:16-17 (Maestas).  Garcia told Maestas that he was on his way to pick up Giangola from a barbershop and pointed down the street.  See Tr.1 at 76:22-25 (Maestas).  Once the officers saw Giangola, they motioned for him to come over.  See Tr.1 at 54:4-6 (Hernandez).

Maestas recognized Giangola from the picture he was shown at the briefing and saw "consistent tattoos on [Giangola's] neck." Tr.1 at 77:6-8 (Maestas). Once Giangola approached, Hernandez asked Giangola if he was "Billy," Tr.1 at 61:24-62:2 (Oliveros & Hernandez), and Giangola identified himself, see id. at 55:14-16 (Ortega & Hernandez). Giangola told Maestas that his brother was driving the Expedition, see Tr.1 at 77:20-23 (Maestas), and identified the Expedition as his mother's vehicle, see Tr.1 at 56:4-5. Giangola also characterized the Expedition as his vehicle, although the vehicle was registered to his mother. See Tr.2 at 12:19-23 (Giangola). Giangola further told the officers that for whatever they had stopped Garcia, or whatever was in the Expedition was Garcia's, not his. See Tr.1 at 77:20-23 (Maestas); Tr.2 at 12:19-23 (Giangola).

Thus, Maestas' and Hernandez' suspicions that Giangola was involved in criminal activity were reasonable, because they were based on specific, articulable facts that the officers possessed, including: (i) there was probable cause to search 1320 Tapia for evidence of narcotics activity; (ii) the Expedition had been seen at 1320 Tapia; (iii) the Expedition was registered in Giangola's mother's name; (iv) Giangola was suspected of trafficking crack cocaine at 1320 Tapia; (vi) Giangola characterized the Expedition as his vehicle; (vii) Giangola disavowed connection to whatever they might find out about Garcia; and (viii) Giangola did not know about the search warrant. The officers could rationally infer from those facts that Giangola might be engaged in illicit activity, and had reasonable suspicion to subject Giangola to a Terry stop. Thus, the officers' initial Terry stop of Giangola was "justified at its inception." United States v. King, 990 F.2d at 1557.

Moreover, the information upon which Maestas and Hernandez based their reasonable suspicion was not stale. At the April 25, 2008 hearing, Giangola contended that a Terry stop must have a temporal connection with criminal activity. See id. at 26:15-24 (Court & Oliveros). Ms.

Oliveros stated that "in every case [she] ha[s] read in preparing for this [case] there has always been a temporal proximity."  Id. at 26:19-20 (Oliveros).

Timeliness of information, however, is "but one of many factors in the mix when assessing whether reasonable suspicion for an investigatory detention exists, and the relative importance of timeliness in the mix depends on the nature of the criminal activity at issue."  United States v. Cortez-Galaviz, 49 F.3d at 1209.  The timeliness of the information possessed by the officers is judged by the kind of legal infraction at issue.  As the Tenth Circuit explained in United States v. Cortez-Galaviz, if "the legal infraction at issue typically wears on for days or weeks or months (like, say, driving without a license or appropriate emissions and safety certifications), rather than concludes quickly (like, say, jaywalking or mugging), the timeliness of the information on which the government relies to effect an investigative detention 'recedes in importance' compared to other factors, such as the type and duration of offense at issue."  United States v. Cortez-Galaviz, 49 F.3d at 1209.

Giangola contended at the hearing that the officers had information only about Giangola's prior criminal history and "that he had a conviction for assault against a police officer."  Tr.2 at 27:1-3 (Oliveros).  Officers may not base their reasonable suspicion solely upon "knowledge of a person's prior criminal involvement.  See United States v. Sandoval, 29 F.3d at 542 (stating that "knowledge of a person's prior criminal involvement (to say nothing of a mere arrest) is alone insufficient to give rise to the requisite reasonable suspicion.").  The Court does not believe that the officers were relying solely on Giangola's prior criminal history for their reasonable suspicion that he was engaged in criminal activity.  It was merely one factor in the mix, and the more relevant information was fresh.

The Court also does not believe that the information that the officers possessed about

Giangola's association with the Tapia residence was stale, because their information about Giangola was gleaned from March 2, 2007 and March 13, 2007.  Both Maestas and Hernandez obtained their information about Giangola on March 13, 2007.  Maestas received information from Sabaugh's briefing on March 13, 2007, and Hernandez received his information from dispatch and from Maestas on March 13, 2007.  Thus, the information the officers possessed was obtained relatively close in time to their encounter with Giangola, and most of the information was of recent origin.  Compare United States v. Cortez-Galaviz, 49 F.3d at 1209 (holding that twenty-day old information was not stale), with United States v. Sandoval, 29 F.3d at 543 (holding that an officer's use of the defendant's earlier involvement in a hit-and-run incident and a five-year old arrest, without conviction, for a claimed narcotics violation was not a reasonable suspicion to believe that the defendant was violating drug laws at the time the officer stopped him).  Even if the information that Maestas and Hernandez possessed when they detained Giangola was relayed by Sabaugh's observations on March 2, 2007, the information is still only eleven days old and relatively fresh compared to the five-year old information that the Tenth Circuit found stale in United States v. Sandoval and the twenty-day old information that was a legitimate basis for the officer's reasonable suspicion in United States v. Cortez-Galaviz.

The United States also offered a second rationale for their stop and detention of Giangola.  The United States argued that the officers did not want Giangola to interfere with the execution of the search warrant.  The officers knew that a search of the residence was occurring or about to begin.  It was reasonable for the officers to fear that, when Giangola saw the police with Garcia, Giangola might call someone connected with their drug conspiracy and warn them about the police.  Giangola might call someone at the residence.  The Court believes that the police had a reasonable basis to signal Giangola over to the traffic stop and have him stay with them and off the telephone while the

warrant was being executed at the Tapia residence.  The police were not required to let Giangola proceed or phone to the Tapia residence, where the warrant was being executed or was about to be executed.

Accordingly an unconstitutional detention of Giangola  did not taint all the evidence in this matter.  The Court will therefore not suppress any evidence because of the initiation of the detention. See Wong Sun v. United States, 371 U.S. at 487-88 (holding that evidence discovered as the direct consequence of an illegal arrest may be suppressed as "fruit of the poisonous tree").  Evidence secured before the search is admissible.

## V.   HANDCUFFING WAS NOT RELATED IN SCOPE TO THE CIRCUMSTANCES THAT JUSTIFIED THE INITIATION OF THE TERRY STOP.

"The second prong of the reasonableness inquiry of either an investigative detention or a protective search is whether the officer's action is reasonably related in scope to the circumstances which justified the interference in the first place."  United States v. King, 990 F.2d at 1557 (internal citations and quotation marks omitted). While "the use of firearms, handcuffs, and other forceful techniques does not necessarily transform a Terry detention into a full custodial arrest -- for which probable cause is required, the circumstances [must] reasonably warrant such measures."  United States v. Melendez-Garcia, 28 F.3d at 1052 (internal quotation marks omitted).  A "continued detention might not be 'reasonably related in scope to the circumstances' which justified the initial stop." United States v. Jacquez, 409 F.Supp.2d 1286, 1296 (D.N.M. 2005)(Browning, J.)(quoting Terry v. Ohio, 392 U.S. at 20), aff'd, No. 06-2026 (10th Cir. July 9, 2008), available at: http://www.ca10.uscourts.gov.

### A.   ONCE GIANGOLA WAS DETAINED AND NOT USING HIS CELLULAR TELEPHONE, THERE WAS NO REALISTIC DANGER THAT GIANGOLA WOULD INTERFERE WITH THE EXECUTION OF THE SEARCH WARRANT AT 1320 TAPIA.

-48-

The United States contends that, because "the BCSO deputies clearly had reasonable suspicion of criminal activity at the residence, they were reasonable in detaining both Garcia and Giangola during the execution of the search warrant."  Response to Briefing at 6.   The Court does not dispute that this rationale supports the initial <u>Terry</u> stop.  The Court is not convinced, however, that this rationale justifies the handcuffs or the search.

The detectives detained Giangola when he was on foot, over two miles away from the residence to be searched.  While the Court is not convinced that distance alone is dispositive, it is difficult for the United States to argue with force that Giangola -- once detained -- was a threat to the execution of the search warrant when he was in the officers' control, was not on his cellular telephone, and did not know of the execution of the search warrant until Maestas told him about it. Unlike the threat of an occupant present at a residence about to be searched for which there is a limited authority to detain, Giangola was not present at 1320 Tapia when the officers detained him.

In <u>Michigan v. Summers</u>, the Supreme Court explained that:

> In assessing the justification for the detention of an occupant of premises being searched for contraband pursuant to a valid warrant, both the law enforcement interest and the nature of the "articulable facts" supporting the detention are relevant. Most obvious is the legitimate law enforcement interest in preventing flight in the event that incriminating evidence is found. Less obvious, but sometimes of greater importance, is the interest in minimizing the risk of harm to the officers.

452 U.S. at 703-704.  <u>See</u> <u>United States v. Richie</u>, 35 F.3d 1477, 1483 (10th Cir. 1994)(stating that the Supreme Court articulated three law enforcement purposes furthered by detention of an occupant of premises being searched pursuant to a valid warrant, including "1) preventing flight of the individual if incriminating evidence is found; 2) minimizing the risk of harm to the police; and 3) facilitating orderly completion of the search.").  A man detained and off the telephone, not near the

area to be searched, cannot reasonably be believed to pose a threat to the safe and orderly administration of the execution of the search warrant. This assertion particularly true when Giangola had no idea that the officers were executing a search warrant at 1320 Tapia until the officers attempted to handcuff him, and Maestas told him. See Tr.1 at 79:3-4 (Maestas); Tr.2 at 13:17-22 (Ortega & Giangola); Tr.2 at 13:12-17 (Oliveros & Giangola).

The officers also cannot raise a legitimate concern that Giangola might destroy evidence at the Tapia residence when Giangola had no opportunity to use his cellular phone and was in the officers' sight at all times. The officers' attempt to handcuff Giangola resulted in Maestas punching Giangola in the nose with an empty fist, see Tr.1 at 80:4-5 (Maestas), and Maestas punching and kneeing Giangola several times while Giangola was prone on the ground, see Tr.1 at 80:9-13 (Maestas & Ortega). While Maestas justified his conduct by stating that Giangola was not complying with Maestas' commands, the Court finds that Maestas' conduct was not justified by Maestas' concern that Giangola would interfere with the search-warrant execution at 1320 Tapia. See id. at 78:10-12 (Maestas). The officers' conduct of attempting to handcuff Giangola exceeded the scope of their reasonable suspicion that Giangola was possibly involved in drug trafficking and might try to interfere with the  execution of the search warrant at 1320 Tapia and might try to destroy evidence if he went home. Thus, the officers' actions in trying to handcuff Giangola after he was detained and not on the telephone were not "reasonably related in scope to the circumstances which justified the interference in the first place." United States v. King, 990 F.2d at 1557 (internal citations and quotation marks omitted).

**B.  THERE WAS NO NEED TO PREVENT GIANGOLA'S FLIGHT IF INCRIMINATING EVIDENCE WAS FOUND AT 1320 TAPIA.**

There was no need to handcuff Giangola to prevent his flight if incriminating evidence was

found at 1320 Tapia.  Giangola was so far away that he could not see what they were finding.

Moreover, Giangola did not know of the execution of the search warrant until Maestas told Giangola

about it -- after Giangola was told to turn around for the handcuffs.  Further, Giangola gave no

indication before the attempt to handcuff him of fleeing and in fact had obeyed the officers'

direction to come over to the traffic stop.  Under these circumstances, proving Giangola's flight if

incriminating evidence was found at 1320 Tapia, or otherwise, does not provide a reasonable

justification for applying handcuffs to Giangola.

### C.   THE   POLICE  DID  NOT  NEED  TO  HANDCUFF  GIANGOLA  TO MINIMIZE RISK OF HARM TO THEM.

To a certain degree, putting handcuffs on a defendant always minimizes the risk of harm to

the police.  This precaution would be particularly helpful when, as here, the police know that

Giangola had committed violence against police in the past.  The Court believes that, under the

circumstances, however, the handcuffing was not reasonably necessary or appropriate to minimize

the risk of harm to the police.  The standards for evaluating an officer's conduct during a

police/citizen encounter is whether "the facts available to the officer would warrant a man of

reasonable caution in the belief that the action taken was appropriate."  United States v. Melendez-

Garcia, 28 F.3d at 1052. Hernandez testified that he was not concerned about his safety during the

detention of Giangola.  See Tr.1 at 69:2-3 (Ortega & Hernandez)(stating that Hernandez never felt

threatened by Giangola). In contrast, Maestas testified that he was afraid that Giangola was going

to hit or attack him before he handcuffed Giangola.  See Tr.1 at 79:23-24 (Maestas). Maestas

testified that he was concerned that Giangola might have a weapon.  See Tr.1 at 79:25-80:1 (Ortega

& Maestas). Maestas knew Giangola was suspected of trafficking narcotics and did not know

whether Giangola had any weapons on his person.  See Tr.1 at 79:23-24 (Maestas).

The Court concludes that the officers did not have a reasonable fear for their safety before they attempted to handcuff Giangola.  First of all, Giangola had come over to the traffic stop when Maestas motioned him to do so.  Second, before the attempt to handcuff him, Giangola had complied with all commands. Third, Giangola did not verbally threaten Maestas. See Tr.1 at 90:3-4 (Oliveros & Maestas).

While the officers' subjective thoughts whether Giangola posed a threat are not the standard by which the Court should judge whether Giangola posed a threat to the officers or others, the Court notes that, while Maestas testified that he had subjectively felt that Giangola posed a threat to him, Hernandez did not feel threatened.  The Court believes that a reasonable person in Maestas' and Hernandez' position would not have felt threatened by Giangola's pre-handcuffing conduct, and that a reasonable officer would not have believed that handcuffing Giangola was appropriate or necessary to minimize the risk of harm to the officers.  The officers did not have a reasonable fear that Giangola would harm them or others when Giangola was compliant with their requests and inquiries before they attempted to handcuff him.

Moreover, while Maestas may have had a subjective fear that Giangola had a weapon, there is nothing in the record to support that fear.  The United States presented no articulable facts to support such a fear. No weapon was found on Giangola.

Finally, if the officers had a fear that Giangola had a weapon, it would have been more reasonable to ask Giangola if they could frisk him, proceed to frisk him, or even engage in a protective search.  The officers, however, made no attempt to search Giangola until after they succeeded in handcuffing him.  In any case, the officers' failure to conduct any frisk or search before they attempted to handcuff Giangola suggests that any fear that Maestas had that there were weapons lacked a reasonable foundation.

**VI.    THE OFFICERS DID NOT HAVE PROBABLE CAUSE TO ARREST GIANGOLA.**

Because the officers went beyond the scope of the <u>Terry</u>-detention by handcuffing Giangola, they must support their additional intrusion by probable cause or consent to be valid.  <u>See</u> <u>United States v. Perdue</u>, 8 F.3d at 1462 ("An encounter between police and an individual which goes beyond the limits of a <u>Terry</u> stop, however, may be constitutionally justified only by probable cause or consent."). The officers did not have an arrest warrant for Giangola.  <u>See</u> Tr.1 at 85:20-22 (Oliveros & Maestas).  The issue before the Court is whether the officers reasonably arrested Giangola without a warrant.

Before the issue of probable cause can be fully analyzed, however, the Court must first address the preliminary issue of when Giangola was arrested. The United States conceded that the officers did not have probable cause to arrest Giangola before they encountered Giangola on Isleta. <u>See</u> Tr.2 at 21:4-12 (Court & Ortega). The United States argued that Giangola's detention became an arrest as soon as Giangola stopped cooperating and had to be taken to the ground.  <u>See</u> <u>id.</u> at 50:19-22 (Ortega). Giangola, on the other hand, contends that he was arrested "at the moment the [officers] told him to put his hands behind his back and forcefully applied handcuffs on him." Supplemental Brief at 9.  Giangola argues that, because he was not free to leave after the handcuffs were placed on him, he was arrested as soon as he was handcuffed.  <u>See</u> <u>id.</u>

The Court has previously noted that an arrest does not necessarily occur when a detainee is handcuffed.  <u>See</u> <u>United States v. Perea</u>, 374 F.Supp.2d at 977 (holding that it was reasonable to place the defendant in handcuffs "for their safety while they conducted their brief investigative questioning of him to establish his identity and dispel their reasonable suspicions of criminal activity . . . . The officers thus did not transform their investigative detention of [the defendant] into an arrest when they  . . . placed him in handcuffs.").  The Tenth Circuit has identified several factors that are

-53-

relevant in determining whether a person has been seized within the meaning of the Fourth

Amendment, including:

> [(i)]  The threatening presence of several officers; [(ii)] the brandishing of a weapon
> by an officer; [(iii)] some physical touching by an officer; [(iv)] the use of aggressive
> language or tone of voice indicating that compliance with an officer's request is
> compulsory; [(v)] prolonged retention of a person's personal effects; [(vi)] a request
> to accompany the officer to the station; [(vii)] interaction in a nonpublic place or a
> small, enclosed space; [(viii)] and absence of other members of the public.

Jones v. Hunt, 410 F.3d at 1226 (internal quotation marks omitted).  None of these factors alone is

dispositive.  See id.  Instead, the court must determine whether, "[w]hen viewing the totality of the

circumstances, it may be that the strong presence of two or three factors demonstrates that a

reasonable person would not believe that he was not free to terminate an encounter with government

officials." Id.

        A reasonable person in Giangola's position would not have felt free to leave when the

officers began handcuffing him.  While two officers may not be "several," Giangola was confronted

by two officers, so there was more than one officer was present.  Jones v. Hunt, 410 F.3d at 1226

(internal quotation marks omitted)(finding an arrest when there were two police officers and one

school official present). There is no indication that either officer brandished a weapon at Giangola.

There was more than "some" physical touching by Maestas, and Hernandez also touched Giangola.

Id.  Hernandez grabbed Giangola's arm to handcuff him.  Tr.1 at 56:17-18 (Hernandez).  In an

attempt to handcuff Giangola, Maestas then punched Giangola in the nose with an open fist.  See

Tr.1 at 80:4-5 (Maestas).  Giangola was knocked out.  See Tr.2 at 9:3 (Giangola).  When Giangola

did not comply with Maestas' instructions, Maestas hit Giangola two or three more times with his

fist and his knee, in Giangola's arm and leg, until Giangola did put his arm behind his back.

See Tr.1 at 80:9-13 (Maestas & Ortega).  Maestas' and Hernandez' use of force on Giangola was

more than just "some physical touching." Jones v. Hunt, 410 F.3d at 1226 (internal quotation marks omitted).

There is no indication in the record of how Hernandez or Maestas spoke to Giangola, and Giangola did not mention in his testimony whether either officer used aggressive language or tone of voice with him.  The officers, however, initially attempted to handcuff Giangola after identifying him.  See Tr.1 at 55:14-16 (Ortega & Hernandez); id. at 56:10-12 (Hernandez); id. at 64:1-3 (Oliveros & Hernandez). The officers did not tell Giangola they were going to handcuff him before they attempted to do so.  See Tr.1 at 64:1-3 (Oliveros & Hernandez).  While the officers may not have used an aggressive tone to indicate that compliance with their requests was compulsory, the Court believes that an officer's attempt to handcuff a person would indicate to that person that compliance with the officer's request is compulsory.

Although Hernandez retained Giangola's identification throughout the encounter, there was no indication that his retention of Giangola's identification was "prolonged." Jones v. Hunt, 410 F.3d at 1226 (internal quotation marks omitted). Giangola testified that, immediately after he gave his driver's license to Hernandez, Hernandez put his license in his pocket and told Giangola to put his hands behind his back.  See Tr.2 at 13:4-6 (Giangola)(indicating that Hernandez kept Giangola's license in his pocket).  Moreover, there is no indication that the officers requested that Giangola accompany them to the station, because they immediately attempted to handcuff him.

It is true that the officers' encounter with Giangola took place on a public street -- Isleta Boulevard -- between a store and a Sonic drive-in. See Tr.1 at 55:25-54:3 (Hernandez).  Thus, the interaction was not in a nonpublic space or a small, enclosed space.  There is also no indication whether other members of the public were absent.  Nevertheless, although not all of the Jones v. Hunt factors suggest that Giangola was not free to leave, the totality of the circumstances, especially

the nature of the officers' physical contact with Giangola, indicate that Giangola was not free to leave.  See United States v. Harris, 313 F.3d at 1235 ("Accordingly, Defendant was not seized for purposes of the Fourth Amendment until [the officer] implemented physical force by removing Defendant's hands from his pockets and escorting him to the police car.").

Although "the use of firearms, handcuffs, and other forceful techniques does not necessarily transform a Terry detention into a full custodial arrest -- for which probable cause is required -- when the circumstances reasonably warrant such measures," United States v. Melendez-Garcia, 28 F.3d at 1052 (internal quotation marks omitted),  "the use of force such as handcuffs . . . is a far greater level of intrusion, and requires the government to demonstrate that the facts available to the officer would warrant a man of reasonable caution in the belief that the action taken was appropriate, " id. at 1052 (internal quotation marks omitted).  Giangola, unlike the defendant in United States v. Perea was not "suspected of being a homicide suspect."  United States v. Perea, 374 F.Supp.2d at 976 n.21.  Moreover, Hernandez and Maestas, like the officers in United States v. Melendez-Garcia, "lacked any such belief or suspicion of possible threat to officer safety." United States v. Perea, 374 F.Supp.2d at 976  n.21.  Because the officers did not suspect that Giangola was a "suspect wanted for homicide" or some other violent crime, it was not reasonable for the officers to handcuff Giangola.  United States v. Perea, 374 F.Supp.2d at 976. This conduct and situation was unlike the officers' conduct and circumstances in United States v. Perea.

The circumstances of the encounter between Giangola and the officers were more like the circumstances in United States v. Melendez-Garcia.  "Drugs and guns and violence often go together, and thus [that the officers' stop of Giangola was based on suspicion that he was trafficking drugs] might be a factor tending to support an officer's claim of reasonableness." 28 F.3d at 1052. Maestas and Hernandez, however, "gave no reasons why the circumstances of the stop reasonably

necessitated the display of firearms and the use of handcuffs."  28 F.3d at 1052.

Like the evidence in United States v. Melendez-Garcia, Hernandez' and Maestas' testimony did not suggest that Giangola "had guns or w[as] violent or that the circumstances of this particular encounter warranted the unusual intrusiveness of handcuffing the defendants during the Terry stop." United States v. Melendez-Garcia,  28 F.3d at 1052-53.  Thus, "[i]n the absence of such evidence, the naked fact that drugs are suspected will not support a per se justification for use . . .  [of] handcuffs in a Terry stop."  Id. at 1053.  The United States has not "met its burden of showing that, under the totality of the circumstances, the intrusiveness of this seizure was reasonably necessary for officer safety."  Id. at 1053.   Giangola, as a handcuffed person, would not have felt free to terminate the encounter and leave.  See id. at 1053 ("[G]iven that [the defendant] was handcuffed and strapped into an officer's car, it is obvious that a reasonable person in [the defendant's] condition would not have felt free to terminate the encounter and leave.").

Maestas' and Hernandez' handcuffing of Giangola was also not justified by a suspicion that he was a "wanted felon [who] will attempt to flee and may jeopardize the safety of officers in such an attempt."  United States v. Shareef, 100 F.3d at 1507.  Once Hernandez and Maestas confirmed Giangola's identity, they knew that he was associated with an address where a search warrant was being executed, but like the officers' use of force in United States v. Shareef, "the continued use of handcuffs constituted an unlawful arrest."  Id.  Moreover, Giangola was not present at the Tapia residence while the search warrant was being executed, so his detention is distinguishable from the defendant's detention in United States v. Bennett.  See 329 F.3d at 774 (holding that the officers acted reasonably when handcuffing a defendant at a residence where a search warrant was being executed because the defendant initially disobeyed police orders to stop and entered his garage at the residence where the search warrant was to be executed, the police were unaware of the

defendant's activities in the garage, and suspected the defendant of being a drug dealer who carried a firearm).  Accordingly, this Court concludes that, under the circumstances of this case, the officers placed Giangola under arrest when they attempted to handcuff him.

The officers handcuffing of Giangola is distinguishable because of the involuntary, "highly intrusive or lengthy" nature of the encounter.  Oliver v. Woods, 209 F.3d at 1186 (internal quotation marks omitted).  The Court believes that the officers' extreme physical touching of Giangola and the threatening presence of several officers indicate that Giangola was arrested and not free to leave. While handcuffing a person will not always immediately result in arrest, under these circumstances the officers' handcuffing Giangola constituted an arrest.

The officers' handcuffing of Giangola's was not supported by probable cause.  At the time of the handcuffing, there was no evidence that the officers had probable cause that Giangola was in the process of or about to commit a crime.  The information that the officers possessed about Giangola at the moment of his arrest was: (i) there was probable cause to search 1320 Tapia for evidence of narcotics activity; (ii) the Expedition had been seen at 1320 Tapia; (iii) the Expedition was registered in Giangola's mother's name; (iv) Giangola was suspected of trafficking crack cocaine at 1320 Tapia; (vi) Giangola characterized the Expedition as his vehicle; (vii) Giangola disavowed connection to whatever they might find out about Garcia; and (viii) Giangola did not know about the search warrant.  While these facts support reasonable suspicion, these facts do not amount to probable cause.  The United States admits that it did not have probable cause to arrest Giangola until after the scuffle ensued.

Probable cause to arrest means that police officers have a reasonable belief that an offense has been or is being committed by the person arrested.  The Supreme Court has explained:

It is basic that an arrest with or without a warrant must stand upon firmer ground

than mere suspicion . . .  though the arresting officer need not have in hand evidence which would suffice to convict. The quantum of information which constitutes probable cause -- evidence which would warrant a man of reasonable caution in the belief that a felony has been committed . . . must be measured by the facts of the particular case.

Wong Sun v. United States, 371 U.S. at 479.  "[P]robable cause must exist at the moment of the arrest."  United States v. Hansen,  652 F.2d at 1388.

The United States conceded that the officers did not have probable cause to arrest Giangola before they encountered Giangola on Isleta.  See Tr.2 at 21:4-12 (Court & Ortega). The United States argues that Giangola's detention became an arrest as soon as Giangola stopped cooperating and Maestas took Giangola to the ground.  See id. at 50:19-22 (Ortega).  There was, however, no conduct by Giangola or additional information obtained by the officers between the time of their encounter of Giangola and their attempt to handcuff Giangola that gave them probable cause.  The officers' reasonable suspicion that Giangola was trafficking drugs was not probable cause for Giangola's arrest.  As the Tenth Circuit stated in United States v. Valenzuela, 365 F.3d 892 (10th Cir. 2004): "Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause." Id. at 896 (internal quotation marks omitted).  Accordingly, Giangola's arrest was unconstitutional when the officers attempted to handcuff him in violation of his Fourth Amendment rights.

## VII.   THE DEPUTIES WERE NOT JUSTIFIED IN SEARCHING GIANGOLA AFTER THEY ATTEMPTED TO HANDCUFF HIM.

Because the handcuffing and arrest of Giangola was unlawful, the discovery cannot be justified as a lawful search.  The search was post-arrest and cannot be fairly characterized as a frisk

or protective search.  And because the arrest was without probable cause, the search cannot be justified as incident to a lawful arrest.

A.      THE OFFICERS DID NOT CONDUCT A LAWFUL PROTECTIVE SEARCH.

The United States contends that the officers were justified in doing a protective search of or frisking Giangola, because "the officers were clearly concerned for their safety and for the safety of the motoring public who were driving on Isleta."  Response to Brief at 7.  The United States argues that "[t]he protective search of Giangola was therefore 'justified at its inception,' because the deputies had an articulable and reasonable suspicion that Giangola could be armed and dangerous." Id.  The United States further argues that the protective search was within the scope of the officers' reasonable suspicion that Giangola was guilty of "drug manufacture and distribution."   Id.

The officers problem with this argument is the chronology of events.  The officers did not conduct the frisk or protective search before the arrest, but after. If the arrest were lawful, the search most likely would have been, too.  In any case, the officers cannot justify the unlawful arrest with a post-arrest search.  See United States v. King, 990 F.2d at 1557 (explaining that a frisk "permits an officer, in the course of an investigative detention, to conduct a limited search for weapons for his or her own protection" and that "[f]or a protective search to be justified at its inception, the officer must not only harbor an articulable and reasonable suspicion that the person is armed and dangerous, the officer must also be entitled to make a forcible stop.)(internal quotation marks omitted); United States v. Mitchell, 61 Fed.Appx. 616, 619 (10th Cir. 2003)(explaining that a officer's frisk of defendant and of defendant's coat, who had been detained for shoplifting, was not incident to an arrest, and therefore suppression of firearm found in coat was required because the officer had no probable cause for arrest as the store manager, at time of frisk, had not yet provided

officer with any factual support for his allegation that defendant had stolen a pair of pants).

Moreover, the attempt to handcuff cannot itself be fairly characterized as a frisk or protective search.  Hernandez grabbed Giangola by his wrist, and Maestas punched Giangola's nose with an empty fist, and kneed and punched Giangola while Giangola was lying prone on the ground. If Maestas was concerned about weapons or the necessity of a protective search, he could have engaged in less violent conduct, such as frisking Giangola, without placing him in handcuffs or punching Giangola in the nose.  Maestas' and Hernandez' conduct, under the facts available to them, would not "would warrant a man of reasonable caution in the belief that the action taken was appropriate,"  United States v. Melendez-Garcia, 28 F.3d at 1052, or in the belief that they were conducting a protective frisk or arrest.

### B.   THE OFFICERS WERE NOT JUSTIFIED IN SEARCHING GIANGOLA'S PERSON AS INCIDENT TO AN ARREST.

Incident to the unlawful arrest of Giangola, the deputies located in Giangola's right front pants pocket one baggie containing suspected crack cocaine and three smaller baggies containing suspected powder cocaine.  See Response to Brief at 9.  Because the officers' arrest of Giangola was unconstitutional and not supported by probable cause, their search of Giangola incident to that arrest was unlawful.  "'[A] lawful custodial arrest creates a situation which justifies the contemporaneous search without a warrant of the person arrested and of the immediately surrounding area.'"  United States  v. Edwards, 242 F.3d at 937 (10th Cir. 2001)(quoting New York v. Belton, 453 U.S. at  457 (1981)(emphasis added).  Because there was no lawful custodial arrest of Giangola, the officers were not permitted to search Giangola's person or any area that Giangola could reach.  See United States v. Franco, 981 F.2d at 472 ("A warrant is not required for a search incident to an arrest because the search prevents the arrestee from reaching weapons or destructible evidence. . . . The scope of the

warrantless search under this exception is restricted to the person of the arrestee and to any area into which the arrestee could reach.").

The United States does not attempt to justify the search as incident to the <u>Terry</u> stop.  Nor could it reasonably make the argument.  The Court has determined that the officers did not have a reasonable fear for their safety, and thus a search would have exceeded the scope of the <u>Terry</u> stop just as the handcuffs would.

## VIII. THE COURT WILL SUPPRESS ALL EVIDENCE GAINED FROM THE OFFICER'S ILLEGAL ARREST AND SEARCH OF GIANGOLA INCIDENT TO THAT ARREST.

Evidence is not considered

fruit of the poisonous tree simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.

<u>Wong Sun v. United States</u>, 371 U.S. at 487-88.  "To suppress evidence as the fruit of [an] unlawful detention, [the defendant] must make two showings: [(i)] that the detention did violate his Fourth Amendment rights; and [(ii)] that there is a factual nexus between the illegality and the challenged evidence."  <u>United States v. DeLuca</u>, 269 F.3d at 1132 (internal quotation marks omitted).

Giangola has demonstrated that the officers' detention of him violated his Fourth Amendment rights.  Giangola is not asking the Court to suppress the evidence that came from the search warrant executed at the residence but is asking only that the Court suppress the evidence that the police found in his pockets incident to his arrest and any statements he made after the officers attempted to handcuff him.  <u>See</u> Tr.2 at 37:3-9 (Court & Oliveros).  There is a factual nexus between the illegality and the challenged evidence, because the baggies containing crack cocaine and powder cocaine, as well as any statements Giangola made post-arrest, were obtained as a direct result of the

officers' illegal arrest of Giangola.  The United States does not argue that the evidence Giangola

seeks to suppress "is not fruit of the poisonous tree, either by demonstrating that the evidence would

have been inevitably discovered, was discovered through independent means, or was so attenuated

from the illegality as to dissipate the taint of the unlawful conduct."  United States v. DeLuca, 269

F.3d at 1132.

The officers' actions do not taint all evidence gained in this matter, but do taint all evidence

gained by and after the unconstitutional arrest of Giangola.  The Court will therefore suppress all

evidence resulting from the search incident to that arrest and any statements that he made following

that unlawful arrest.

**IT IS ORDERED** that the Motion to Suppress Evidence is granted in part and denied in part

as moot.  The Court held two evidentiary hearings.  The Court will suppress all evidence seized

incident to Defendant Billy Giangola's handcuffing and arrest, and all Giangola's statements made

following his handcuffing.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Gregory J. Fouratt
    United States Attorney for the District of New Mexico
Larry Gomez
Fred J. Federici, III
Roberto D. Ortega
    Assistant United States Attorneys for the District of New Mexico
Albuquerque, New Mexico

    *Attorneys for the Plaintiff*

-63-

Louren M. Oliveros
Gorence & Oliveros, P.C.
Albuquerque, New Mexico

*Attorneys for the Defendant*